**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS CUSTOMER PREFERENCE | ) | Adv. Pro. No. 24-04024 (MG) |
| ACTIONS. | ) | |
| | ) | |

## DEFENDANTS' JOINT OPENING BRIEF REGARDING PHASE ONE ISSUES

### Issues Presented

1. Whether the definition of "Withdrawal Preference Exposure" under the Plan governs, or 11 U.S.C. §§ 547(c) and 550, govern for purposes of calculating the amount of the Defendants' potential liability in the Avoidance Actions.

2. Whether the presumption against extraterritoriality is applicable to the Avoidance Actions, and if so, whether 11 U.S.C. § 547 applies extraterritorially.

3. Whether the Court has specific personal jurisdiction over Defendants in connection with the Avoidance Actions.

## <u>TABLE OF CONTENTS</u>

I.   THE SCOPE OF DEFENDANTS' POTENTIAL PREFERENCE LIABILITY IS
     GOVERNED BY THE TERMS OF THE DEBTORS' CONFIRMED CHAPTER 11
     PLAN ................................................................................................................. 1

     A.    INTRODUCTION ................................................................................... 1

     B.    FACTS ..................................................................................................... 3

           1.   The Debtors' Plan and Disclosure Statement clearly define customers'
                potential preference liability, both before and after Plan effectiveness, as
                their "Withdrawal Preference Exposure." .............................................. 3

           2.   The Debtors' mathematical errors in calculating customers' Withdrawal
                Preference Exposure created concerns that such errors might become *res
                judicata.* .................................................................................................... 6

           3.   After the Plan was confirmed and became effective, the Debtors continued
                to tell customers that the preference exposure they would need to resolve
                with Plaintiff was their "Withdrawal Preference Exposure," as defined in
                the Plan..................................................................................................... 9

           4.   Once Plaintiff took control of the avoidance actions against customers, he
                immediately disregarded the provisions of the confirmed Plan that he
                believed to be unfavorable to him........................................................ 11

           5.   The Plan Administrator has continued to advise customers that they must
                resolve their Withdrawal Preference Exposure, *as defined in the Plan*, in
                order to be eligible to receive their distributions. ................................ 13

     C.    ARGUMENT ......................................................................................... 14

           1.   The unambiguous language of the Plan shows that the definition of
                "Withdrawal Preference Exposure" continues to control after the Effective
                Date...................................................................................................... 14

           2.   The Debtors and their customers contractually agreed in the Plan on the
                methodology for determining customers' potential liability, and Plaintiff is
                bound by that agreement....................................................................... 17

           3.   Plaintiff is estopped from seeking to recover amounts other than
                Withdrawal Preference Exposure because of the Debtors' repeated
                representations to customers that their potential preference liability was
                their Withdrawal Preference Exposure. ............................................... 22

II.  THE PRESUMPTION AGAINST EXTRATERRITORIALITY APPLIES TO
     PREFERENCE CLAIMS BROUGHT UNDER 11 U.S.C. § 547 ...................................... 24

III. PERSONAL JURISDICTION IS A FACT-INTENSIVE QUESTION THAT
     CANNOT BE DECIDED BY THE COURT AT THIS STAGE.......................................... 29

IV.  CONCLUSION.................................................................................................... 36

i

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Adelphia Recovery Trust v. Bank of Am., N.A.*,
 390 B.R. 80 (S.D.N.Y. 2008) *aff'd,* 379 Fed. Appx. 10 (2d Cir. 2010) ..................................17

*In re CIL Ltd.*,
 582 B.R. 46 (Bankr. S.D.N.Y. 2018), *amended on reconsideration*, 2018 WL
 3031094 (Bankr. S.D.N.Y. June 15, 2018) ..............................................................................25

*Donaldson v. Bernstein*,
 104 F.3d 547 (3d Cir. 1997) ....................................................................................................23

*EEOC v. Arabian Am. Oil Co.*,
 499 U.S. 244 (1991) ...........................................................................................................24, 26

*Eurotech Dev. Inc. v. Adirondack Pennysaver Inc.*,
 224 A.D.2d 738, 636 N.Y.S.2d 956 (1996) .............................................................................33

*In re Evergreen Solar, Inc.*,
 2014 WL 300965 (Bankr. D. Del. Jan. 28, 2014) ...................................................................17

*Flextronics Da Amazonia Ltda. v. CRW Plastics USA, Inc.*,
 2023 WL 8270818 (2d Cir. Nov. 30, 2023) .............................................................................33

*In re French*,
 440 F.3d 145 (4th Cir. 2006) ..................................................................................................25

*In re Friedman's, Inc.*,
 356 B.R. 766 (Bankr. S.D. Ga. 2006) ...............................................................................18, 19

*In re GBG USA Inc.*,
 666 B.R. 115 (Bankr. S.D.N.Y. 2024) .....................................................................................30

*Gucci Am., Inc. v. Frontline Processing Corp.*,
 721 F. Supp. 2d 228 (S.D.N.Y. 2010) ...............................................................................30, 36

*IQMax, Inc. v. Fusion PM Holdings, Inc.*,
 2023 WL 2290815 (2d Cir. Mar. 1, 2023) ..............................................................................16

*Licci ex rel. Licci v. Lebanese Canadian Bank*,
 SAL, 732 F.3d 161 (2d Cir. 2013) ...........................................................................30, 31, 35

*In re Maxwell Commc'n Corp. plc by Homan*,
 93 F.3d 1036 (2nd Cir. 1996) ..................................................................................................26

*Maxwell Communication Corp. plc v. Barclays Bank (In re Maxwell Commc'n
    Corp. plc)*,
    170 B.R. 800, 809 (Bankr. S.D.N.Y. 1994), *aff'd*, 186 B.R. 807
    (S.D.N.Y.1995), *aff'd on other grounds*, 93 F.3d 1036 (2d Cir.1996) ..................................26

*Meghji v. Spadafora*,
    Adv. Pro. No. 24-03981 (Bankr. S.D.N.Y.) (April 28, 2025) ................................31

*In re Momentum Mfg. Corp.*,
    25 F.3d 1132 (2d Cir. 1994)...................................................................................23

*Morrison v. Nat'l Australia Bank Ltd.*,
    561 U.S. 247 (2010).......................................................................................24, 26

*Nat'l Ass'n v. Bank of Am. N.A.*,
    916 F.3d 143 (2d Cir. 2019).....................................................................................30

*In re Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Sec. LLC*,
    917 F.3d 85 (2d Cir. 2019)....................................................................27, 28, 29

*RJR Nabisco, Inc. v. European Cmty.*,
    579 U.S. 325 (2016).......................................................................................24, 25

*In re Sec. Inv. Protection Corp. v. Bernard L. Madoff Inv. Sec.*,
    480 B.R. 501 (Bankr. S.D.N.Y. 2012) ...................................................................27

*In re Serv. Plastics, Inc.*,
    1997 WL 657119 (Bankr. N.D. Ill. Oct. 20, 1997) ................................................18

*Sillam v. Labaton Sucharow LLP*,
    No. 21 CV 6675 (CM), 2022 WL 1448673 (S.D.N.Y. May 9, 2022) ....................34

*Spizz v. Goldfarb Seligman & Co. (In re Ampal-Am. Isr. Corp.)*,
    562 B.R. 601 (Bankr. S.D.N.Y. 2017)................................................................25, 27

*In re Texaco, Inc.*,
    2025 WL 582462 (Bankr. S.D.N.Y. Feb. 21, 2025) ..............................................16

*United Student Aid Funds, Inc. v. Espinosa*,
    559 U.S. 260 (2010).................................................................................................18

*Walden v. Fiore*,
    571 U.S. 277 (2014).................................................................................................30

*Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*,
    543 B.R. 127 (Bankr. S.D.N.Y. 2016) ...................................................................25

*Wexler v. Allegion (UK) Ltd.*,
   374 F. Supp. 3d 302 (S.D.N.Y. 2019) ...................................................................21

*Wynn v. AC Rochester*,
   273 F.3d 153 (2d Cir. 2001) ...................................................................................34

*In re Zetta Jet USA, Inc.*,
   2020 WL 7682136 (Bankr. C.D. Cal. July 29, 2020) ...........................................25

**Statutes**

11 U.S.C. § 523(a)(8) ....................................................................................................18

11 U.S.C. § 541(a) .........................................................................................................25

11 U.S.C. § 546(a) .........................................................................................................18

11 U.S.C. § 546(e) ...........................................................................................................1

11 U.S.C. § 547 ...................................................................................................... *passim*

11 U.S.C. § 548 ..............................................................................................................27

11 U.S.C. § 550 ........................................................................................................14, 27

18 U.S.C. § 1957(d)(2) ..................................................................................................25

**Other Authorities**

Companies (Winding Up and Miscellaneous Provisions) Ordinance (Cap. 32) §
   266(4) ....................................................................................................................26

Regulation (EU) No. 1215/2012 of the European Parliament and of the Council,
   art. 19(1), 2015 O.J. (L 351) ................................................................................35

I.    **THE SCOPE OF DEFENDANTS' POTENTIAL PREFERENCE LIABILITY IS GOVERNED BY THE TERMS OF THE DEBTORS' CONFIRMED CHAPTER 11 PLAN**

A.    **INTRODUCTION**

As Defendants will demonstrate during Phase Two, they have no liability to Plaintiff. Every transfer that Plaintiff seeks to avoid and recover was made in the ordinary course of business and according to ordinary business terms, and moreover is shielded by the safe harbor of § 546(e) of the Bankruptcy Code. But even if Defendants did not have multiple complete defenses to liability, they would at most be liable for a fraction of the amounts Plaintiff now demands. Plaintiff contends that he can recover the current, appreciated value of any coins that a Defendant withdrew during the preference period—regardless of whether the Defendant still has those coins or divested them years ago. That position is completely at odds with the provisions of the Debtors' confirmed Plan.

In their Plan, the Debtors created a specific methodology for determining the amounts that potentially could be clawed back from customers—expressly defined in the Plan as "Withdrawal Preference Exposure."[1] In creating this methodology, the Debtors elected to fix the transfers that could be recovered from customers at their dollar value "*as of the time of such withdrawals,*" less the aggregate dollar value of *all* deposits made after the first such withdrawal.

The Debtors use the defined term "Withdrawal Preference Exposure" throughout their Plan and Disclosure Statement to describe the potential preference liability that customers would face both before and after the Plan's Effective Date. They expressly disclosed to customers that if customers did not settle their Withdrawal Preference Exposure pursuant to the settlement offered under the Plan, they would have to resolve their Withdrawal Preference Exposure (i.e., the Plan-

---

[1] *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates (Conformed for MiningCo Transaction),* Docket No. 4289, at 24.

1

defined potential liability) later with Plaintiff.

Customers specifically and understandably relied on the Debtors' disclosures and the terms
of the Plan in deciding whether to object to the Plan and how or whether to vote on it, including
whether to grant third party releases or to contribute their own individual causes of action to
Plaintiff.

It is outrageous for Plaintiff—who stands in the shoes of the Debtors' estates with respect
to these preference claims and is represented by the same lawyers (White & Case) that represented
the Creditors' Committee in the negotiations of the Plan[2]—now to claim that he is not bound by
the unambiguous terms of the Debtors' Plan. Curiously, Plaintiff seeks to enforce certain provisions
of the definition of Withdrawal Preference Exposure that are advantageous to him, while evidently
believing that he can simply ignore the parts that don't suit him. Specifically, Plaintiff asserts that
he is entitled to avoid and recover loan proceeds—amounts that were advanced to customers on
account of loans they took from Celsius, and not on account of antecedent debt—that are
"preferential" only because the Plan's definition of Withdrawal Preference Exposure makes them
so. Yet, eschewing consistency, Plaintiff ignores other parts of the definition of Withdrawal
Preference Exposure by demanding that Defendants repay *today's* value of the coins they withdrew
rather than the transfer date value and by failing to count as new value any deposits that would
reduce net preference exposure below zero.

Plaintiff may not like all the terms of the Plan, but he cannot pick and choose which he will
follow. He is bound by all the terms of the Plan[3] and is barred from seeking to impose liability on

---

[2] Plan, Art.IV.L.1 (stating that Plaintiff serves as a representative of the Debtors' estates).

[3] *See Third Notice of Filing of Plan Supplement*, Docket No. 3444, Ex. E at 2 ("The Litigation administrator
agrees to accept and administer the Post-Emergence Claims on behalf of the Claims Holders, ***subject to the
provisions of the Plan*** ….") (emphasis added); *id.* at 6 ("The Litigation Administrator shall (i) serve as a
mechanism for prosecuting all Post-Emergence Claims, resolving all Post-Emergence Claims, monetizing

2

Defendants that is different from what the Plan permits.

      **B.**     **FACTS**

            **1.**     **The Debtors' Plan and Disclosure Statement clearly define customers' potential preference liability, both before and after Plan effectiveness, as their "Withdrawal Preference Exposure."**

On August 15, 2023, the Debtors filed their *Fourth Revised Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3319] (the "Solicitation Version Plan" and, as subsequently modified, the "Plan"). On August 17, 2023, the Debtors filed their *Fourth Revised Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3332] (the "Disclosure Statement").

The Solicitation Version Plan, like each prior version of the Debtors' plan, contemplated that a Litigation Administrator would pursue preference claims against Celsius's customers. The Debtors created a simplified methodology for measuring those customers' potential preference liability, which they termed "Withdrawal Preference Exposure." Under the Solicitation Version of the Plan, Withdrawal Preference Exposure is defined as:

> (i) the aggregate value of all assets an Account Holder withdrew from the Debtors' platform in the 90 days prior to the Petition Date (i.e., on or after April 14, 2022), valued as of the time of such withdrawals *less* (ii) the aggregate value of any deposits such Account Holder made after such Account Holder's first withdrawal in such period, valued as of the time of such deposits. The details of how Withdrawal Preference Exposure is calculated are included in Article.III.PP of the Disclosure Statement.[4]

Nothing in the definition of Withdrawal Preference Exposure suggests that its methodology

---

the Post-Emergence Claims, distributing the Litigation Proceeds and closing the Chapter 11 Cases, in each case, ***in accordance with the Plan*** . . . .") (emphasis added).

[4] Plan at 24 (emphasis in original).

3

for measuring customers' potential preference liability was to be used solely for purposes of the Account Holder Avoidance Action Settlement and would have no post-Effective Date application. To be sure, the Plan does use the term Withdrawal Preference Exposure in the context of the Account Holder Avoidance Action Settlement, but it is not limited to that context.

Pursuant to the Account Holder Avoidance Action Settlement, the Debtors released all avoidance actions against (i) customers with Withdrawal Preference Exposure under $100,000 who voted in favor of the Plan and did not opt out of the Plan releases, and (ii) customers with Withdrawal Preference Exposure of more than $100,000 who voted in favor of the Plan, did not opt out of the Plan releases, and paid 27.5% of the Withdrawal Preference Exposure amount. In the Disclosure Statement, the Debtors made clear, however, that customers' preference liability if they did *not* accept the Settlement would be their Withdrawal Preference Exposure—not some other amount. Specifically, the Disclosure Statement provides:

> Pursuant to section 547 of the Bankruptcy Code, the Debtors can pursue Avoidance Actions against Account Holders for certain withdrawals Account Holders made from the Debtors' platform within 90 days of the Petition Date, which are referred to as "preferences." **An Avoidance Action would be pursued by filing a lawsuit against the Account Holder requesting the return of the withdrawals identified as preferences. As defined under the Plan, an Account Holder's Withdrawal Preference Exposure is** (i) the aggregate value of all assets an Account Holder withdrew from the Debtors' platform in the 90 days prior to the Petition Date (i.e., between April 14, 2022, and July 13, 2022), **valued as of the time of such withdrawals**, minus (ii) the aggregate value of any deposits such Account Holder made after such Account Holder's first withdrawal in this period, **valued as of the time of such deposits**.[5]

In other words, the Debtors disclosed to customers that their potential preference liability

---

[5] Disclosure Statement at 76 (emphasis added).

in a lawsuit would consist of what the Plan defined as their "Withdrawal Preference Exposure." Article.III.PP of the Disclosure Statement, incorporated by reference in the definition of Withdrawal Preference Exposure, goes on to describe at length which types of transactions are deemed to be "withdrawals" that increase Withdrawal Preference Exposure, and which count as "deposits" that decrease Withdrawal Preference Exposure.[6] Notably, one of the types of transactions deemed to be a "withdrawal" increasing Withdrawal Preference Exposure is the funding of loans *from* Celsius *to* customer-borrowers, even though such transfers indisputably were not on account of any antecedent debt.[7]

Nowhere in the Disclosure Statement did the Debtors even hint at the notion that if customers did not settle, their potential liability would *not* be their Withdrawal Preference Exposure as defined in the Plan, but rather the current market value of their coins. Nowhere in the Disclosure Statement did the Debtors disclose to customers that if they did not settle, their potential liability would *not* be reduced by all of the "deposits" described, but only by some of them or none at all.

Moreover, the definition of Withdrawal Preference Exposure is used in other contexts in the Plan: (i) with respect to the treatment of Allowed General Custody Claims; (ii) with respect to provisions governing post-Effective Date distributions; and (iii) with respect to the establishment of reserves for disputed claims on and after the Effective Date.

- Treatment of Allowed General Custody Claims. The Plan provides that "Custody Settlement Participants that (1) are not Excluded Parties and (2) have Withdrawal

---

[6] *Id.* at 76-81.

[7] *Fourth Revised Disclosure Statement*, Docket No. 3332, at 78 (stating that amounts funded for loans from Celsius to account holders "[i]ncreases Account Holder's Withdrawal Preference Exposure if Incoming Loan Principal Payment is made to Custody or made in USD").

Preference Exposure under $100,000 shall receive a 100% recovery under Treatment A."[8]

- Provisions Governing Distributions. The Plan provides that "the Distribution Agent shall not be required to make a distribution to any Account Holder with unresolved Withdrawal Preference Exposure until such Withdrawal Preference Exposure is resolved."[9] In other words, a customer will be entitled to his post-Effective Date distribution once he resolves his Withdrawal Preference Exposure—i.e., what the Plan defines as the aggregate transfer-date value of all withdrawals during the preference period, less the aggregate transfer-date value of all deposits made after the first withdrawal. Notably, the Plan does not require a customer to resolve all preference liability before obtaining a distribution, as would be typical.

- Setting the Disputed and Contingent Claims Reserve. The Plan provides for the establishment, on or after the Effective Date, of one or more reserves for disputed claims, including a reserve for claims "where the Holder is or may be subject to an Avoidance Action."[10] The amounts of such reserves are to be determined "consistent with the Proof of Claim Filed by the applicable Holder of such Disputed Claim and/or the Withdrawal Preference Exposure amount associated with such Claim."[11]

These provisions clearly demonstrate that the definition of Withdrawal Preference Exposure is applicable beyond the bounds of the Account Holder Avoidance Action Settlement, and continues to have life after the Effective Date.

### 2. The Debtors' mathematical errors in calculating customers' Withdrawal Preference Exposure created concerns that such errors might become *res judicata*.

On or about August 24, 2023, the Debtors began disseminating their Plan solicitation package to customers by email.[12] Each customer was provided with a link to a customized ballot, which indicated, among other things, whether the customer had Withdrawal Preference Exposure

---

[8] Plan at 32.

[9] Plan at 64.

[10] Plan at 8.

[11] *Id.* at 68.

[12] *Notice Regarding E-Mail Distribution of Solicitation Packages and Related Materials*, Docket No. 3354.

as well as Celsius's calculation of that amount.[13] Celsius's calculations of customers' Withdrawal Preference Exposure created questions for many customers. For one thing, the calculations failed to take into account amounts that some customers had already paid pursuant to the pre-confirmation Custody Settlement, raising the concern that—either deliberately or through inadvertence—the Debtors would seek to recover such inflated amounts, and that customers would be forced to spend time and resources trying to prove that they had already settled the Custody portion of their Withdrawal Preference Exposure.[14] In other instances, the calculations overlooked transactions that should have counted as "new value" under the methodology spelled out in the Disclosure Statement, or inappropriately treated as withdrawals transactions that were simply transfers from one Earn account to another Earn account owned by the same customer on the Celsius platform.

On September 18, 2023, attempting to clarify some of these issues, the Debtors filed a *Notice Regarding Calculation of Withdrawal Preference Exposure* [Docket No. 3488] (noting that "since the commencement of Solicitation on the Debtors' plan of reorganization . . . the Debtors have received numerous inquiries about the calculation of Account Holders' withdrawal preference exposure (the 'Withdrawal Preference Exposure'), as listed in their ballots (the 'Ballots'), and

---

[13] *Order (I) Approving the Adequacy of the Debtors' Disclosure Statement, (II) Approving the Solicitation and Voting Procedures with Respect to Confirmation of the Debtors' Joint Plan of Reorganization, (III) Approving the Form of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, (V) Authorizing and Approving Reimbursement of Certain of the Plan Sponsor's Fees and Expenses, and (VI) Granting Related Relief*, at 53-76.

[14] *See* Exhibit A, Email from D. Kovsky to C. Koenig (Sept. 12, 2023) ("This customer had $102,566.26 in Custody and withdrawals off the platform of $165,542.98. She accepted the Custody settlement so she should have no preference exposure as to the Custody piece. Yet her ballot indicates total preference exposure of $282,919.64. It's impossible to check where that number came from. Even if it's intended to be the total of what she had in Custody plus what she withdrew, the numbers don't add up. Can you clarify how the total preference exposure was calculated, and confirm that this will not hold up the distribution of the balance of her Custody assets?").

requests to reevaluate such calculations").

However, many customers continued to be concerned that the Debtors' calculations of their Withdrawal Preference Exposure were inaccurate—and worse, that should they fail to object to the amounts listed in the Ballots, those inaccurate calculations would be *res judicata* in subsequent litigation. Accordingly, counsel for the Troutman Defendants (then representing the Withhold Ad Hoc Group, some of whose members had Withdrawal Preference Exposure) proposed protective language (the "Protective Language") to be included in the Plan to make it clear that customers retained the right to challenge the Debtors' calculation of their Withdrawal Preference Exposure: "For the avoidance of doubt, the Debtors' ***calculation*** of Withdrawal Preference Exposure shall not be binding on any defendant in an Avoidance Action."[15]

Both counsel for the Debtors and counsel for the Committee, who now represents Plaintiff, received the proposed Protective Language. If the Debtors or Committee believed that customers had misunderstood the Plan—if they believed that the defined term "Withdrawal Preference Exposure" had no application beyond the Account Holder Avoidance Action Settlement, such that the erroneous calculations would be irrelevant in any subsequent litigation—it would have been very easy for them to say so. No Protective Language would have been required. Instead, the Debtors, apparently with the Committee's acquiescence, included the Protective Language in the definition of Withdrawal Preference Exposure in the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* filed on September 27, 2023.[16]

If indeed customers were mistaken that Withdrawal Preference Exposure would continue

---

[15] *See* Exhibit B, Emails among Troutman, Kirkland & Ellis and White & Case (Sept. 19, 2023) (emphasis added).

[16] Docket No. 3577 at 25.

to govern their potential liability in subsequent litigation, the Debtors and Committee had another chance to correct that misapprehension at the confirmation hearing. Counsel for the Withhold Ad Hoc Group explained on the record that "[t]he Withhold Ad Hoc Group was concerned about the potential preclusive effect that the Debtors' calculation of withdrawal preference exposure under the plan might have. The Debtors and Committee agreed to add clarifying language that those calculations will not be binding on any defendant in a subsequent avoidance action."[17]

Counsel for the Debtors or the Committee could have stood up and told the Court that, in fact, the Protective Language was entirely unnecessary; that the Debtors' **calculation** of Withdrawal Preference Exposure could not have any preclusive effective because the very **definition** of Withdrawal Preference Exposure had no relevance or effect beyond the Account Holder Avoidance Action Settlement; and that customers should expect, instead, to be sued for the return of their coins or the current price thereof. As the record shows, they did not do so.

> **3.    After the Plan was confirmed and became effective, the Debtors continued to tell customers that the preference exposure they would need to resolve with Plaintiff was their "Withdrawal Preference Exposure," as defined in the Plan.**

Following confirmation, the Debtors continued to urge customers to accept the Account Holder Avoidance Action Settlement, which remained open until the Plan's Effective Date of January 31, 2024. In their Settlement Procedures Notice, the Debtors reminded customers in all-caps, bolded language that (absent a settlement) they would need to resolve their Withdrawal Preference Exposure with the Litigation Administrator after the Effective Date:

> **YOU ARE RECEIVING THIS NOTICE BECAUSE YOU HAVE WITHDRAWAL PREFERENCE EXPOSURE GREATER THAN $100,000 AND WILL NEED TO SETTLE YOUR CLAIM, OBTAIN A COURT ORDER RULING THAT YOU HAVE NO PREFERENCE LIABILITY, OR OTHERWISE <u>RESOLVE</u>**

---

[17] Confirmation Hrg. Tr. (Oct. 2, 2023), 72:21-73:1.

**YOUR WITHDRAWAL PREFERENCE EXPOSURE WITH THE LITIGATION ADMINISTRATOR AFTER THE EFFECTIVE DATE BEFORE YOU ARE ABLE TO RECEIVE ANY DISTRIBUTIONS UNDER THE PLAN.**[18]

The Debtors went on to explain, very explicitly and unambiguously, that the potential liability that customers might have with respect to Avoidance Actions was "Withdrawal Preference Exposure" *as defined in the Plan*:

> PLEASE TAKE NOTICE that certain Account Holders may have potential liability to the Debtors on account of Avoidance Actions because of transfers made by Account Holders in the 90 days prior to July 13, 2022 (the "Petition Date"). **This potential liability is referred to in the Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates [Docket No. 3577] (the "Plan") as "Withdrawal Preference Exposure."** Withdrawal Preference Exposure is defined as (i) the aggregate value of all assets an Account Holder withdrew from the Debtors' platform in the 90 days prior to the Petition Date (i.e., on or after April 14, 2022), valued as of the time of such withdrawals less (ii) the aggregate value of any deposits such Account Holder made after such Account Holder's first withdrawal in such period, valued as of the time of such deposits.[19]

The Settlement Procedures Notice goes on to reiterate that if customers did not elect to settle at that time, they would not be eligible to receive their distributions until "such Withdrawal Preference Exposure"—that is, the potential liability that the Notice explains is equal to the aggregate transfer-date value of all preference period withdrawals, less the aggregate transfer-date value of all deposits made after the first withdrawal—is otherwise resolved with the Litigation Administrator after the Effective Date."[20] This language is flatly contrary to Plaintiff's position

---

[18] *Notice Regarding Procedures for Settling Withdrawal Preference Exposure and Instructions for Making Settlement Payments Pursuant to the Account Holder Avoidance Action Settlement* [Docket No. 4207] ("Settlement Procedures Notice"), at 1 (emphasis added).

[19] *Id.* at 2 (emphasis added).

[20] *Id.* at 4.

that the Plan's definition of Withdrawal Preference Exposure had no more force or effect after the

Effective Date.

Nowhere did the Settlement Procedures Notice advise customers that they would be

required to resolve something *other than* their Withdrawal Preference Exposure with Plaintiff after

the Effective Date in order to receive their distributions.

**4.    Once Plaintiff took control of the avoidance actions against customers, he immediately disregarded the provisions of the confirmed Plan that he believed to be unfavorable to him.**

On July 1, 2024, Plaintiff began filing approximately 2,400 adversary proceedings against

Celsius's customers. Each of the complaints follows essentially the same form (the "Complaint").[21]

In the Complaint, Plaintiff cherry-picks the parts of the definition of Withdrawal Preference

Exposure he likes. He adopts wholesale the Disclosure Statement provisions that address the types

of transfers that count as "withdrawals" for purposes of the Plan-defined term Withdrawal

Preference Exposure:

> All types of withdrawals or transactions which Plaintiff alleges qualify as Avoidable Transfers are described in the Disclosure Statement. As noted in Article.III.PP of the Disclosure Statement, transfers which are listed as increasing an Account Holder's Withdrawal Preference Exposure are ones involving transfers of the Debtors' property under the Terms of Use and any other governing documents and would be considered Avoidable Transfers under this Complaint.[22]

Among other things, this brings Celsius's disbursement of loan proceeds to borrowers within the

scope of avoidable transfers, even though such disbursements were not on account of an antecedent

debt and thus could not be avoided under § 547 of the Bankruptcy Code. This results in an

enormous increase in amounts that Plaintiff can seek to recover from customers who took out loans

---

[21] *See, e.g.,* Docket No. 5002.

[22] *Id.* at 18 n.32.

from Celsius.

But Plaintiff ignores the part of the definition of Withdrawal Preference Exposure that fixes the value of the allegedly avoidable withdrawals at the date of transfer. Instead, Plaintiff seeks in the Complaint to recover the market value of the various assets as of June 14, 2024,[23] while reserving the right to value the coins as of another date or to recover the coins themselves.[24]

Plaintiff also disregards the part of the definition of Withdrawal Preference Exposure that *automatically* reduces the amount of customers' potential liability by the amount of all deposits made after the first preference-period withdrawal. In the Complaint, he alleges that he has reviewed the Debtors' books and records and identified the amount of transfers that would potentially qualify as "new value," but asserts that "the subsequent new value defense is an affirmative defense, for which Defendant bears the burden of proof."[25] Thus, rather than automatically netting such amounts, as the Plan requires, Plaintiff seeks to force Defendants to prove that they made the deposits reflected in the Debtors' own books and records. Moreover, the amounts that Plaintiff identifies in the complaints as potential new value are, in many instances, significantly lower than the amounts that would be included under the Plan's definition of Withdrawal Preference Exposure because he excludes deposits that would have reduced prior exposure below zero.[26]

The Complaint also includes a count for disallowance of the customer's claim against Celsius "unless and until Defendant relinquishes to Plaintiff the property transferred or pays to Plaintiff the value of such transferred property"—alleged, in the Complaint, to be at least the

---

[23] This date apparently was selected arbitrarily.

[24] *Id.* at 18 n.33.

[25] *Id.* ¶ 44.

[26] In other instances, consistent with the errors rife in the pre-litigation calculations of Withdrawal Preference Exposure, Plaintiff has simply overlooked transfers that clearly constitute new value by any measure.

market value as of June 14, 2024. This is contrary to the express terms of the Plan, which provide that the Plan Administrator may withhold distributions only until customers' Withdrawal Preference Exposure is resolved. Indeed, Plaintiff himself continues to inform customers that their claims are being disallowed *due to Withdrawal Preference Exposure*, a Plan-defined term, and not due to preference liability equal to the coins' current value. As recently as March 10, 2025, when a Defendant inquired about the status of his claim against Celsius, Plaintiff responded: "Your distribution is currently being held back due to unresolved Withdrawal Preference Exposure (WPE)."[27]

> **5.      The Plan Administrator has continued to advise customers that they must resolve their Withdrawal Preference Exposure, *as defined in the Plan*, in order to be eligible to receive their distributions.**

The Plan Administrator, represented by the same counsel who represented the Debtors and drafted the Plan, has evinced the same understanding as Defendants that customers' potential preference liability is their Withdrawal Preference Exposure, as defined in the Plan. In the Plan Administrator's *Third Status Report on Distributions* [Docket No. 8005] (the "<u>Status Report</u>"), filed on March 3, 2025, he notes that "there are various creditors who, for one reason or another, are not yet eligible for distributions—the most common reason is that there is litigation that one of the Litigation Administrators has or could bring against the eligible claimant (such as Withdrawal Preference Exposure, equitable subordination, or other litigation)."[28] In other words, the litigation that Plaintiff "could bring" against a customer is for the customer's Withdrawal Preference Exposure, which has a specialized meaning under the Plan.

The Plan Administrator uses the term "Withdrawal Preference Exposure" no fewer than 11

---

[27] <u>Exhibit C</u>, Email from Celsius Litigation Administrator (Mar. 10, 2025).

[28] Status Report, ¶ 51.

times in the Status Report, reminding customers of the need to resolve their Withdrawal Preference

Exposure with Plaintiff before distributions may be released to them: "Pursuant to the Plan,

Distribution Agents are not permitted to make distributions to creditors with unresolved

Withdrawal Preference Exposure above $100,000 until such Withdrawal Preference Exposure is

resolved. See Plan Art. IV.B.3."[29]

The Plan Administrator's use of the term "Withdrawal Preference Exposure" is not a mere

colloquialism or shorthand for potential liability under §§ 547 and 550 of the Bankruptcy Code.

The Status Report specifically provides that

> [c]apitalized terms used but not defined herein shall have the
> meanings ascribed to such terms in the *Modified Joint Chapter 11*
> *Plan of Reorganization of Celsius Network LLC and Its Debtor*
> *Affiliates (Conformed for MiningCo Transaction)* [Docket No.
> 4289] (as may be further modified, amended, or supplemented from
> time to time, the '<u>Plan</u>') or the *Joint Order (I) Authorizing*
> *Supplemental Distribution to Eligible Corporate Creditors, (II)*
> *Approving Procedures for Supplemental Corporate Creditor*
> *Distributions, and (III) Granting Related Relief* [Docket No. 7747],
> as applicable.[30]

Accordingly, even after the Effective Date, the Plan Administrator has continued to tell customers

that what stands between them and their distributions is the resolution of their *Withdrawal*

*Preference Exposure, as defined in the Plan*.

C.    **ARGUMENT**

1.    **The unambiguous language of the Plan shows that the definition of**
**"Withdrawal Preference Exposure" continues to control after the**
**Effective Date.**

Plaintiff asserts that the simplified formula for determining preference liability set forth in

the Plan's definition of "Withdrawal Preference Exposure" was included in the Plan solely for

---

[29] *Id.*, ¶ 57; *see also* ¶¶ 15, 49, 53, 54.

[30] *Id.* at 1 n.2.

purposes of the Account Holder Avoidance Action Settlement. According to Plaintiff, once the Plan became effective and the Account Holder Avoidance Action Settlement was concluded, the defined term Withdrawal Preference Exposure no longer had any force or effect.

As outlined in detail above, the evidence against Plaintiff's position is overwhelming. As an initial matter, the plain language of the definition contains no such limitation, and there is no basis for the Court to read one in. To the contrary, parties clearly contemplated that Withdrawal Preference Exposure would be the measure of damages in post-Effective Date litigation. This necessitated the inclusion of Protective Language to allow Defendants to challenge the Debtors' mathematical miscalculations of their Withdrawal Preference Exposure in subsequent litigation.[31] The Protective Language would have been unnecessary if the entire concept of Withdrawal Preference Exposure simply went out the window once the Plan went effective.

Moreover, the Plan itself expressly indicates that Withdrawal Preference Exposure would continue to be the relevant measure of customers' potential liability *after* the Effective Date. As described above, the Plan requires the amount of the post-Effective Date Disputed and Contingent Claims Reserve take into account the amount of customers' Withdrawal Preference Exposure. Further, the Plan prohibits the Distribution Agent from making post-Effective Date distributions to customers until their Withdrawal Preference Exposure (and not some other amount) is resolved.

These provisions, taken together with the Disclosure Statement, make clear that the Plan was predicated on customers' potential preference liability being fixed at their Withdrawal Preference Exposure. It would make no sense to establish reserves consistent with customers'

---

[31] Plaintiff may try to argue that the Protective Language actually means that the definition of Withdrawal Preference Exposure itself would be inapplicable in any adversary proceeding. The notion that a Plan provision stating that the Debtors' "calculation" of Withdrawal Preference Exposure is not binding "on any defendant" means that the entire concept of Withdrawal Preference Exposure is not binding on anyone, including the Debtors and Plaintiff, is simply implausible.

"Withdrawal Preference Exposure *amount*" if some other metric governed preference claims against customers. Likewise, it would make no sense for the Plan to require the Distribution Agent to make distributions to a customer once his Withdrawal Preference Exposure is resolved, while at the same time allowing Plaintiff to sue that same customer and seek to withhold his distributions until the customer pays an entirely different amount. The Plan would cease to function properly if Plaintiff's position were adopted.

And even if the Plan were deemed ambiguous as to the continued post-Effective Date relevance of Withdrawal Preference Exposure (and it is not), the extrinsic evidence is fatal to Plaintiff's position. Consistent with the terms of the Plan, the Plan Administrator continues to this day to reiterate to customers that what stands between them and their distributions is their Withdrawal Preference Exposure *as defined in the Plan*, demonstrating the correct (and, indeed, only reasonable) interpretation of the Plan. Plaintiff himself has adopted at least part of the definition of Withdrawal Preference Exposure in the complaints that he filed against Defendants— a very curious move on his part, given his insistence that the definition is entirely irrelevant to this litigation.

Finally, any possible ambiguity in the Plan must be construed against the drafters, the Debtors, in whose shoes Plaintiff stands. *IQMax, Inc. v. Fusion PM Holdings, Inc.*, 2023 WL 2290815, at *1 (2d Cir. Mar. 1, 2023) ("The Court follows principles of contract interpretation to interpret a confirmed plan of reorganization.") (internal quotation marks and citation omitted); *In re Texaco, Inc.*, 2025 WL 582462, at *28 (Bankr. S.D.N.Y. Feb. 21, 2025) ("New York follows the well established *contra proferentem* principle which requires that equivocal contract provisions are generally to be construed against the drafter.") (quoting *McCarthy v. Am. Int'l Grp.*, 283 F.3d 121, 124 (2d Cir. 2002) and finding that ambiguous terms in the plan had to be construed against

the debtor).

In short, the Plan makes clear that Plaintiff is limited to seeking the recovery of the dollar value of the coins that Defendants withdrew "as of the time of such withdrawals," not as of today, and that such amount must be net of all deposits after the first withdrawal. The words in the Plan must be applied consistently, not just when it suits Plaintiff best.

> **2.    The Debtors and their customers contractually agreed in the Plan on the methodology for determining customers' potential liability, and Plaintiff is bound by that agreement.**

Defendants anticipate that Plaintiff will assert that the Bankruptcy Code trumps the Plan and that the Plan—which must comply with the Bankruptcy Code—cannot modify it. This is a red herring: No one is suggesting that the Bankruptcy Code has been altered in any way. The Plan is a contract between Celsius and its creditors. *See Adelphia Recovery Trust v. Bank of Am., N.A.,* 390 B.R. 80, 88 (S.D.N.Y. 2008) *aff'd,* 379 Fed. Appx. 10 (2d Cir. 2010) ("Under the Bankruptcy Code, a confirmed plan of reorganization acts like a contract that is binding on all of the parties, debtor and creditors alike.") (quotation omitted). Nothing in the Bankruptcy Code or applicable case law prohibited Celsius from contractually agreeing to limit its exercise of its avoidance powers (or, indeed, to release them altogether).

Indeed, such voluntary limitations are commonplace. For example, debtors regularly agree to forgo pursuing preferences below a threshold set much higher than the statutory floor. *See, e.g., In re Evergreen Solar, Inc.,* 2014 WL 300965, at *1 (Bankr. D. Del. Jan. 28, 2014) (debtor entered into agreement with creditors to release all preference claims less than $60,000). Under Celsius's own Plan, it agreed not to pursue customers holding *De Minimis* Claims for Withdrawal Preference Exposure less than $100,000, regardless of whether such customers voted in favor of the Plan or

opted out of releases under the Plan.[32]

Debtors and their creditors have also agreed, in plans of reorganization, to shorten or lengthen the statutory time period to bring preference actions prescribed in 11 U.S.C. § 546(a). For example, in *Service Plastics,* the confirmed plan of reorganization required avoidance actions to be commenced within six months after confirmation. *In re Serv. Plastics, Inc.*, 1997 WL 657119, at *2 (Bankr. N.D. Ill. Oct. 20, 1997). The debtor filed a preference action against a defendant later than six months after confirmation, but still within § 546(a)'s two-year limit. The court found that the debtor's claims were time-barred, explaining:

> The issue is whether the bar date in the Plan controls over the longer statute of limitations set forth in § 546(a). . . . The parties do not dispute that Service Plastics filed its cause of action within the time limits under § 546(a). Even so, **Service Plastics agreed in the Plan to bind itself to a shorter bar date. Thus, it contracted away its right to rely on § 546(a)**. Service Plastics must adhere to the terms of the confirmed Plan. *See* 11 U.S.C. § 1141(a) ("the provisions of a confirmed plan bind the debtor....").

*Id.* at *5 (emphasis added).

Courts have even enforced plan terms that are expressly contrary to the Bankruptcy Code. In *Espinosa*, the bankruptcy court confirmed a chapter 13 plan that discharged student loans even though it failed to find undue hardship as required by § 523(a)(8) of the Bankruptcy Code. The Supreme Court nonetheless found that the order confirming the plan remained enforceable and binding. *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 275 (2010). Similarly, in *Friedman's*, the debtors' plan defined "Subordinated Claims" to include, categorically, *all* fines and penalties. *In re Friedman's, Inc.*, 356 B.R. 766, 773 (Bankr. S.D. Ga. 2006). Despite the lack of any statutory basis for such subordination, the court found that "[a]ll parties are bound by the

---

[32] Plan at 38.

18

definition of what constitutes a Subordinated Claim." *Id.*

Celsius's own Plan is, in part, at odds with the Bankruptcy Code because it defines preferential transfers to include amounts loaned by Celsius to borrowers[33]—transfers that were not on account of antecedent debts owed by Celsius, and thus outside of the scope of § 547. Expressly relying on the Plan definition in his complaints,[34] Plaintiff seeks to recover those loan amounts from numerous customers. Surely he doesn't intend to argue that § 547 of the Bankruptcy Code bars him from doing so.

If plan provisions that are truly "unlawful" are enforceable, then certainly plan provisions that lawfully and consensually constrain an estate's avoidance powers are enforceable, *a fortiori*. The Plan sets forth a clear methodology for determining customers' preference liability. Celsius contracted away its right to seek recovery of the market value of the coins at the time of judgment. It further contractually agreed to credit customers for *all* deposits after the first withdrawal.

It should be noted that the Plan's definition of Withdrawal Preference Exposure does not one-sidedly favor Defendants. Defendants' liability is fixed at the value of the coins at the time of transfer, even if the coins have subsequently declined in value, as some of them have done. For example, on April 15, 2022, ETH—one of the most popular cryptocurrencies—traded at $3,040.92.[35] On April 15, 2025, it dipped as low as $1,585.23.[36] The Plan's definition of Withdrawal Preference Exposure means that a Defendant who withdrew 100 ETH on April 15,

---

[33] *Fourth Revised Disclosure Statement*, Docket No. 3332, at 78 (stating that amounts funded for loans from Celsius to account holders "[i]ncreases Account Holder's Withdrawal Preference Exposure if Incoming Loan Principal Payment is made to Custody or made in USD") (incorporated by reference in the Definition of "Withdrawal Preference Exposure").

[34] Complaint at 18 n.32.

[35] *See* Ethereum USD (ETH-USD) Stock Historical Prices & Data - Yahoo Finance, *available at* https://finance.yahoo.com/quote/ETH-USD/history/?period1=1587177830&period2=1744944162.

[36] *Id.*

2022, when they were worth $304,092, could not opportunistically return the depreciated coins on

April 15, 2025, when they were worth only $158,523. Instead, the Defendant would be required

to pay what the coins were worth at the time of transfer.

Indeed, avoiding such gamesmanship by customers and the uncertain effects of the

notoriously volatile crypto market were presumably key reasons that the Debtors fixed customers'

potential liability at transfer-date prices. After all, on March 31, 2023, when the Debtors first filed

their Plan [Docket No. 2358], BTC closed at $28,478.48.[37] That was significantly lower than the

closing price for BTC for virtually the entire pre-Pause preference period.[38] Likewise, the day the

Plan was filed, ETH closed at $1,822.02, lower than its closing price throughout most of the pre-

Pause preference period.[39] When the Debtors' Plan provided on March 31, 2023 that customers'

preference exposure would be determined as of the time of transfer, the Debtors were saying that

customers' potential liability was *higher* than it would be at then-current prices. The Debtors were

not granting customers some massive concession; they were ensuring that they were protected

from downside risk.

There were also practical reasons for the Debtors to fix preference liability at transfer-date

pricing, even if that meant forgoing the potential future appreciation of customers' coins. Aside

from ensuring that they were protected from price *decreases*, doing so avoided a number of knotty

issues: How would the Litigation Administrator determine whether the customer still held the coins

that had been withdrawn?[40] If the coins were no longer recoverable, would the potential recovery

---

[37]  Bitcoin USD (BTC-USD) Stock Historical Prices & Data - Yahoo Finance, *available at* https://finance.yahoo.com/quote/BTC-USD/history/?period1=1583966017&period2=1741732410.

[38] *Id.*

[39]  Ethereum USD (ETH-USD) Stock Historical Prices & Data - Yahoo Finance, *available at* https://finance.yahoo.com/quote/ETH-USD/history/?period1=1583960521&period2=1741726891.

[40] Defendants understand Plaintiff's position to be that it is immaterial whether or not they still hold the coins. In Plaintiff's view, a Defendant who withdrew $100,000 of BTC when the price was $30,000 and

be measured by the price at the time of withdrawal, the price at the time the coins were divested, or some other price? What if the coins were not sold for value, but rather lost? What if a customer withdrew one BTC from Celsius, put it in a wallet with other BTC the customer owned, and then sold or lost some but not all of the BTC in that wallet? How would the Litigation Administrator be able to verify the divestiture of the Celsius-linked coins and the consideration (if any) obtained? What if the customer sold the coins withdrawn from Celsius, but later purchased the same types of coins, albeit with a different cost basis? Answering these questions would be fact-intensive, time-consuming, and costly, potentially burdening the parties and the Court with hundreds of individual trials to determine those facts. The Debtors' solution, by contrast, is neat, simple and easy for the litigants and the Court to understand and apply.

Plaintiff may argue that the Debtors could not have contractually waived their rights under the Bankruptcy Code because, under New York law, the waiver of a statutory right must be clear and unmistakable. *See, e.g., Wexler v. Allegion (UK) Ltd.*, 374 F. Supp. 3d 302, 314 (S.D.N.Y. 2019). First, there is a world of difference between waiver of the Debtors' right to pursue avoidance actions and the Debtors' contractual agreement to exercise their avoidance powers within certain limitations. Second, to the extent that the Plan effectuated a waiver of any statutory right, such waiver *was* clear and unmistakable, both in word and deed. The Debtors chose to define customers' potential liability as their Withdrawal Preference Exposure. They used that term throughout the Plan and Disclosure Statement, not just with reference to the Account Holder Avoidance Action Settlement but in the context of post-Effective Date litigation with Plaintiff. They unambiguously communicated to customers that the potential liability they would face in litigation if they didn't

---

promptly sold it for a loss is nonetheless liable for today's value of nearly $300,000—even though he never benefited from any appreciation of the coins. Defendants do not believe the case law supports such an extraordinarily inequitable result.

settle was their Withdrawal Preference Exposure. The Plan Administrator continues to advise customers and the Court that in order to receive distributions, customers must resolve their Withdrawal Preference Exposure, *as defined in the Plan*. The Debtors' intent that their definition of Withdrawal Preference Exposure would apply for all purposes is clear.

> **3.     Plaintiff is estopped from seeking to recover amounts other than Withdrawal Preference Exposure because of the Debtors' repeated representations to customers that their potential preference liability was their Withdrawal Preference Exposure.**

The Plan and Disclosure Statement are replete with representations to customers that their potential preference liability—whether they settled under the Plan or litigated it later with Plaintiff—would be Withdrawal Preference Exposure, as defined in the Plan. Customers, including Defendants, relied on these representations in assessing their potential future risk and deciding how to vote on the Plan, including whether to settle, whether to release claims against Celsius's officers and directors, whether to opt out of a class settlement and whether to contribute individual causes of action to Plaintiff. The ballot that each customer received to vote on the Plan indicated whether the customer had Withdrawal Preference Exposure as well as Celsius's calculation of that amount.[41] Even customers who no longer had a claim against Celsius and thus may not have received a ballot were entitled to rely on the Debtors' representations in determining whether they would file an opposition to the Plan.

Nowhere—not in the Plan, not in the Disclosure Statement, not on the ballots, not in the Settlement Procedures Notice—did the Debtors ever suggest to customers that after the Effective Date, the Litigation Administrator would be entitled to demand something from them that was (in some cases) many multiples of their Withdrawal Preference Exposure. To the contrary, every

---

[41] *See* <u>Exhibit D</u>, Sample Ballot.

communication and disclosure said the same thing: customers had potential liability for "(i) the aggregate value of all assets an Account Holder withdrew from the Debtors' platform in the 90 days prior to the Petition Date . . ., valued as of the time of such withdrawals less (ii) the aggregate value of any deposits such Account Holder made after such Account Holder's first withdrawal in such period, valued as of the time of such deposits."

As the Second Circuit has explained,

> [o]f prime importance in the reorganization process is the principle of disclosure. The Code obliges a Debtor to engage in full and fair disclosure, providing to creditors "information of a kind, and in sufficient detail, as far as is reasonably practicable ... that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan...."

*In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d Cir. 1994). In *Momentum*, the debtors' amended disclosure statement communicated the debtors' intention to pay severance to their employees, an impression that the debtors continued to convey through the confirmation hearing. *Id.* However, the debtors had already decided to deny such benefits. *Id.* Pointing to evidence that employees voted in favor of the plan in reliance on the debtors' representations,[42] the Second Circuit affirmed the lower courts' holding that the debtors were estopped from denying the severance payments. *Id.* at 1137; *cf. Donaldson v. Bernstein*, 104 F.3d 547, 555-56 (3d Cir. 1997) ("Judicial estoppel . . . prevents a party from playing 'fast and loose with the court' by using 'intentional self-contradiction . . . as a means of obtaining unfair advantage.' . . . [E]ven if we assume that a bankruptcy disclosure statement is not enforceable as a contract, it is at least a representation which in appropriate circumstances can serve as the basis for judicial estoppel.")

---

[42] Defendants reserve the right to present evidence of their reliance on the Debtors' representations in Phase Two of this litigation.

(citation omitted).

Here, the representations in the Disclosure Statement, as well as in other communications to customers, were clear: Whether customers settled under the Plan or litigated later with Plaintiff, their potential liability was, for better or worse, their Withdrawal Preference Exposure. Customers justifiably relied on the Debtors' representations. Plaintiff, standing in the Debtors' shoes, is estopped from pulling a "gotcha" and imposing any different or greater liability on customers than that disclosed by the Debtors.

## II.    THE PRESUMPTION AGAINST EXTRATERRITORIALITY APPLIES TO PREFERENCE CLAIMS BROUGHT UNDER 11 U.S.C. § 547

For the reasons discussed below, the general presumption against extraterritoriality applies to preference claims brought under Section 547, and discovery and a factual record are necessary before this Court can determine whether the Litigation Administrator can overcome that presumption as to some or all of the Defendants.

The "presumption against extraterritoriality" is a "longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248, (1991) (internal quotation marks and citation omitted); *accord RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 335 (2016); *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 248, (2010). "Absent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." *RJR Nabisco*, 579 U.S. at 335. This canon helps "avoid the international discord that can result when U.S. law is applied to conduct in foreign countries." *Id.* The presumption against extraterritoriality involves a two-part analysis. "First, the Court asks whether the presumption against extraterritoriality has been rebutted—*i.e.*, whether the statute gives a clear, affirmative indication that it applies extraterritorially." *RJR Nabisco*, 579 U.S. at 326.

24

Second, "[if] the statute is not found extraterritorial at step one, the Court moves to step two, where it examines the statute's 'focus' to determine whether the case involves a domestic application of the statute." *Id.*

As for the first step, Section 547 contains no "clear, affirmative" indication that Congress intended U.S. preference law to apply extraterritorially. Unlike other federal statutes, Section 547 includes not a word suggesting that Congress intended that it permit the avoidance, on preference grounds, of transfers that occur wholly outside the United States.[43] To be sure, Section 541 provides that property of a debtor's estate includes all of the debtor's property "wherever located," 11 U.S.C. § 541(a), but it also makes clear that property a debtor has transferred only becomes property of the estate once the transfer has been avoided and the property has been recovered, *id.* § 541(a)(3). Accordingly, while a few cases have held that Congress intended to apply the fraudulent-transfer provisions of the Bankruptcy Code extraterritorially,[44] later decisions (including some from this District) have rejected those decisions. *See In re CIL Ltd.*, 582 B.R. 46, 92 (Bankr. S.D.N.Y. 2018), amended on reconsideration, 2018 WL 3031094 (Bankr. S.D.N.Y. June 15, 2018); *see also In re Zetta Jet USA, Inc.*, 2020 WL 7682136, at *9 (Bankr. C.D. Cal. July 29, 2020) (holding that avoidance provisions do not apply extraterritorially and describing that as the "majority view" after surveying cases). And, in any event, bankruptcy courts in this District have held that the presumption against extraterritoriality applies fully to preference claims. *See Spizz v. Goldfarb Seligman & Co. (In re Ampal-Am. Isr. Corp.)*, 562 B.R. 601, 602 (Bankr. S.D.N.Y. 2017);

---

[43]The absence of any such language is all the more telling because Congress knows how to provide for extraterritorial application of federal law when it wants to do so. By way of example, Congress specified that the federal RICO statute would apply to certain offenses that "take[] place outside the United States." 18 U.S.C. § 1957(d)(2); *see RJR Nabisco*, 579 U.S. at 338. By contrast, § 547 contains no comparable language.

[44] See *Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*, 543 B.R. 127, 155 (Bankr. S.D.N.Y. 2016); see also *In re French*, 440 F.3d 145 (4th Cir. 2006).

*Maxwell Communication Corp. plc v. Barclays Bank (In re Maxwell Commc'n Corp. plc)*, 170 B.R. 800, 809 (Bankr. S.D.N.Y. 1994), *aff'd*, 186 B.R. 807 (S.D.N.Y.1995), *aff'd on other grounds*, 93 F.3d 1036 (2d Cir.1996).

Applying the presumption against extraterritoriality to preference claims makes particular sense. The presumption "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord." *Arabian Am. Oil Co.*, 499 U.S. at 248. While many countries have laws permitting the recovery of fraudulent transfers (transfers for which the debtor receives no or less than fair consideration), U.S. preference law is far more unusual to the extent that it permits the recovery of payments by a debtor of legitimate debts it owes and for which the debtor receives full value. For example, English law generally allows a recovery of such a payment only if the debtor actually intended to prefer the creditor it paid over other, unpaid creditors. *See* Insolvency Act 1986 § 239(5).[45] Recognizing this fundamental difference in the preference laws of the two countries, the Second Circuit has held that there is a "true conflict" between U.S. and English preference law. *See In re Maxwell Commc'n Corp. plc by Homan*, 93 F.3d 1036, 1049-50 (2nd Cir. 1996). As a result, it would be contrary to basic notions of international comity to disregard the standard presumption against extraterritoriality and apply U.S. preference to transactions occurring wholly outside the United States.

The second step of an extraterritoriality analysis is to examine the statute's 'focus' to determine whether the case involve a domestic application of the statute. *Morrison*, 561 U.S. at 266. In the context of avoidance and recovery provisions, the majority of courts to examine the issue, including the Second Circuit, have determined that the legislative focus is the initial transfer

---

[45] Hong Kong law also allows for a recovery of payments only to the extent that an unfair preference was influenced by a desire to prefer that specific creditor. *See* Companies (Winding Up and Miscellaneous Provisions) Ordinance (Cap. 32) § 266(4).

that depletes property that would otherwise have become property of the estate. *See, e.g.*, *In re Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Sec. LLC*, 917 F.3d 85, 97 (2d Cir. 2019); *In re Ampal-Am. Isr.,* 562 B.R. at 613; *In re Sec. Inv. Protection Corp. v. Bernard L. Madoff Inv. Sec.*, 480 B.R. 501, 524 (Bankr. S.D.N.Y. 2012).

This second step of the analysis—whether application of the preference statute in the hundreds of the initial transfers in these preference actions would be properly domestic or improperly extraterritorial—is more complicated and cannot fairly be resolved at this stage before any discovery has occurred and any evidence has been provided. The Second Circuit's decision in *In re Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Sec. LLC*, 917 F.3d 85 (2d Cir. 2019), involving allegedly fraudulent transfers illustrates the point.

In *Picard*, the initial transfers had been made by a U.S. entity from U.S. bank accounts to feeder or other investment funds located outside the United States; those funds then transferred the money they had received to their investors who were also located outside the United States. The trustee sued the subsequent transferees under § 550. The subsequent transferees argued that applying § 550 to transfers from a foreign initial transferee to a foreign subsequent transferee would constitute an impermissible extraterritorial application of that provision. *See id.* at 94. The *Picard* court rejected that argument, but only because the *initial* transfer had been "domestic." The Second Circuit concluded that § 550 operates only in tandem with § 548, or other avoidance provisions of the Bankruptcy Code, and that the "focus" of the avoidance provisions is the initial transfer from the debtor. *Id.* at 97-99. Thus, as the court put it, the question was "whether [the debtor's] transfers *took place in the United States* such that regulating them involves a domestic application of that statute." *Id.* at 99 (emphasis added). The court found that a "transfer of property from the United States is domestic activity for the purposes of §§ 548(a)(1)(A) and 550(a)," and

27

because the debtor "transferr[ed] property from a U.S. bank account," the initial transfers at issue were domestic and thus unaffected by extraterritoriality. *Id.* at 99-100.

Here, the Court cannot conclude at this stage, without the presentation of any evidence, that any, let alone all, of the transfers at issue occurred in or from accounts in the United States. Many or all transfers may have originated or taken place entirely outside the United States, and any action under § 547 to avoid such transactions should be barred by the presumption against extraterritoriality.

As described in the Examiner's Report, prior to the Summer of 2021, all of Celsius' customer assets and liabilities were housed at Celsius Network (UK).[46] But in June 2021, the financial regulators in the United Kingdom informed Celsius it needed to cease its retail operations in England.[47] Celsius then purported to migrate its customer-facing business from the United Kingdom to the United States.[48] But "purported" is an apt description. The supposed "migration" was accomplished through an accounting maneuver in which Celsius Network (US) assumed—on paper—substantially all customer-facing assets and liabilities.[49] But the accounting treatment appears to have hidden the reality.

While "assets associated with defi and staking strategies, as well as undeployed assets" were in fact transferred to Celsius Network (US), "Celsius Network (US) lent—or more accurately, permitted Celsius Network (UK) to retain—billions of dollars of customer-related assets that were being deployed on exchanges or for institutional lending."[50] Rather than the actual crypto assets,

---

[46] *See* Final Report of Shoba Pillay, Examiner, Docket No. 1956 ("Examiner's Report"), 363.

[47] *Id.*

[48] *Id.* at 363-64.

[49] *Id.* at 364.

[50] *Id.*

Celsius Network (US) received what was "characterized as a demand loan of crypto and fiat currencies from Celsius Network (US) to Celsius Network (UK) commencing August 19, 2021."[51] As an accounting matter, the Celsius entities booked offsetting payables and receivables to reflect the "migration," but the assets in fact remained with Celsius Network (UK). As the Examiner explained, "The crypto assets continued to be deployed directly from the same Fireblocks workspaces (or in other words, the wallets in vaults in the Celsius Network (UK) workspace were not moved to vaults in the Celsius Network (US) workspace). That arrangement continues to this day."[52]

As a result, it is a virtual certainty that a substantial proportion, if not all, of the transfers at issue here were of assets located *outside* of the United States, and (even though it would not amount to a purely domestic application of the statute even if a recipient were located in the United States) many of those were transferred to recipients also located *outside* of the United States. As the Second Circuit instructed in *Picard*, such transfers do not constitute "domestic activity" and applying U.S.'s unusual preference law to such entirely extraterritorial transactions would be contrary to the presumption against extraterritoriality and basic notions of comity, especially when otherwise applicable law, such as English law and Hong Kong law, is in direct conflict. Each Defendant is entitled to discovery and to present evidence on whether the transfers on which it is being sued occurred in or from the United States, or in and from a foreign country. This Court cannot resolve this inherently factual issue without a factual record.

## III.    PERSONAL JURISDICTION IS A FACT-INTENSIVE QUESTION THAT CANNOT BE DECIDED BY THE COURT AT THIS STAGE

The issue of personal jurisdiction arises because many of the Defendants are citizens of

---

[51] *Id.* at 365.

[52] *See id.* at 366-67.

foreign countries.  For similar reasons to those discussed above regarding extraterritoriality, the

Court cannot decide this question, *en masse* as to all Defendants, at this stage without any factual

record.  "Personal jurisdiction is necessarily a fact-sensitive inquiry dependent on the particulars

of the case before the court." *Gucci Am., Inc. v. Frontline Processing Corp.*, 721 F. Supp. 2d 228,

240 (S.D.N.Y. 2010).  That is certainly true in this matter.

For a court to assert specific jurisdiction over a defendant, "[d]ue process considerations

require that the defendant 'have certain minimum contacts [with the forum state] such that the

maintenance of the suit does not offend traditional notions of fair play and substantial justice.'"

*Licci ex rel. Licci v. Lebanese Canadian Bank*, SAL, 732 F.3d 161, 169 (2d Cir. 2013) (quoting

*Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316

(1945)).  The minimum contacts test "focuses on the relationship among the defendant, the forum,

and the litigation," a relationship that "must arise out of contacts that the defendant himself creates

with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quotations omitted).  "Incidental

effects within the United States are not enough; instead, the defendant must have intentionally

caused – i.e., expressly aimed to cause – an effect in the United States through its foreign actions."

*In re GBG USA Inc.*, 666 B.R. 115, 133 (Bankr. S.D.N.Y. 2024) (citations omitted).  Indeed, before

a court may exercise specific jurisdiction over a foreign defendant three separate conditions must

all be met:

> First, the defendant must have purposefully availed itself of the
> privilege of conducting activities within the forum State or have
> purposefully directed its conduct into the forum State.  Second, the
> plaintiff's claim must arise out of or relate to the defendant's forum
> conduct.  Finally, the exercise of jurisdiction must be reasonable
> under the circumstances.

*U.S.* Bank *Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019) (internal quotation

marks and citations omitted).  This Court recently recognized this principle in an adversary

30

proceeding arising out of this same Chapter 11 case.  *See Meghji v. Spadafora*, Adv. Pro. No. 24-03981 (Bankr. S.D.N.Y.) (April 28, 2025), at 5.

As discussed above with respect to extraterritoriality, the Examiner's Report casts substantial doubt on the notion that a cross-section (let alone all) of the Defendants had *any* meaningful contact with the United States in connection with the transfers at issue, let alone the minimum contacts arising out of their own purposeful actions for a U.S. court to assert specific jurisdiction.  Celsius customers (at least all those who opened their accounts before the middle of 2021) originally transacted with a United Kingdom-based entity, and engaged in the transaction of assets to and from the United Kingdom.  The Examiner's Report indicates that the "migration" of Celsius's customer-facing business was nothing more than an accounting contrivance meant to evade regulatory scrutiny, that a huge proportion of customer assets never left the United Kingdom, and as a result that the transactions themselves continued, in substantial part, to run through the United Kingdom.  Celsius's management itself corroborated the illusory nature of the migration: "In more than 20 interviews conducted by the Examiner, no witness made any distinction between Celsius Network (UK) and Celsius Network (US) when describing crypto assets, their deployment, or liquidity."[53]  A Defendant whose withdrawals were from assets located in the United Kingdom that never passed through the United States can hardly be said to have "purposefully availed itself of the privilege of doing business in the forum."  *Licci*, 732 F.3d at 170.

The Litigation Administrator has cited a New York governing law and forum selection provision present in certain versions of Celsius's "Terms of Use."  Notably, however, that clause varied meaningfully across different iterations of the Terms of Use.  For example, version 4 of the

---

[53] Examiner's Report at 366.

Terms of Use, dated June 15, 2020, invoked the laws of the State of Delaware.[54] Version 5 of the

Terms of Use, dated September 30, 2020, provides that it "is governed exclusively by the laws of

England and Wales," and that "[a]ny dispute arising out of, or related to, your Celsius Wallet or

relationship with Celsius must be brought exclusively in the courts located in London, England."[55]

Not until Version 6 of the Terms of Use, which is undated, does the New York law provision

appear.[56] Determining which, if any, of these versions of the governing law and forum selection

provisions were applicable at the time of the transfers at issue or which version, if any, each

Defendant had agreed to be bound by presents yet more issues of fact that cannot be resolved

without a full evidentiary record.[57]

Moreover, even where a Defendant nominally agreed to a version of the Terms of Use

containing a New York law provision, that provision does not automatically confer specific

jurisdiction over the Defendant.  The Second Circuit employs a four-part test to determine the

enforceability of forum selection clause with respect to personal jurisdiction:

> The first inquiry is whether the clause was reasonably
> communicated to the party resisting enforcement.  The second step
> requires us to classify the clause as mandatory or permissive, i.e., to
> decide whether the parties are required to bring any dispute to the
> designated forum or simply permitted to do so.  Part three asks
> whether the claims and parties involved in the suit are subject to the
> forum selection clause.
>
> If the forum clause was communicated to the resisting party, has
> mandatory force and covers the claims and parties involved in the
> dispute, it is presumptively enforceable.  The fourth, and final, step

---

[54] *See* Decl. of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, Providing Terms of Use
Dating Back to February 18, 2018, Docket No. 393, Ex. A-4, ¶ 34.

[55] *Id.*, Ex. A-5, ¶ 34.

[56] *Id.*, Ex. A-6, ¶ 33.

[57] *See* Decl. of Oren Blonstein, Head of Innovation and Chief Compliance Officer of the Debtors, In Support
of the Debtors' Motion Regarding Ownership of Earn Assets and the Sale of Stablecoin, Docket No. 1327,
¶ 20 (stating that as of an unspecified date approximately 90% of all Celsius Account Holders had accepted
Terms of Use Version 6 or later).

is to ascertain whether the resisting party has rebutted the
presumption of enforceability by making a sufficiently strong
showing that enforcement would be unreasonable or unjust, or that
the clause was invalid for such reasons as fraud or overreaching.

*Flextronics Da Amazonia Ltda. v. CRW Plastics USA, Inc.*, 2023 WL 8270818, at *3 (2d Cir. Nov.

30, 2023) (quotations omitted).

This four-part test raises yet more fact-intensive issues that can only be resolved through

discovery and the presentation of evidence. As to step one, the constantly-shifting nature of the

Terms of Use raises doubt as to whether the clause was "reasonably communicated" to any

particular Defendant, and requires a factual inquiry into the methods used and the effectiveness

thereof. As the Examiner's Report points out, "Celsius's Terms of Use, which customers accepted

by clicking their agreement when opening a Celsius account, also conflicted with what Celsius

told its customers."[58]  Indeed, this Court has already recognized that many Celsius account holders

may have valid arguments that they were misled by Celsius. *See* Memorandum Opinion and Order

Regarding Ownership of Earn Account Assets, Docket No. 1822, at 43 ("The Court takes seriously

potential violations of state law and non-bankruptcy federal law, as well as the litany of allegations

including, but not limited to, fraudulent inducement into the contract, fraudulent conveyance,

breach of contract, and that the contract was unconscionable. These allegations may (or may not)

have merit, and the creditors' rights with respect to such claims are explicitly reserved for the

claims resolution process.").

In this regard, New York courts have recognized fraudulent inducement as a basis for

rescission or defense against enforcement of a contract. *Eurotech Dev. Inc. v. Adirondack*

*Pennysaver Inc.*, 224 A.D.2d 738, 636 N.Y.S.2d 956 (1996) ("[D]efendants may be entitled to

---

[58] Examiner's Report at 20.

rescission of purchase agreement if their allegations of fraud in inducement . . . can be proven.");

*Sillam v. Labaton Sucharow LLP*, No. 21 CV 6675 (CM), 2022 WL 1448673, at \*4 (S.D.N.Y. May

9, 2022) (a party "having plausibly alleged fraudulent inducement, is entitled to the equitable

remedy of rescission or non-enforcement."). Fraudulent inducement exists where there was "(1)

a misrepresentation or omission of material fact; (2) which the [counterparty] knew to be false; (3)

which the [counterparty] made with the intention of inducing reliance; (4) upon which the [party]

reasonably relied; and (5) which caused injury to the [party]." *Wynn v. AC Rochester*, 273 F.3d

153, 156 (2d Cir. 2001).

Celsius's myriad misleading or outright false representations to customers, in particular as

to the nature and circumstances of the purported "migration" from the United Kingdom to the

United States, give rise to the argument that the Terms of Use—or at least, later versions containing

a New York choice of law provision—should be rescinded or held unenforceable as to various

Defendants. Neither Mr. Mashinsky nor anyone else at Celsius disclosed that the reason for the

purported migration from the U.K. to the U.S. was because U.K. regulators were nipping at

Celsius' heels. Whether a Defendant "reasonably relied" on Celsius's misrepresentations and was

thus fraudulently induced into agreeing to each relevant Terms of Use, including any change from

an English to New York venue provision, could require individualized discovery and presentation

of fact.

Moreover, many Defendants are citizens of nations that significantly limit the

enforceability of forum selection clauses against consumers, implicating the fourth step in the

analysis (whether enforcing the forum selection clause would be unreasonable and unjust). For

example, Regulation (EU) No. 1215/2012 of the European Parliament and of the Council, on

jurisdiction and the recognition and enforcement of judgments in civil and commercial matters

34

("Brussels I bis"), which applies to all Defendants residing in the European Union, protects consumers in the EU regardless of where the commercial counterparty is domiciled, and confers certain protections on consumers, such as requiring that a forum selection clause be agreed to *after* a dispute has arisen, that would preclude the enforcement of the forum selection clause.  Regulation (EU) No. 1215/2012 of the European Parliament and of the Council, art. 19(1), 2015 O.J. (L 351).  Thus, the reasonable expectations of different Defendants could vary depending on (among other things) whether they are protected from the forum selection clauses in the Terms of Use by the laws of their home jurisdiction.

Finally, even where a foreign Defendant "*purposefully* established minimum contacts," that would not mean that this Court automatically had specific personal jurisdiction over the Defendant. Rather, those contacts would need to be balanced against certain factors to determine if the assertion of personal jurisdiction comported with notions of "fair play and substantial justice." *Licci*, 732 F.3d at 170 (emphasis added).  Those factors include "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; [and] (3) the plaintiff's interest in obtaining convenient and effective relief."  *Id.*

The burden on foreign Defendants in these cases will be significant, depending on the circumstances of each individual.  In addition to the general difficulty of engaging in litigation in another country, many do not speak English, are located in countries with legal systems that differ significantly from that in the United States, or are from countries with consumer-protection and other laws that create a reasonable expectation that the Defendants would be protected from actions like these.  Conversely, the United States has no special interest in these cases; both the creditors on whose behalf Plaintiff is acting and the Defendants (who overlap, in many instances) are located throughout the world, and many of the actual transactions giving rise to these actions took place

in or through the United Kingdom, not the United States. And, while Plaintiff has an interest in streamlining these proceedings for his convenience, that convenience does not automatically outweigh the substantial burden many Defendants would face if forced to litigate these actions here.

Again, these issues cannot be resolved for all Defendants *en masse* without any discovery, presentation of evidence, and fact-finding. Thus, just as with the question of extraterritoriality, the Court should put in place procedures for Phase Two, so that the parties can develop a factual record. Discovery and evidentiary presentations can, of course, be coordinated among the various Actions, so as to avoid undue cost and duplication of effort. But, while the process should be as efficient a manner as possible, the issue of personal jurisdiction over foreign Defendants, like that of extraterritoriality, "is necessarily a fact-sensitive inquiry dependent on the particulars of the case before the court." *Gucci Am. Inc.*, 721 F. Supp. 2d at 240.

## IV.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court (i) find that Plaintiff is bound by the Plan's definition of Withdrawal Preference Exposure; (ii) defer any ruling on extraterritoriality or personal jurisdiction until an adequate factual record has been developed; and (iii) grant such other and further relief as the Court deems appropriate.

**[signature pages follow]**

36

Dated: May 2, 2025

Respectfully submitted,

**TROUTMAN PEPPER LOCKE LLP**

By:    /s/ *Deborah Kovsky-Apap*
       Deborah Kovsky-Apap
       Robert S. Hertzberg
       875 Third Avenue
       New York, NY 10022
       Tel: 212-704-6000
       Email: deborah.kovsky@troutman.com
              robert.hertzberg@troutman.com

       *Attorneys for the Troutman Defendants*

**LOWENSTEIN SANDLER LLP**

By:    */s/ Daniel B. Besikof*
       Daniel B. Besikof
       Brittany M . Clark
       1251 Avenue of the Americas
       New York, New York 10020
       Tel:  212-262-6700
       Email: dbesikof@lowenstein.com
              bclark@lowenstein.com

       *Attorneys for the Lowenstein Defendants*

**WILMER CUTLER PICKERING HALE AND DORR LLP**

By:    /s/Philip D. Anker
       Philip D. Anker
       7 World Trade Center
       250 Greenwich Street
       New York, NY 10007 USA
       Tel: 212-230-8890
       Email: philip.anker@wilmerhale.com

       *Attorneys for Olney-Fraser Lawyers on behalf of the DOF Group of Defendants*

**AIDALA, BERTUNA & KAMINS, P.C.**

By:     /s/ *Imran H. Ansari*
        Imran H. Ansari
        546 Fifth Avenue, Sixth Floor
        New York, New York 10036
        Tel: (212) 486-0011
        Email: iansari@aidalalaw.com

        *Attorneys for Defendant Joshua Bingham*


**BECKER, GLYNN, MUFFLY, CHASSIN**
**& HOSINSKI LLP**

By:     /s/ *Alec P. Ostrow*
        Alec P. Ostrow
        299 Park Avenue
        New York, New York 10171
        Tel: 212-888-3033
        Email: aostrow@beckerglynn.com

        *Attorneys for Defendant Vincenzo Agui*


**BRESSLER, AMERY & ROSS P.C.**

By:     /s/*Christopher M. Vaughan*
        Christopher M. Vaughan, Esq.
        Louis F. Mendez, Esq.
        17 State Street 34th Floor
        New York, New York 10004
        Tel:  212-495-9300
        Email: cvaughan@bressler.com
                 lmendez@bressler.com

        *Attorneys for The Bressler Defendants*

38

**FREEMAN | NELSON**

By:       */s/ Shannon O.C. Nelson*
          Shannon O.C. Nelson (*pro hac vice* motion forthcoming)
          8484 Wilshire Blvd., Suite 515
          Beverly Hills, CA 90211
          Tel: 213-369-9560
          Email: snelson@fnlaw.net

          *Attorneys for Khanh Le Pham*


**JONES & ASSOCIATES**

By:       */s/ Roland Gary Jones*
          Roland Gary Jones
          1325 Avenue of the Americas 28th Floor
          New York, New York 10019
          Tel: 347-862-9254
          Fax: 212-202-4416
          www.rolandjones.com

          *Attorneys for Chieh Chung, Tomas Greif, Sakari Tapio Perttunen,*
          *Edward Won Jae Lee, Jonathan Michael Dawson, Jason Kirby*
          *Jason Kirby, Didier VanMaercke, Christopher Leclerc,*
          *Edwin Jared Veldheer, Coinlend Gmbh*


**K&L GATES LLP**

By:       /s/ Robert T. Honeywell
          Robert T. Honeywell
          599 Lexington Ave
          New York, New York 10022
          Telephone: (212) 536-4863
          Facsimile: (212) 536-3901
          E-mail: robert.honeywell@klgates.com

          *Attorneys for Defendant Andrew M. Tymms*

**MILBANK LLP**

By:    */s/ Jaimie Fedell*
       Jaimie Fedell
       55 Hudson Yards
       New York, New York 10001
       Tel: (212) 530-5000
       Email: jfedell@milbank.com

       *Attorneys for Defendant Alexander J.S. Hartley*


**PROSKAUER ROSE LLP**

By:    */s/ Brian Rosen*
       Brian Rosen
       Eleven Times Square
       New York, NY 10036-8299
       Tel: 212.969.3380
       Email: brosen@proskauer.com

       *Attorneys for Coinhouse LLC*


**As to Issue 1 only:**

**JACKSON WALKER LLP**

By:    */s/ Zachary McKay*
       Zachary McKay (*pro hac vice* motion forthcoming)
       1401 McKinney Street, Suite 1900
       Houston, TX 77010
       Tel: (713) 752-4200
       Facsimile: (713) 752-4221
       Email: zmckay@jw.com

       *Attorneys for Mike Boudet*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify a true and correct copy of the foregoing, and all attachments thereto, was filed on May 2, 2025 via the Court's CM/ECF system, which will serve a copy on all counsel of record.

By: _/s/ Deborah Kovsky-Apap_

Deborah Kovsky-Apap