**Hearing Date and Time: To Be Scheduled Following the Close of Briefing**
**Response Brief Deadline: June 27, 2025 (prevailing Eastern Time)**

**WHITE & CASE LLP**
Samuel P. Hershey
David M. Turetsky
Lucas Curtis
Nikita Ash
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: sam.hershey@whitecase.com
     david.turetsky@whitecase.com
     lucas.curtis@whitecase.com
     nikita.ash@whitecase.com

– and –

**WHITE & CASE LLP**

Keith H. Wofford
Devin Rivero (admitted *pro hac vice*)
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
Email: kwofford@whitecase.com
     devin.rivero@whitecase.com

– and –

**WHITE & CASE LLP**

Gregory F. Pesce (admitted *pro hac vice*)
Laura Baccash (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
Email: gregory.pesce@whitecase.com
     laura.baccash@whitecase.com

**WHITE & CASE LLP**
Ronald Gorsich (admitted *pro hac vice*)
Aaron Colodny (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Telephone: (213) 620-7700
Facsimile: (213) 620-7800
Email: rgorsich@whitecase.com
     aaron.colodny@whitecase.com

– and –

**ASK LLP**
Marianna Udem
60 East 42nd Street
46th Floor
New York, New York 10165
Telephone: (212) 267-7342
Facsimile: (212) 918-3427
Email: mudem@askllp.com

– and –

**ASK LLP**
Brigette McGrath
Kara E. Casteel (admitted *pro hac vice*)
2600 Eagan Woods Drive, Suite 400
St. Paul, Minnesota 55121
Telephone: (651) 406-9665
Facsimile: (651) 406-9676
Email: bmcgrath@askllp.com
     kcasteel@askllp.com

*Co-Counsel to Mohsin Y. Meghji, Litigation Administrator, as Representative for the Post-Effective Date Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  | § |  |
|---|---|---|
| In re: | § | |
| | § | |
| CELSIUS CUSTOMER PREFERENCE | § | Adv. Proc. No. 24-04024 (MG) |
| ACTIONS.[1] | § | |
| | § | |
| | § | |

**NOTICE OF LITIGATION ADMINISTRATOR'S OPENING BRIEF ON PHASE ONE
ISSUES IN ACCORDANCE WITH THE ORDER GRANTING REVISED MOTION FOR
AN ORDER ESTABLISHING STREAMLINED PROCEDURES GOVERNING
AVOIDANCE ACTIONS PURSUANT TO SECTIONS 502, 547, AND 550 OF THE
BANKRUPTCY CODE**

PLEASE TAKE NOTICE that Mohsin Y. Meghji, as Litigation Administrator

("**Plaintiff**" or the "**Litigation Administrator**") for Celsius Network LLC and its affiliated post-

effective date debtors (the "**Post-Effective Date Debtors**"), in accordance with the *Order*

*Granting Revised Motion for an Order Establishing Streamlined Procedures Governing*

*Avoidance Actions Pursuant to Sections 502, 547, and 550 of the Bankruptcy Code* [Consolidated

Dkt. No. 36][2] (the "**Procedures Order**"), has filed the *Litigation Administrator's Opening Brief*

*on Phase One Issues in Accordance with the Order Granting Revised Motion for an Order*

*Establishing Streamlined Procedures Governing Avoidance Actions Pursuant to Sections 502,*

---

[1] The Post-Effective Date Debtors in these chapter 11 cases (the "**Chapter 11 Cases**"), along with the last
four digits of each Post-Effective Date Debtor's federal tax identification number, are: Celsius Network
LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius
Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US
Holding LLC (7956); GK8 Ltd (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location
of Post-Effective Date Debtor Celsius Network LLC's principal place of business and the Post-Effective
Date Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New
Jersey 07030.

[2] "**Consolidated Dkt. No.**" refers to the docket styled *In re Celsius Customer Preference Actions*, Adv.
Proc. No. 24-04024 (MG) (Bankr. S.D.N.Y.).  Documents filed on this docket can be accessed free of
charge at https://cases.stretto.com/Celsius/court-docket/court-docket-category/2341-celsius-customer-
preference-actions-consolidated-docket/.  "**Main Dkt. No.**" refers to the docket styled *In re Celsius
Network LLC, et al.*, Case No. 22-10964 (MG) (Bankr. S.D.N.Y., filed July 13, 2022). Documents filed on
this docket can be accessed free of charge at https://cases.stretto.com/celsius/court-docket/.

*547, and 550 of the Bankruptcy Code* (the "**Phase One Opening Brief**"), seeking entry of an order, substantially in the form annexed to the Phase One Opening Brief as **Exhibit A**.

**PLEASE TAKE FURTHER NOTICE** that the Phase One Opening Brief addresses the following issues (collectively, the "**Phase One Issues**"): whether the presumption against extraterritoriality applies to the avoidance actions (the "**Avoidance Actions**")[3] brought by Plaintiff pursuant to sections 502, 547, and 550 of title 11 of the United States Code (the "**Bankruptcy Code**") and if so, whether sections 547 and 550 apply extraterritorially; (ii) whether the Court has specific personal jurisdiction over the defendants in connection with the Avoidance Actions (the "**Defendants**"); and (iii) whether the definition of "Withdrawal Preference Exposure" under the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates (Conformed for MiningCo Transaction)* [Main Dkt. No. 4289] (as amended, supplemented, or modified from time to time, the "**Plan**"), or sections 547(c) and 550(a), govern for purposes of calculating the amount of Defendants' potential liability in the Avoidance Actions.

**PLEASE TAKE FURTHER NOTICE** that a hearing to consider the Phase One Issues (the "**Hearing**") will be held before the Honorable Martin Glenn, Chief United States Bankruptcy Judge for the United States Bankruptcy Court for the Southern District of New York, at a time to be scheduled following the close of briefing.

**PLEASE TAKE FURTHER NOTICE** that the Hearing will be conducted in a format to be determined when the Hearing is scheduled.

---

[3] The Avoidance Actions are identified in Exhibit A to the *Second Notice of Additional Avoidance Action Subject to the Court's Order Granting Revised Motion for an Order Establishing Streamlined Procedures Governing Avoidance Actions Pursuant to Sections 502, 547, and 550 of the Bankruptcy Code* [Consolidated Dkt. No. 55].

**PLEASE TAKE FURTHER NOTICE** that responses must follow the requirements set forth in the Procedures Order, including page limits. The Procedures Order provides, among other things:

> Defendants shall coordinate among themselves regarding the process for preparing the joint opening and response briefs. Should any Defendant wish to make an argument that is **not** already being made in a joint brief, that Defendant may seek leave from the Court to make a supplemental filing. Such request to the Court must be made at least five (5) days before the joint brief is due and clearly state (i) the proposed issue to be briefed and (ii) the requested number of pages for the supplemental brief.

Procedures Order, Ex. 2 at 2.

**PLEASE TAKE FURTHER NOTICE** that responses, if any, to the Phase One Opening Brief must: (a) be in writing; (b) describe the basis for the response or opposition and the specific grounds therefor; (c) comply with the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York (the "**Rules**"); (d) be filed electronically with the Court on the docket of *In re Celsius Customer Preference Actions*, Adv. Proc. No. 24-04024 (MG) by registered users of the Court's electronic filing system and in accordance with all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York (which are available on the Court's website at http://www.nysb.uscourts.gov); and (e) be served in accordance with the *Second Amended Final Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief*, [Main Dkt. No. 2560] (the "**Case Management Order**") by June 27, 2025, prevailing Eastern Time, to (i) the entities on the Master Service List (as defined in the Case Management Order and available on the case website of the Debtors at https://cases.stretto.com/celsius) and (ii) any person or entity with a particularized interest in the subject matter of the Phase One Opening Brief.

**PLEASE TAKE FURTHER NOTICE** that only those responses that are timely filed, served, received, and submitted in accordance with the Rules and the Procedures Order will be considered at the Hearing.  Failure to file a timely response in accordance with the Rules and the Procedures Order may result in the Court not considering the response.

**PLEASE TAKE FURTHER NOTICE** that copies of all pleadings filed in these chapter 11 cases may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/Celsius. You may also obtain copies of the motions and other pleadings filed in these chapter 11 cases by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

*[Remainder of page intentionally left blank]*

Dated: May 2, 2025
        New York, New York

By: */s/ Samuel P. Hershey*

**WHITE & CASE LLP**
Samuel P. Hershey
David M. Turetsky
Lucas Curtis
Nikita Ash
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: sam.hershey@whitecase.com
        david.turetsky@whitecase.com
        lucas.curtis@whitecase.com
        nikita.ash@whitecase.com

– and –

**WHITE & CASE LLP**
Gregory F. Pesce (admitted *pro hac vice*)
Laura Baccash (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
Email: gregory.pesce@whitecase.com
        laura.baccash@whitecase.com

– and –

**WHITE & CASE LLP**
Keith H. Wofford
Devin Rivero (admitted *pro hac vice*)
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
Email: kwofford@whitecase.com
        devin.rivero@whitecase.com

**WHITE & CASE LLP**
Ronald Gorsich (admitted *pro hac vice*)
Aaron Colodny (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Telephone: (213) 620-7700
Facsimile: (213) 620-7800
Email: rgorsich@whitecase.com
        aaron.colodny@whitecase.com

**ASK LLP**
Marianna Udem, Esq.
60 East 42nd Street
46th Floor
New York, New York 10165
Telephone: (212) 267-7342
Facsimile: (212) 918-3427
Email: mudem@askllp.com
– and –

**ASK LLP**
Brigette McGrath, Esq.
Kara E. Casteel, Esq. (admitted *pro hac vice*)
2600 Eagan Woods Drive, Suite 400
St. Paul, Minnesota 55121
Telephone: (651) 406-9665
Facsimile: (651) 406-9676
Email: bmcgrath@askllp.com
        kcasteel@askllp.com

*Co-Counsel to Mohsin Y. Meghji, Litigation Administrator, as Representative for the Post-Effective Date Debtors*

**WHITE & CASE LLP**
Samuel P. Hershey
David M. Turetsky
Lucas Curtis
Nikita Ash
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: sam.hershey@whitecase.com
           david.turetsky@whitecase.com
           lucas.curtis@whitecase.com
           nikita.ash@whitecase.com

– and –

**WHITE & CASE LLP**

Keith H. Wofford
Devin Rivero (admitted *pro hac vice*)
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
Email: kwofford@whitecase.com
           devin.rivero@whitecase.com

– and –

**WHITE & CASE LLP**

Gregory F. Pesce (admitted *pro hac vice*)
Laura Baccash (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
Email: gregory.pesce@whitecase.com
           laura.baccash@whitecase.com

**WHITE & CASE LLP**

Ronald Gorsich (admitted *pro hac vice*)
Aaron Colodny (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Telephone: (213) 620-7700
Facsimile: (213) 620-7800
Email: rgorsich@whitecase.com
           aaron.colodny@whitecase.com

– and –

**ASK LLP**
Marianna Udem
60 East 42nd Street
46th Floor
New York, New York 10165
Telephone: (212) 267-7342
Facsimile: (212) 918-3427
Email: mudem@askllp.com

– and –

**ASK LLP**
Brigette McGrath
Kara E. Casteel (admitted *pro hac vice*)
2600 Eagan Woods Drive, Suite 400
St. Paul, Minnesota 55121
Telephone: (651) 406-9665
Facsimile: (651) 406-9676
Email: bmcgrath@askllp.com
           kcasteel@askllp.com

*Co-Counsel to Mohsin Y. Meghji, Litigation Administrator, as Representative for the Post-Effective Date Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | |
| | § | |
| CELSIUS CUSTOMER PREFERENCE | § | Adv. Proc. No. 24-04024 (MG) |
| ACTIONS.[1] | § | |
| | § | |
| | § | |

### LITIGATION ADMINISTRATOR'S OPENING BRIEF ON PHASE ONE ISSUES IN ACCORDANCE WITH THE ORDER GRANTING REVISED MOTION FOR AN ORDER ESTABLISHING STREAMLINED PROCEDURES GOVERNING AVOIDANCE ACTIONS PURSUANT TO SECTIONS 502, 547, AND 550 OF THE BANKRUPTCY CODE

---

[1] The Post-Effective Date Debtors in these chapter 11 cases (the "**Chapter 11 Cases**"), along with the last four digits of each Post-Effective Date Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Post-Effective Date Debtor Celsius Network LLC's principal place of business and the Post-Effective Date Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................2

BACKGROUND ......................................................................................................4

    A.    The Celsius Business Model and its Programs ...................................4

    B.    The Celsius Corporate Structure and Relationships with Customers ................5

    C.    Celsius's Financial Decline Leading Up to the Petition Date ...........................6

    D.    The Chapter 11 Cases....................................................................7

    E.    The Avoidance Actions ..................................................................8

    F.    Celsius's Settlement Offer ..............................................................9

    G.    Avoidance Action Litigation............................................................9

PHASE ONE ISSUES ..............................................................................................10

ARGUMENT .........................................................................................................10

I.    The Presumption Against Extraterritoriality Does Not Bar the Avoidance Actions....10

    A.    The Transfers at Issue Are Domestic. ...............................................11

    B.    Sections 547 and 550 of the Bankruptcy Code Apply Extraterritorially. .........15

        1.    The Statutory Scheme Supports Extraterritorial Application of Sections 547 and 550. ..........................................................16

        2.    Extraterritorial Application of Sections 547 and 550 Accords with a Core Purpose of the Bankruptcy Code..................................17

II.    The Court Has Specific Personal Jurisdiction over the Defendants. ...........................18

    A.    The Foreign Defendants Purposely Availed Themselves of the United States by Agreeing to the Terms of Use....................................................19

    B.    The Foreign Defendants' Challenged Conduct Is Directly Related to Their Contacts with the United States. ....................................................22

    C.    The Exercise of Jurisdiction Is Reasonable Under the Circumstances .............23

III.    Sections 547 and 550 of the Bankruptcy Code Control the Calculation of Damages in the Avoidance Actions, Not the Definition of "WPE" in the Limited-Time, Defunct Plan Settlement Offer That Defendants Rejected. ......................................................24

i

D.      The Plan Preserved and Did Not Waive the Litigation Administrator's Right
        to Calculate Preference Liability in Accordance with the Bankruptcy Code. ...32

CONCLUSION.................................................................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Bahl v. NYCOM-NYIT,*
14-cv-4020-AKT, 2017 WL 5479655 (E.D.N.Y. Mar. 31, 2017) ....................................................21

*Baskett v. Autonomous Rsch. LLP,*
No. 17-CV-9237-VSB, 2018 WL 4757962 (S.D.N.Y. Sept. 28, 2018)............................................22

*In re Bernard L. Madoff Inv. Sec. LLC,*
418 B.R. 75 (Bankr. S.D.N.Y. 2009) ............................................................................................20

*Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.,*
448 F.3d 573 (2d Cir. 2006)........................................................................................................32

*Burger King Corp. v. Rudzewicz,*
471 U.S. 462 (1985)............................................................................................................19, 20

*Chevron Corp. v. Donzinger,*
974 F. Supp. 2d 362 (S.D.N.Y. 2014)..........................................................................................20

*Chloe v. Queen Bee of Beverly Hills, LLC,*
616 F.3d 158 (2d Cir. 2010)........................................................................................................23

*Cooper v. Ashley Commc'ns, Inc. (In re Morris Commc'ns NC Inc.),*
75 B.R. 619 (Bankr. W.D.N.C. 1987)...........................................................................................27

*Corp. v. Bayerische Moteren Werke Aktiengesellschaft (In re FAH Liquidating Corp.),*
572 B.R. 117 (Bankr. D. Del. 2017) ............................................................................................16

*CutCo Indus., Inc. v. Naughton,*
806 F.2d 361 (2d Cir. 1986)........................................................................................................20

*D.H. Blair & Co. v. Gottdiener,*
462 F.3d 95 (2d Cir. 2006)....................................................................................................20, 21

*Diaz-Barba v. Kismet Acquisition, LLC,*
No. 08-cv-1446-BTM-BLM, 2010 WL 2079738 (S.D. Cal. May 20, 2010) ...................................16

*Feltman v. Warmus (In re Am. Way Serv. Corp.),*
229 B.R. 496 (Bankr. S.D. Fla. 1999)..........................................................................................27

*French v. Liebmann (In re French),*
440 F.3d 145 (4th Cir. 2006).................................................................................15, 16, 17, 18

*Gonzales v. DPI Food Prods. (In re Furrs Supermarkets, Inc.),*
296 B.R. 33 (Bankr. D.N.M. 2003)..............................................................................................30

iii

*Govaert v. B.R.E. Holding Co. (In re Blitstein)*,
    105 B.R. 133 (Bankr. S.D. Fla. 1989) ........................................................................... 26

*Gunsalus v. Cty. of Ontario*,
    37 F.4th 859 (2d Cir. 2022) ......................................................................................... 28

*In re Hipple*,
    225 B.R. 808 (Bankr. N.D. Ga. 1996) ......................................................................... 29

*Hirsch v. Gersten (In re Centennial Textiles, Inc.)*,
    220 B.R. 165 (Bankr. S.D.N.Y. 1998) .................................................................... 27, 28

*In re HS 45 John LLC*,
    585 B.R. 64 (Bankr. S.D.N.Y. 2018) ........................................................................... 32

*Joseph v. Madray (In re Brun)*,
    360 B.R. 669 (Bankr. C.D. Cal. 2007) ......................................................................... 31

*Koninklijke Philips Elecs. v. Digital Works, Inc.*,
    358 F. Supp. 2d 328 (S.D.N.Y. 2005) ......................................................................... 21

*Krohn v. ADM Milling Co. (In re Dependable Food Prod.)*,
    193 B.R. 662 (Bankr. E.D.N.Y. 1996) ......................................................................... 29

*Lehman Bros. Sp. Fin. Inc. v. Bank of Am. Nat'l Ass'n (In re Lehman Bros. Holdings Inc.)*,
    535 B.R. 608 (Bankr. S.D.N.Y. 2015) ......................................................................... 18

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
    732 F.3d 161 (2d Cir. 2013) ......................................................................................... 22

*Luitpold Pharms., Inc. v. Ed. Geistlich Söhne A.G. Für Chemische Industrie*,
    784 F.3d 78 (2d Cir. 2015) ........................................................................................... 32

*Meghji v. Spadafora (In re Celsius Network LLC)*,
    Adv. Proc. 24-03981, Case No. 22-10964 (MG), 2025 WL 1232578 (Bankr. S.D.N.Y. Apr. 28,
    2025) ....................................................................................................................... 23, 24

*In re Meredith Manor, Inc.*,
    902 F.2d 257 (4th Cir. 1990) ....................................................................................... 29

*MOAC Mall Holdings LLC v. Transform Holdco LLC (In re Sears Holdings Corp.)*,
    661 B.R. 298 (S.D.N.Y. 2024) ..................................................................................... 28

*Morrison v. Nat'l Austl. Bank Ltd.*,
    561 U.S. 247 (2010) ..................................................................................................... 15

*Motors Liquidation Co. Avoidance Action Tr. ex rel. Wilmington Tr. Co. v. JPMorgan Chase Bank,
    N.A. (In re Motors Liquidation Co.)*,
    565 B.R. 275 (Bankr. S.D.N.Y. 2017) ......................................................................... 21

iv

*In re Nettel Corp.*,
    No. 00-01771-SMT, 2017 WL 5664840 (Bankr. D.D.C. Oct. 2, 2017) ........................................... 29

*Official Comm. of Unsec. Cred. of Arcapita Bank B.S.C.(c) v. Bahrain Islamic Bank (In re Arcapita Bank B.S.C.(c))*,
    575 B.R. 229 (Bankr. S.D.N.Y. 2017) .................................................................................... 12, 13

*In re Picard*,
    917 F.3d 85 (2d Cir. 2019) .......................................................................... 11, 12, 13, 14, 15

*Pritchard v. Brown (In re Brown)*,
    118 B.R. 57 (Bankr. N.D. Tex. 1990) ..................................................................................... 28

*Red.com, Inc. v. Jinni Tech. Ltd.*,
    No. SAC17-00382-CJC(KESx), 2017 WL 8223610 (C.D. Cal. Nov. 29, 2017)........................... 21

*Riske v. Seitz Irr. Trust (In re Seitz)*,
    400 B.R. 707 (Bankr. E.D. Mo. 2008) ............................................................................... 29, 32

*RJR Nabisco, Inc. v. Eur. Cmty.*,
    579 U.S. 325 (2016) ......................................................................................................... 11, 15

*Rose v. Int'l Bus. Machs. Corp.*,
    2:23-cv-09123-MCS-SSC, 2024 WL 3914471 (C.D. Cal. June 25, 2024) ...................................... 21

*Sanders v. Hang (In re Hang), Adv. Proc.* ,
    No. 05-30655, 2007 WL 2344958 (Bankr. E.D. Cal. Aug. 16, 2007) ............................................ 27

*Sec. & Exch. Comm'n v. PlexCorps*,
    No. 17-CV-7007, 2018 WL 4299983 (E.D.N.Y. Aug. 9, 2018) ..................................................... 22

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    480 B.R. 501 (Bankr. S.D.N.Y. 2012) .......................................................................... 12, 13, 16, 17

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC*,
    460 B.R. 106 (Bankr. S.D.N.Y. 2011) .................................................................................. 19, 20

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv., Sec., LLC*,
    474 B.R. 76 (S.D.N.Y. 2012) ................................................................................................. 19

*In re Tether & Bitfinex Crypto Asset Litig.*,
    576 F. Supp. 3d 55 (S.D.N.Y. 2021) ...................................................................................... 23

*In re Thomas W. Garland, Inc.*,
    19 B.R. 920 (Bankr. E.D. Mo. 1982) ..................................................................................... 30

*Tulis v. Gordos N. Rest. Corp. (In re Gordos Rest. Corp.)*,
    643 B.R. 1 (Bankr. S.D.N.Y. 2022) ........................................................................................ 31

*U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*,
    916 F.3d 151 (2d Cir. 2019) .......................................................................................... 19, 22

*Ultracashmere House, Ltd. v. Madison's of Columbus, Inc.*,
    534 F. Supp. 542 (S.D.N.Y. 1982) ................................................................................... 21

*Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*,
    543 B.R. 127 (Bankr. S.D.N.Y. 2016) ................................................... 11, 15, 16, 18

*Wiener v. AXA Equitable Life Ins. Co.*,
    113 F.4th 201 (2d Cir. 2024) ........................................................................................ 32

*Yao v. Chen*,
    No. CV TDC-23-0889, 2024 WL 1051740 (D. Md. Mar. 11, 2024) ................................. 23

*Young v. Cont'l Worsteds, Inc. (In re Wingspread Corp.)*,
    120 B.R. 8 (Bankr. S.D.N.Y. 1990) .............................................................................. 29

## FEDERAL STATUTES

11 U.S.C. § 502 ............................................................................................................... 1, 10

11 U.S.C. § 541 ............................................................................................................... 16, 17

11 U.S.C. § 547 ..............................................................................................................*passim*

11 U.S.C. § 548 ............................................................................................................... 12, 16

11 U.S.C. § 550 ..............................................................................................................*passim*

## FEDERAL RULES

Fed. R. Bankr. P. 7004 ....................................................................................................... 18

Mohsin Y. Meghji, as Litigation Administrator ("**Plaintiff**" or the "**Litigation Administrator**") for Celsius Network LLC and its affiliated post-effective date debtors (the "**Post-Effective Date Debtors**," and, together with their non-debtor affiliates, "**Celsius**"),[2] through his undersigned counsel, in accordance with the *Order Granting Revised Motion for an Order Establishing Streamlined Procedures Governing Avoidance Actions Pursuant to Sections 502, 547, and 550 of the Bankruptcy Code* [Consolidated Dkt. No. 36][3] (the "**Procedures Order**"), hereby submits this opening brief with respect to the following issues (collectively, the "**Phase One Issues**"): (i) whether the presumption against extraterritoriality applies to the avoidance actions (the "**Avoidance Actions**") brought by Plaintiff pursuant to sections 502, 547, and 550 of title 11 of the United States Code (the "**Bankruptcy Code**") and, if so, whether sections 547 and 550 apply extraterritorially; (ii) whether the Court has specific personal jurisdiction over the defendants in connection with the Avoidance Actions (the "**Defendants**"); and (iii) whether the definition of "Withdrawal Preference Exposure" under the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates (Conformed for MiningCo Transaction)* [Main Dkt. No. 4289] (as amended, supplemented, or modified from time to time, the "**Plan**"), or sections 547(c) and 550(a) govern for purposes of calculating the amount of

---

[2] Prior to the Effective Date (defined below), the Post-Effective Date Debtors are referred to as the "**Debtors**."

[3] The Avoidance Actions are identified in Exhibit A to the *Second Notice of Additional Avoidance Action Subject to the Court's Order Granting Revised Motion for an Order Establishing Streamlined Procedures Governing Avoidance Actions Pursuant to Sections 502, 547, and 550 of the Bankruptcy Code* [Consolidated Dkt. No. 55].  "**Consolidated Dkt. No.**" refers to the docket styled *In re Celsius Customer Preference Actions*, Adv. Proc. No. 24-04024 (MG) (Bankr. S.D.N.Y.).  Documents filed on this docket can be accessed free of charge at https://cases.stretto.com/Celsius/court-docket/court-docket-category/2341-celsius-customer-preference-actions-consolidated-docket/.  "**Main Dkt. No.**" refers to the docket styled *In re Celsius Network LLC, et al.*, Case No. 22-10964 (MG) (Bankr. S.D.N.Y., filed July 13, 2022).  Documents filed on this docket can be accessed free of charge at https://cases.stretto.com/celsius/court-docket/.

Defendants' potential liability in the Avoidance Actions. In connection with the Phase One Issues, the Litigation Administrator seeks entry of an order, substantially in the form attached to this brief as **Exhibit A**. In support of his position on the Phase One Issues, the Litigation Administrator respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The Litigation Administrator brought the Avoidance Actions to recover and equitably redistribute billions of dollars in assets that were transferred from Celsius's platform shortly before its bankruptcy. The Litigation Administrator's goal has always been to settle these cases where reasonably possible, and for more than a year, he has invested substantial time and resources into mediation and settlement. The result of this work is that thousands of parties have settled, returning over $100 million to the Celsius estates and thereby providing substantial value which can be equitably distributed among creditors. Still, there remain more than a thousand Defendants with combined preference exposure of over $1 billion who, despite ample opportunity, have not settled. Accordingly, the Litigation Administrator hereby commences the "phase one" litigation against the non-settling Defendants, for the benefit of all other Celsius stakeholders.

2.      The Phase One Issues fall into three buckets: (i) the extraterritorial application of sections 547 and 550 of the Bankruptcy Code, (ii) personal jurisdiction over Avoidance Action Defendants, and (iii) the amount of recoveries to which the Litigation Administrator is entitled under sections 547 and 550. The Litigation Administrator prevails on all three issues.

3.      *First*, to determine whether section 547 applies extraterritorially, the Court need look no further than whether there is a "domestic application" of section 547 in the Avoidance Actions. There is. Customers of Celsius entered into a contractual agreement with named counterparty Celsius Network LLC ("**LLC**"), a U.S. entity, and agreed that their transactions with LLC would be governed by U.S. law and any resulting disputes would be subject to U.S.

2

jurisdiction and venue.  Moreover, when customers withdrew assets from Celsius, in nearly all cases, the transfers came from U.S. wallets.  These facts demonstrate that the initial transfers from LLC, which are the "focus" of section 547, were domestic.  The analysis stops there.  However, if the Court were to continue the inquiry, it would find that Congress intended sections 547 and 550 to apply extraterritorially, which is consistent with both abundant case law on the issue and the goals and purposes of the Bankruptcy Code.

4.      **Second**, the Court has specific personal jurisdiction over all Defendants in the Avoidance Actions.  It is indisputable that the Court has personal jurisdiction over Defendants who reside in the United States.  As to the Defendants who reside outside of the United States, every one of them entered into a contract with Celsius that provided for (i) a U.S. counterparty (LLC), (ii) New York governing law, and (iii) New York jurisdiction.  The law is clear that these contractual provisions give this Court personal jurisdiction over Defendants.

5.      **Third**, the plain language of section 550(a) entitles the Litigation Administrator to recover "the property transferred, or, if the court so orders, the value of such property."  In the majority of Avoidance Actions, the property at issue has appreciated substantially, and the Celsius estate (rather than Defendants, the preference transferees) should receive the benefit of that appreciation.  Additionally, the plain language of section 547(c)(4) provides that only those transfers to Celsius made "after" a preferential transfer can qualify as "new value."  That reading aligns with the statute's purpose.  Defendants seek to use cherry-picked terms from a limited-time, defunct Plan settlement offer—which Defendants rejected—to override Celsius's rights under the Plan and the Bankruptcy Code.  That effort fails.

3

# BACKGROUND[4]

## A.    The Celsius Business Model and its Programs

6.      Celsius began in 2017.  Through Celsius's online exchange platform, customers could transfer their cryptocurrency assets to Celsius in exchange for weekly interest (the "**Earn Program**").  The Earn Program allowed customers to deposit "Digital Assets" with Celsius ("**Earn Accounts**") and, in exchange, earn interest, referred to as "Rewards," in the form of Digital Assets.[5]  *See* Compl. ¶¶ 20–21.  The Celsius Terms of Use (the "**Terms of Use**")[6] governed the relationship between Celsius's customers and Celsius with respect to the Earn Program.  Earn Decision at 30.[7]

7.      As recognized by the Court, the Terms of Use unambiguously transferred title and ownership of Digital Assets deposited into Earn Accounts from each Celsius customer to Celsius. *Id.* ("[T]he Terms of Use formed a valid, enforceable contract between the Debtors and Account Holders, and . . . the Terms [of Use] unambiguously transfer title and ownership of Earn Assets deposited into Earn Accounts from Accounts Holders to the Debtors.").  The Terms of Use provide that the customer "grant[s] Celsius all rights and title to such Digital Assets, for Celsius to use in its sole discretion while using the Earn Service." Compl. ¶ 21.  Celsius is thus granted the right "to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of

---

[4] As the Court is aware, the Litigation Administrator has filed approximately 2,500 complaints against Defendants (the "**Complaints**"), which are substantially identical except for specific details regarding individual Defendants' personal information and particular transaction histories.  For reference, the Litigation Administrator has attached a sample complaint to this brief as **Exhibit B**.

[5] "Digital Assets" and "Rewards" are defined in the Terms of Use.

[6] The Terms of Use are incorporated by reference in the Complaints.

[7] On January 4, 2023, the Court entered an opinion and order determining that cryptocurrency assets deposited in Earn Accounts prior to the Petition Date constitute property of the Debtors' Estates.  *See Memorandum Opinion and Order Regarding Ownership of Earn Account Assets* [Main Dkt. No. 1822] (the "**Earn Decision**").

ownership," and "to use or invest such Digital Assets in [its] full discretion."  *See* Earn Decision at 10–11.

### B.    The Celsius Corporate Structure and Relationships with Customers

8.    Beginning in 2021 and through the date of the Debtors filing for bankruptcy (the "**Petition Date**"), Celsius faced increasing regulatory pressure.  Compl. ¶¶ 25–27.  In response, Celsius shifted its primary operations and business relationships and obligations to customers away from Celsius Network Limited ("**CNL**"), a U.K. entity, to LLC, a Delaware entity.  *Id.* ¶ 26. Specifically, Celsius "migrated" all customer balances and obligations arising from transactions on the Celsius platform from CNL to LLC.  *Id.*

9.    On July 22, 2021, the Terms of Use were updated to "**Version 6**."[8]  Terms of Use Decl. at 5; *see also* Compl. ¶ 22.  Among other changes, the Terms of Use added LLC as a contractual counterparty for all customers.   Compl. ¶ 22. Additionally, the governing law of the Terms of Use was changed from English law to New York law, and any disputes "arising out of, or related to, [a customer's] Celsius Account or relationship with Celsius must be brought exclusively in the competent courts located in New York, NY[.]" *Id.*   Moreover, any arbitration or related proceeding was designated to take place in New York or the state and federal courts thereof, and was to be governed by the American Arbitration Association. Terms of Use Decl. at 309, 313.

10.    When this change was made, Celsius's customers were required to agree to abide by the updated Terms of Use by clicking a check-box to "acknowledge that under the new [Terms of Use], the services will be provided to me by Celsius Network LLC, and that Celsius Network Limited shall transfer to Celsius Network LLC my data, account balance, and its rights and

---

[8] *Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, Providing Terms of Use Dating Back to February 18, 2018* [Main Dkt. No. 393] (the "**Terms of Use Declaration**").

obligations to me," which included a "[c]hange of legal entity [to LLC], a Delaware company"

and "[c]hange of governing laws [to] (NY)[.]"[9] *Declaration of Oren Blonstein, Head of Innovation*

*and Chief Compliance Officer of the Debtors, in Support of the Debtors' Motion Regarding*

*Ownership of Earn Assets and the Sale of Stablecoin* [Main Dkt. No. 1327], Exs. A-7, A-9

("**Blonstein II Declaration**"); *see also* Customer Claims Decision at 11; *see also* Compl. ¶ 22;

Earn Decision at 31–33. The Court found in the Earn Decision that an account holder's clicking

to accept the terms was a valid acceptance, forming a contract between LLC and each Defendant.

Earn Decision at 31-34.

### C.    Celsius's Financial Decline Leading Up to the Petition Date

11.    Celsius was insolvent for the entire 90-day period prior to the bankruptcy filing. In

March 2022, Celsius internally acknowledged that it was not producing revenue sufficient to cover

liabilities or additional operating expenses. Compl. ¶ 23. By May 16, 2022, Celsius's liquidity had

dropped by 40% due to customer withdrawals and steep price declines in Bitcoin ("**BTC**") and

Ethereum ("**ETH**"). *Id.* ¶ 30.

12.    Celsius entered even more dire straits that month, as the amount of digital assets

transferred off the Celsius platform began to increase dramatically. On May 7, 2022, what started

as a spike in withdrawals turned into an explosion when the cryptocurrency token TerraUSD

suffered a significant loss of value (the "**Terra Luna Crash**"). *Id.* ¶ 28. In the face of the Terra

Luna Crash, Celsius experienced a "run on the bank." *Id.* ¶ 31. Seventy-five percent of the

withdrawals during the Preference Period occurred after the Terra Luna Crash, severely hobbling

an already struggling Celsius. *Id.* ¶ 29. As of July 2022, Celsius had billions of dollars tied up in

---

[9] On March 9, 2023, the Court entered the *Memorandum Opinion Regarding Which Debtor Entities Have Liability for Customer Claims Under the Terms of Use* [Main Dkt. No. 2205] ("**Customer Claims Decision**"). The Court examined the Terms of Use and determined that users have contract claims against only LLC under the Terms of Use.

illiquid investments, including approximately 410,517 staked ETH, and an outstanding loan balance of approximately $649 million owed by its affiliated mining operation.  Disclosure Statement at 148, 158.[10]  As a result, Celsius held insufficient assets to address customer withdrawal requests.

13.    Over the course of May and June 2022, cryptocurrency prices dropped significantly.  In May, BTC was down 15.7% month-over-month.  Compl. ¶ 31.  June was even worse, as BTC was down 37.9%.  *Id.*  This caused many customers who had not already withdrawn their assets to seek to do so, demanding assets that Celsius did not have the liquidity to provide *en masse*.  This system-wide run on the bank caused many other players in the cryptocurrency markets to collapse under the same pressures, with cryptocurrency hedge fund Three Arrows Capital, Ltd. and cryptocurrency brokerage company Voyager Digital Holdings, Inc. filing for bankruptcy on July 1, 2022, and July 5, 2022, respectively.   *See In re Three Arrows Cap., Ltd.,* No. 22-10920 (MG) (Bankr. S.D.N.Y.); *In re Voyager Digit. Holdings, Inc.,* No. 22-10943 (MEW) (Bankr. S.D.N.Y.).

14.    On June 12, 2022, Celsius paused all withdrawals from the platform to finally stop the run on the bank (the "**Pause**").  *See* Plan Art. IV.G.  Customers who had assets on the platform were left without recourse, unable to withdraw or sell their coins.  A matter of minutes, in some cases, made the difference between being a customer who could withdraw assets and a customer who had his or her assets frozen indefinitely while their value continued to plummet.

### D.    The Chapter 11 Cases

15.    On July 13, 2022, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

---

[10] *Fourth Notice of Filing of Revised Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates* [Main Dkt. No. 3332] (the "**Disclosure Statement**").

16.    On November 9, 2023, the Court entered *Findings of Fact, Conclusions of Law, and Order Signed on November 9, 2023 Confirming the Modified Joint Chapter 11 Plan of Celsius Network LLC and its Debtor Affiliates* [Main Dkt. No. 3972] (the "**Confirmation Order**").[11]  On January 31, 2024, the Plan went effective (the "**Effective Date**"). *See Notice of Occurrence of Effective Date of Debtors' Modified Chapter 11 Plan of Reorganization and Commencement of Distributions* [Main Dkt. No. 4298].  Under the Plan, the Litigation Administrator was appointed to prosecute, settle, or otherwise resolve any claims still remaining in the estates of the Post-Effective Date Debtors (collectively, the "**Estates**") and to serve as the Estates' representative in any litigation.  *See* Plan Art. IV.L; *see also Eleventh Notice of Filing of Plan Supplement*, Ex. B [Main Dkt. No. 4297] (the "**Litigation Administrator Agreement**").

E.    **The Avoidance Actions**

17.    One of the Litigation Administrator's first priorities after appointment was investigating the enormous preference liability of the thousands of creditors who received transfers in the 90 days prior to the Petition Date (the "**Preference Period**"), thereby receiving superior recoveries (and in many cases, appreciation in value) compared to what was received by creditors under the Plan.  Creditors who withdrew their funds from the platform in the hours, days, and weeks preceding the Pause contributed to the run on the bank that accelerated Celsius's collapse.  By avoiding these preferential transfers, the Estates will be able to distribute a higher percentage of value *equally* across all similarly situated creditors.

---

[11] On December 27, 2023, the Court entered an order authorizing the Debtors to amend the terms of the chapter 11 plan of reorganization [Main Dkt. No. 4172], and subsequently, the Debtors filed the Plan at Main Docket No. 4289, in accordance with that order.

### F.    Celsius's Settlement Offer

18.    On March 20, 2024, the Litigation Administrator issued a notice setting forth a settlement offer (the "**Settlement Offer**") to individuals identified as having received transfers of more than $100,000 of cryptocurrency from the platform during the Preference Period.[12]   The Settlement Offer gave current and former account holders who directed and received such transfers the opportunity to resolve their preference exposure immediately through payment to the Litigation Administrator equal to 13.75% of the transaction date pricing for the transferred assets.   While the Litigation Administrator initiated Avoidance Actions in July 2024 against individuals and entities who had not accepted the Settlement Offer, the Settlement Offer remained available at the Court's direction through October 29, 2024.   The Litigation Administrator took numerous steps to inform Defendants of the Settlement Offer, including through emails, direct mailings and social media postings.   The Litigation Administrator also filed notices on the public docket of the Settlement Offer's expiration date.   *See Notice of Deadline to Accept Settlement Offer in Connection with Celsius Customer Preference Actions* [Consolidated Dkt. No. 4]; *Amended Notice of Deadline to Accept Settlement Offer in Connection with Celsius Customer Preference Actions* [Consolidated Dkt. 27].

19.    To date, approximately 2,400 parties have executed settlement agreements in connection with the Litigation Administrator's preference claims.

### G.    Avoidance Action Litigation

20.    In July 2024, the Litigation Administrator filed thousands of Avoidance Actions against non-settling parties.   On July 22, 2024, the Litigation Administrator filed a motion seeking an order establishing streamlined procedures to govern the Avoidance Actions.   *Motion for an*

---

[12] The Plan released all customers with less than $100,000 of preference liability at transaction date pricing.

*Order Establishing Streamlined Procedures Governing Avoidance Actions Pursuant to Sections 502, 547, and 550 of the Bankruptcy Code* [Main Dkt. No. 7534].  After briefing and argument, on November 7, 2024, the Court entered the Procedures Order.  *See* Consolidated Dkt. Nos. 3, 9–15, 21, 36.  The Procedures Order established "Phase One Issues," requiring the Litigation Administrator to submit one opening brief and one response brief, and requiring Defendants to submit one joint opening brief and one joint response brief addressing the Phase One Issues. Procedures Order, Ex. 2 at 1.  Pursuant to the Procedures Order, all deadlines in connection with individual Avoidance Actions are stayed during litigation of the Phase One Issues.  *Id.* at 2.

## PHASE ONE ISSUES

21.    Under the Procedures Order, the following are Phase One Issues:

- Whether the presumption against extraterritoriality applies to the Avoidance Actions, and if so, whether sections 547 and 550 apply extraterritorially;

- Whether the Court has specific personal jurisdiction over Defendants in connection with the Avoidance Actions; and

- Whether the definition of "Withdrawal Preference Exposure" under the Plan governs, or sections 547(c) and 550(a) govern, for purposes of calculating the amount of Defendants' potential liability in the Avoidance Actions.

## ARGUMENT

## I.    The Presumption Against Extraterritoriality Does Not Bar the Avoidance Actions.

22.    Defendants domiciled outside of the United States argue that the Avoidance Actions against them are barred by the presumption against extraterritoriality.  This is incorrect for two reasons, either of which is dispositive.  *First*, the Avoidance Actions involve domestic application of sections 547 and 550 of the Bankruptcy Code and therefore do not implicate the defense.  *Second*, the Bankruptcy Code affirmatively indicates that sections 547 and 550 apply extraterritorially.  This reading also comports with the Bankruptcy Code's objectives.

23.    It is indisputable that "Congress has the authority to enforce its laws beyond the territorial boundaries of the United States." *Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*, 543 B.R. 127, 148 (Bankr. S.D.N.Y. 2016) (quoting *E.E.O.C. v. Arabian-American Oil Co.*, 499 U.S. 244, 248 (1991)).  Nonetheless, courts use the presumption against extraterritoriality to "avoid the international discord that can result when U.S. law is applied to conduct in foreign countries." *In re Picard*, 917 F.3d 85, 95 (2d Cir. 2019) (quoting *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 335 (2016)).  The presumption is not "a limit upon Congress's power to legislate," but rather a canon of construction to guide the understanding of a statute's meaning.  *Id.* at 100.

24.    Courts use a two-step inquiry to determine whether the presumption against extraterritoriality applies to a given statute.  *In re Lyondell Chem. Co.*, 543 B.R. at 148.  First, "a court must determine if the presumption applies at all—by 'identifying the conduct proscribed or regulated by the particular legislation in question,' and considering whether that conduct 'occurred outside of the borders of the U.S.'"  *Id.* (citation omitted).   "Second, if the presumption is implicated, an inquiry into Congressional intent must be undertaken to determine if Congress intended to extend the coverage of the relevant statute to such extraterritorial conduct."  *Id.*

25.    A court need not decide whether a statute applies extraterritorially if the particular case at issue involves a domestic application of the statute.  That is the case here.

### A.    The Transfers at Issue Are Domestic.

26.    In determining whether a case involves a domestic application of the statute, the Court must evaluate (i) the statute's "focus" and (ii) whether that "focus" centers around events and conduct that occurred in the United States.  *In re Picard*, 917 F.3d at 96.  The "focus" of the statute is "the object of its solicitude," which includes the "conduct it seeks to regulate" and the "parties and interests it seeks to protect or vindicate."  *Id.* (citing *WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407, 414 (2018)).  The statute cannot be analyzed in a vacuum—it

11

must be assessed "in concert" with other statutory provisions that "work[] in tandem." *Id.* (citing *WesternGeco*, 585 U.S. at 414).

27.     It is well-established that the "focus" of the Bankruptcy Code's avoidance provisions is the initial transfer from the debtor to the defendant that depletes assets that would have otherwise been part of the estate on the petition date. *In re Picard*, 917 F.3d at 97 (explaining that the general purpose of avoidance provisions is to protect the debtor's estate "from depletion to the prejudice of the unsecured creditor");[13] *Official Comm. of Unsec. Cred. of Arcapita Bank B.S.C.(c) v. Bahrain Islamic Bank (In re Arcapita Bank B.S.C.(c)),* 575 B.R. 229, 244 (Bankr. S.D.N.Y. 2017) ("Courts in this jurisdiction have held that 'the focus of the [Bankruptcy Code's] avoidance and recovery provisions is the initial transfer that depletes the property that would have become property of the estate.'"); *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 480 B.R. 501, 524 (Bankr. S.D.N.Y. 2012) ("***Madoff II***") ("As demonstrated by the text and structure of the avoidance and recovery sections of the Code, their focus is on the improper depletion of the bankruptcy estate's assets.").

28.     The language of section 547 focuses on the transfer from the debtor—*i.e.*, the initial transfer—and the condition of the debtor at the time of such transfer.[14] *See* 11 U.S.C. § 547(b)(1) ("avoid any transfer of an interest *of the debtor* in property") (emphasis added); 11 U.S.C. § 547(b)(2)-(3) (explaining that a transfer can be avoided only if it was made when *the debtor* was insolvent). The recipients of the transfers are not the statute's focus. *See Madoff II*, 480 B.R. at 524 ("[T]he focus of the avoidance and recovery sections is . . . not on the recipient of the transfers

---

[13] While *Picard*'s "focus" analysis evaluated the avoidance provision in section 548(a)(1)(A) of the Bankruptcy Code, the Second Circuit's reasoning is equally applicable to section 547.

[14] It is also consistent with section 548, which focuses on the debtor's transfer of the estate property, "not the transferee's receipt of property." *In re Picard*, 917 F.3d at 100; *see also* 11 U.S.C. § 548(a)(1)(A)-(B) (focusing on the transfer made by the debtor and the debtor's circumstances at the time of the transfer).

or the subsequent transfers."); *see also In re Picard*, 917 F.3d at 100 ("The presumption against extraterritoriality therefore does not prohibit that debtor's trustee from recovering such property using § 550(a), regardless of where any initial or subsequent transferee is located.").

29.     Based on these principles, the Second Circuit analyzes two factors to determine whether a transfer is domestic: (i) whether the debtor-transferor is located domestically; and (ii) whether the debtor-transferor used a domestic account to execute the transfer.  *See In re Picard*, 917 F.3d at 99-100 (holding that the relevant focus is on the "debtor's initial transfer of property" and that it is domestic conduct where "a domestic entity" transfers property from a U.S. bank account); *see also Madoff II*, 480 B.R. at 524-25 (finding that the initial transfers were domestic because the transfers originated from U.S. bank accounts).  The Second Circuit has held that the location of transfer recipients and their bank accounts is irrelevant.  *In re Picard*, 917 F.3d at 100 ("The relevant conduct in these actions is the debtor's fraudulent *transfer* of property, not the transferee's *receipt* of property."); *Arcapita Bank*, 575 B.R. at 249 (finding that subsequent transferees of preferential transfers are not the focus).

30.     Here, the initial transfers from LLC to each Defendant emanated from the United States.  The inquiry stops there.  LLC is a U.S. entity.  When Defendants initiated a withdrawal request from their Earn Accounts, the property was transferred from LLC-designated frictional wallets (*i.e.*, wallets used to transfer assets off-platform) within the LLC workspaces.  Compl. ¶ 22; *see also Declaration of Oren Blonstein Head of Innovation and Chief Compliance Officer of Celsius Network Limited, with Respect to Certain Phase I Issues Pursuant to the Joint Stipulation and Agreed Scheduling Order by and among the Debtors, the Committee, and the Ad Hoc Groups with Respect to the Custody and Withhold Issues* ¶ 20 [Main Dkt. No. 1192] ("**Blonstein I Declaration**") (explaining that "frictional wallets" were automated wallets where "all withdrawals to external wallets were processed").  The depletion of the Estates therefore took place when

13

cryptocurrency was transferred from LLC's wallets to Defendants' wallets. These facts—a domestic debtor transferring assets from a domestic account—unequivocally make the transfers domestic in nature. *Cf. In re Picard*, 917 F.3d at 99-100.[15]

31.    Other facts bolster the conclusion that the transfers at issue were domestic. This Court found that the parties to the Terms of Use intended LLC to be the only Debtor or non-Debtor affiliate liable to customers on contract claims under the Terms of Use. Customer Claims Decision at 4. Moreover, the Terms of Use: (1) are governed by New York law; (2) instruct dispute notices to be sent to LLC in New Jersey; (3) provide that arbitration is governed by the American Arbitration Association; (4) provide that any arbitration in person will be in New York or in the continental United States; and (5) provide that disputes must be brought in New York. Terms of Use §§ 27.D, 27.F, 27.G, 33.

32.    Additionally, the circumstances surrounding the establishment of LLC as the contracting party to the Terms of Use support that the transfers were domestic in nature. During the formation of LLC and the establishment of Version 6, pop-up communications informed customers that the Terms of Use included a "[c]hange of legal entity [to] Celsius Network LLC, a Delaware Company" and "[c]hange of governing laws [to] (NY)[.]" Blonstein II Decl., Exs. A-7, A-9; *see also* Customer Claims Decision at 10-11. Customers were required to accept these modifications by clicking a checkbox to "acknowledge that under the new [Terms of Use], the services will be provided to me by Celsius Network LLC, and that Celsius Network Limited shall

---

[15] The Litigation Administrator has determined that, because certain cryptocurrencies were not allowed to be traded in the United States, certain Defendants received transfers from the Celsius EU UAB workspace, consisting exclusively of the following three cryptocurrencies: (i) BNB, (ii) XAUT, and (iii) XRP. These transfers represented less than 2% of all transfers made by the remaining Defendants, as calculated at the transaction date. Despite being effectuated from non-U.S. wallets, these transfers were still domestic in nature because LLC remained contractually liable for those transfers, and the transfers were governed by New York law.

transfer to Celsius Network LLC my data, account balance, and its rights and obligations to me."

Blonstein II Decl., Exs. A-7, A-9; *see also* Customer Claims Decision at 10-11.  These facts further

demonstrate that the subsequent transfers by LLC to Defendants were domestic in nature.

**B.    Sections 547 and 550 of the Bankruptcy Code Apply Extraterritorially.**

33.    As noted above, the Court need look no further than the fact that the "focus" of the

transfers at issue was domestic.[16]  However, should the Court wish to analyze whether sections

547 and 550 of the Bankruptcy Code apply extraterritorially, it would find that they do.

34.    A statute applies outside the United States if Congress "gives a clear, affirmative

indication that it applies extraterritorially."  *RJR Nabisco, Inc.*, 579 U.S. at 337.  To make this

determination, courts may look at "all available evidence . . . including the text of the statute, the

overall statutory scheme, and legislative history."  *French v. Liebmann (In re French)*, 440 F.3d

145, 151 (4th Cir. 2006).  The Supreme Court has clarified that the presumption against

extraterritoriality is not a "clear statement rule," meaning that it does not require the statute to

explicitly state that it applies abroad to rebut the presumption.  *See Morrison v. Nat'l Austl. Bank

Ltd.*, 561 U.S. 247, 265 (2010); *see also In re Lyondell Chem. Co.*, 543 B.R. at 151.  Rather, courts

may look to "context, including surrounding provisions of the Bankruptcy Code, to determine

whether Congress nevertheless intended that statute to apply extraterritorially."  *In re Lyondell

Chem. Co.*, 543 B.R. at 151; *see also Morrison*, 561 U.S. at 265 ("Assuredly context can be

consulted as well.").

35.    While the Second Circuit has not ruled on whether the Bankruptcy Code's

avoidance provisions apply extraterritorially, the Fourth Circuit—the only circuit court to address

---

[16] This is the path taken by the Second Circuit in the *Madoff* cases.  *See In re Picard*, 917 F.3d at 100
("Because we find that these cases involve a domestic application of § 550(a), we express no opinion on
whether § 550(a) clearly indicates its extraterritorial application.").

this issue—has held that the presumption against extraterritoriality does not bar the extraterritorial application of the avoidance provisions. *In re French*, 440 F.3d at 151 (holding that the presumption against extraterritoriality does not prevent application of 11 U.S.C. § 548(a)(1)). Additionally, there is significant authority, including within this circuit, supporting the extraterritorial application of avoidance and recovery statutes. *See In re Lyondell Chem. Co.*, 543 B.R. at 152 (holding that Congress expressed clear intent for 11 U.S.C. § 548 to apply extraterritorially); *Madoff II*, 480 B.R. at 526-27 (holding that Congress expressed clear intent for 11 U.S.C. § 550 to apply extraterritorially based on the definition of "property of the estate" under § 541, the incorporation of § 541 in avoidance provisions §§ 544(b), 547, and 548, and authorization of § 550 to recover avoided transfers); *see also Emerald Cap. Adv. Corp. v. Bayerische Moteren Werke Aktiengesellschaft* (*In re FAH Liquidating Corp.*), 572 B.R. 117, 126 (Bankr. D. Del. 2017) (holding that § 548 applies extraterritorially); *Diaz-Barba v. Kismet Acquisition, LLC*, No. 08-cv-1446-BTM-BLM, 2010 WL 2079738, at *10 (S.D. Cal. May 20, 2010) (holding that § 550 applies extraterritorially). This Court should follow this precedent.

**1.   The Statutory Scheme Supports Extraterritorial Application of Sections 547 and 550.**

36.     The Bankruptcy Code affirmatively indicates that sections 547 and 550 apply extraterritorially. Section 547(b) provides that a "trustee may . . . avoid any transfer of an ***interest of the debtor in property***," and section 541 of the Bankruptcy Code provides that "property of the estate" includes all "***interests of the debtor in property***."[17] *See* 11 U.S.C. § 541(a)(1) (emphasis added); *Madoff II*, 480 B.R. at 527 ("These sections' reference to the 'interest of the debtor in property'—the same term used in Section 541—is not coincidental."). This definition is consistent with the principle that the bankruptcy court has *in rem* jurisdiction over "all of a debtor's property,

---

[17] Section 548 contains similar language. *See* 11 U.S.C. § 548(a)(1).

whether domestic or foreign." *In re French*, 440 at 151 (citing *Hong Kong & Shanghai Banking Corp., Ltd. v. Simon (In re Simon)*, 153 F.3d 991, 996 (9th Cir. 1998)). Moreover, section 541 provides that property of the estate includes all property "wherever located." 11 U.S.C. § 541(a). The legislative history shows that Congress added this phrase to "make clear that a trustee in bankruptcy is vested with the title of the bankrupt in property, which is located without, as well as within, the United States." H.R. Rep. No. 82–2320, at 15 (1952), *reprinted in* 1952 U.S.C.C.A.N.1960, 1976.

37.     Section 547's reference to section 541 grants a trustee authority to avoid ***all transfers***, including transfers to foreign parties, that would have been property of the estate. *See Madoff II*, 480 B.R. at 528. The incorporation of section 541 into avoidance statutes expresses a congressional intent to have avoidance statutes allow "a trustee to avoid any transfer of property that *would have been* 'property of the estate' prior to the transfer in question—as defined by § 541—even if that property is not 'property of the estate' *now*." *In re French*, 440 F.3d at 151 (emphasis in original); *Madoff II*, 480 B.R. at 528. For this reason, the avoidance action statutes were intended by Congress to apply extraterritorially.

38.     Moreover, section 541 defines property of the estate as "any interest in property that the trustee recovers under section . . . 550[.]" 11 U.S.C. § 541(a)(3). The interplay between sections 541 and 550—which provides that property that is recovered by the trustee, "wherever located," becomes property of the estate—further demonstrates Congress's intent that the avoidance and recovery statutes would apply extraterritorially. *See Madoff II*, 480 B.R. at 528.

**2.      Extraterritorial Application of Sections 547 and 550 Accords with a Core Purpose of the Bankruptcy Code.**

39.     The extraterritorial application of sections 547 and 550 are in accordance with a core purpose of the Bankruptcy Code: "to prevent debtors from illegitimately disposing of property

that should be available to their creditors." *In re French*, 440 F.3d at 152.  Courts have noted that

it would be difficult to reconcile Congress's intent for the Bankruptcy Code to "apply

extraterritorially with respect to property of the estate, but not to apply extraterritorially with

respect to what would have been property of the estate but for a fraudulent transfer." *In re Lyondell*

*Chem. Co.*, 543 B.R. at 154.  As the *Lyondell* court found, "[i]t would be inconsistent (such that

Congress could not have intended) that property located anywhere in the world could be property

of the estate once recovered under section 550, but that a trustee could not avoid the fraudulent

transfer and recover that property if the center of gravity of the fraudulent transfer were outside of

the United States." *Id.* at 154–55.  In other words, hobbling the trustee's ability to recover estate

property because it was preferentially transferred abroad, rather than domestically, would

undermine core provisions of the Bankruptcy Code and frustrate one of its key purposes.

**II.      The Court Has Specific Personal Jurisdiction over the Defendants.**

40.      Pursuant to Federal Rule of Bankruptcy Procedure 7004, personal jurisdiction is

based upon the defendant's "contacts with the United States, rather than with the forum state."

*Lehman Bros. Sp. Fin. Inc. v. Bank of Am. Nat'l Ass'n* (*In re Lehman Bros. Holdings Inc.*), 535

B.R. 608, 619 (Bankr. S.D.N.Y. 2015).  As such, "state long-arm statutes are inapplicable, and the

only remaining inquiry for a bankruptcy court is whether exercising personal jurisdiction over the

defendant would be consistent with the Due Process Clause of the Fifth Amendment." *Id*.

(citations omitted).  Specific personal jurisdiction, then, requires: (1) the defendant's "purposeful

availment" of the forum (*i.e.*, the United States); (2) that the underlying contact with the forum

"arise[s] out of or relate[s] to" the alleged misconduct; and (3) that the exercise of jurisdiction is

"reasonable under the circumstances."  *U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019) (citing cases).  Each of these factors is met as to the foreign Defendants.[18]

### A.    The Foreign Defendants Purposely Availed Themselves of the United States by Agreeing to the Terms of Use.

41.    The first step of the specific personal jurisdiction analysis, "purposeful availment," is "satisfied if the defendant has 'purposefully directed' his activities at residents of the forum." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).  "The defendant's activity need not have taken place within the forum . . . and a single transaction with the forum will suffice."  *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC*, 460 B.R. 106, 117 (Bankr. S.D.N.Y. 2011) ("**Madoff I**"), *aff'd*, 474 B.R. 76 (S.D.N.Y. 2012) (citing *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)).  The foreign Defendants clearly availed themselves of the laws and jurisdiction of the United States.

42.    As outlined in the Complaints, the foreign Defendants by necessity fall into one of two camps.  For the foreign Defendants who contracted with Celsius post-July 2021, after Version 6 was implemented, the counterparty was always LLC, a Delaware entity, with disputes to be adjudicated under New York law, and arbitrated under U.S. rules of arbitration.  For the foreign Defendants who held accounts with Celsius prior to July 2021, all account holders were required to acknowledge and accept the adoption of Version 6 (including its Delaware counterparty, New York jurisdiction and law, and U.S. arbitration provisions) to continue to use Celsius.  The Court has found the click through contract bound all account holders.  Earn Decision at 31-38.  The pop-

---

[18] The question presented on this topic is "[w]hether the Court has specific personal jurisdiction over Defendants in connection with the Avoidance Actions."  Procedures Order, Ex. 2 at 1.  The Litigation Administrator reserves the right to assert that any foreign Defendant is subject to general personal jurisdiction for any reason, including by virtue of filing a proof of claim in the Debtors' Chapter 11 Cases. Additionally, because there is general jurisdiction over domestic Defendants due to their residency in the United States, a finding of specific jurisdiction as to those Defendants is unnecessary.  Moreover, even if a finding of specific jurisdiction as to domestic Defendants were necessary, all of the arguments regarding foreign Defendants apply equally to domestic Defendants.

up communications informed customers that the Terms of Use included a "[c]hange of legal entity [to] Celsius Network LLC, a Delaware Company" and "[c]hange of governing laws [to] (NY)." Blonstein II Decl., Exs. A-7, A-9.  Affirmative acceptance of those changes was required to continue to utilize Celsius's services.  *Id.*

43.    Courts, including this Court, consistently hold that the parties' clear intent in contracting, exhibited by choice-of-law and forum selection clauses, weighs heavily in favor of a finding of specific personal jurisdiction.  In the Second Circuit, "it is settled . . . that parties to a contract may agree in advance to submit to the jurisdiction of a given court." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 103 (2d Cir. 2006) (quoting *Nat'l Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 315-16 (1964)) (citations omitted).  Entering into a contract with a New York choice-of-law clause is "a significant factor in a personal jurisdiction analysis because the parties . . . invoke the benefits and protections of New York law." *Madoff I*, 460 B.R. at 117 (quoting *Sunward Elec., Inc. v. McDonald*, 362 F.3d 17, 22-23 (2d Cir. 2004)); *see also Burger King*, 471 U.S. at 482 (finding that the choice-of-law provision is a factor in determining a defendant's "deliberate affiliation with the forum state and the reasonable foreseeability of possible litigation there"); *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 367 (2d Cir. 1986) (finding that the district court erred by not giving weight to the choice-of-law provision in a contract in determining personal jurisdiction); *In re Bernard L. Madoff Inv. Sec. LLC*, 418 B.R. 75, 80-81 (Bankr. S.D.N.Y. 2009) (exercising personal jurisdiction over defendants who, when opening investment accounts, executed customer agreements with New York choice-of-law clauses); *Chevron Corp. v. Donzinger*, 974 F. Supp. 2d 362, 623 (S.D.N.Y. 2014) (noting that parties "invoke the benefits and protections of New York law" through a choice-of-law clause, supporting the court's extension of personal jurisdiction).

44.     Similarly, forum selection clauses have been found to confer personal jurisdiction over foreign defendants. *See Motors Liquidation Co. Avoidance Action Tr. ex rel. Wilmington Tr. Co. v. JPMorgan Chase Bank, N.A. (In re Motors Liquidation Co.)*, 565 B.R. 275, 287 (Bankr. S.D.N.Y. 2017) (Glenn, J.) (finding that lender consented to personal jurisdiction under term loan agreement with forum selection clause); *Koninklijke Philips Elecs. v. Digital Works, Inc.*, 358 F. Supp. 2d 328, 333 (S.D.N.Y. 2005) ("A valid forum selection clause establishes sufficient contacts with New York for purposes of jurisdiction and venue."); *see also Ultracashmere House, Ltd. v. Madison's of Columbus, Inc.*, 534 F. Supp. 542, 545 (S.D.N.Y. 1982) ("In fact, the forum selection clause alone would constitute consent to personal jurisdiction."); *Gottdiener*, 462 F.3d at 103 ("Parties can consent to personal jurisdiction through forum-selection clauses in contractual agreements.").

45.     The same principle applies in clickwrap agreements, like the Terms of Use pop-up that certain foreign Defendants accepted to continue to receive Celsius's services. *See, e.g.*, *Rose v. Int'l Bus. Machs. Corp.*, 2:23-cv-09123-MCS-SSC, 2024 WL 3914471, at *2 (C.D. Cal. June 25, 2024) (holding that "[b]y accepting the terms of the clickwrap agreement, Plaintiff accepted the forum selection clause compelling disputes between [defendant] and Plaintiff arising from the agreement to be litigated in New York" and that "[t]here is no dispute that [defendant] assented to the forum selection clause and submits to S.D.N.Y.'s personal jurisdiction."); *see also Red.com, Inc. v. Jinni Tech. Ltd.*, No. SAC17-00382-CJC(KESx), 2017 WL 8223610, at *6-7 (C.D. Cal. Nov. 29, 2017) (noting that "[n]umerous courts have upheld similar forum selection clauses in 'click-wrap' agreements which required the plaintiffs to travel long distances to litigate their actions" and holding that "Defendant's conduct of accepting the terms of service [that include a forum selection clause] is sufficient to constitute consent to personal jurisdiction in [that forum]."); *Bahl v. NYCOM-NYIT*, 14-cv-4020-AKT, 2017 WL 5479655, at *2, 5, 10 (E.D.N.Y. Mar. 31,

2017) (finding that defendant's acceptance of the terms and conditions through a website was sufficient to enforce the forum selection clause and transfer the case to the Southern District of Indiana).

**B.      The Foreign Defendants' Challenged Conduct Is Directly Related to Their Contacts with the United States.**

46.      A cause of action arises out of or relates to a defendant's contacts with a forum when "defendant's allegedly culpable conduct involves at least in part financial transactions that touch the forum." *U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d at 151.  The cause of action is related to the defendant's contacts in the forum if the two are not "completely unmoored" from each other.  *See Baskett v. Autonomous Rsch. LLP*, No. 17-CV-9237-VSB, 2018 WL 4757962, at *10 (S.D.N.Y. Sept. 28, 2018).

47.      Here, the preferential transfers to the foreign Defendants meet this low threshold because the Litigation Administrator's claims against the foreign Defendants arise directly out of those Defendants' contacts with the United States.  Each of the foreign Defendants was a counterparty to the Terms of Use with LLC (a U.S. entity) and directed LLC to make transfers to them during the Preference Period.  Compl. ¶ 22.  Such transfers were "used as an instrument to achieve" the very basis of the Avoidance Actions—the preferential transfers.  *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 171 (2d Cir. 2013) (denying motion to dismiss for lack of personal jurisdiction where defendants executed wire transfers from New York bank accounts); *Sec. & Exch. Comm'n v. PlexCorps*, No. 17-CV-7007, 2018 WL 4299983, *12 (E.D.N.Y. Aug. 9, 2018) (finding personal jurisdiction over foreign defendants where they processed money for their allegedly fraudulent scheme through accounts on Stripe and Kraken, because "creation of those accounts [by defendants] assisted" the alleged misconduct).

48.     Several courts deciding cases in the context of cryptocurrency have found personal jurisdiction arising from the use of accounts based in the United States. *See, e.g.*, *In re Tether & Bitfinex Crypto Asset Litig.*, 576 F. Supp. 3d 55, 88-89 (S.D.N.Y. 2021) (exercising jurisdiction over foreign defendant that had used a single bank account within the forum state, and the account was used "as an instrument to achieve the very wrong alleged" and "was deliberate and recurring.") (internal quotation marks and citation omitted); *Yao v. Chen*, No. CV TDC-23-0889, 2024 WL 1051740, at *10 (D. Md. Mar. 11, 2024) (exercising jurisdiction over a party where its cryptocurrency wallet was located in the forum and was used as part of the operations, including transacting money, at issue in the litigation). This, too, supports personal jurisdiction here.

## C.     The Exercise of Jurisdiction Is Reasonable Under the Circumstances

49.     In considering whether the exercise of jurisdiction offends "traditional notions of fair play and substantial justice," courts will consider a variety of factors, including (i) the burden on the defendant, (ii) the interests of the forum in litigating the dispute, (iii) the plaintiff's interest, (iv) judicial efficiency, and (v) the shared interest in "substantive social policies." *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 173 (2d Cir. 2010) (citations omitted). Here, each of these factors supports jurisdiction over the Defendants. Indeed, this Court recently issued a decision in another Celsius case—*Meghji v. Spadafora (In re Celsius Network LLC)*, Adv. Proc. No. 24-03981, Case No. 22-10964, 2025 WL 1232578 (Bankr. S.D.N.Y. Apr. 28, 2025) (Glenn, J.)—that is dispositive on each of these points.

50.     *First*, "being a foreign citizen does not make litigation in the United States per se unreasonable." *Spadafora*, 2025 WL 1232578, at *5. Here, "over the course of the Celsius bankruptcy, this Court has accommodated litigants from all of the world," demonstrating that "it would not cause an undue burden on [non-U.S. defendants] to litigate this matter in the United States." *Id.*

51.     **Second**, the Litigation Administrator plainly has an interest in adjudicating the Avoidance Actions in the United States, having brought the cases here, where Celsius's bankruptcy and related proceedings are pending.

52.     **Third**, "it would be most efficient to litigate this case in this Court because it presides over the bulk of the Celsius litigation." *Id.*

53.     **Fourth**, "the Celsius litigation has been ongoing in this Court since 2022. Thus, the judicial system is interested in resolving this case in the United States." *Id.*

54.     **Fifth**, having contracted with a U.S. entity under Terms of Use that are governed by U.S. law and provide for adjudication in U.S. courts, the foreign Defendants cannot credibly contend adjudication in this Court is unreasonable.

### III.     Sections 547 and 550 of the Bankruptcy Code Control the Calculation of Damages in the Avoidance Actions, Not the Definition of "WPE" in the Limited-Time, Defunct Plan Settlement Offer That Defendants Rejected.

55.     Section 550(a) provides that "the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property[.]" 11 U.S.C. § 550(a). Consistent with this statute, the Litigation Administrator seeks to recover in the Avoidance Actions either the assets transferred from Celsius's platform or their value, which, in most cases, is currently multiples of what it was at the time of transfer.

56.     Additionally, section 547(c) provides a defense, commonly known as the "subsequent new value defense," which protects against the avoidance of a preferential transfer "to the extent that, **after** such transfer, such creditor gave new value to or for the benefit of the debtor[.]"). *See* 11 U.S.C. § 547(c) (emphasis added). Consistent with this statute, the Litigation Administrator has counted as "new value" only those transfers to Celsius that occurred after a Defendant's first preferential transfer.

57.    Defendants, however, contend that both of these statutory provisions have been overridden by certain language in a limited-time settlement offer contained in the Plan, which expired over a year ago and which Defendants did not accept.  They are wrong.

58.    In an effort to distribute value to creditors quickly and equitably, the Plan contained an "Account Holder Avoidance Action Settlement."[19]  This offer was available to any "Account Holder" who was not an "Excluded Party" and "(i) ha[d] Withdrawal Preference Exposure greater than $100,000, (ii) vote[d] in favor of the Plan, (iii) [did] not opt out of the releases under the Plan, and (iv) provide[d] the Debtors or the Litigation Administrator(s), as applicable, with Cash equal to 27.5% of such Account Holder's Withdrawal Preference Exposure no later than 14 days prior to the anticipated Effective Date of the Plan."[20]  Plan Art. IV.B.3.  In other words, this was a limited-time offer, expiring 14 days before the Effective Date, that required parties accepting the offer to, among other things, (i) vote in favor of the Plan, (ii) not opt out of the releases and (iii) pay, in cash, 27.5% of their "Withdrawal Preference Exposure," a defined term discussed below.  "Account Holders" who accepted this offer were entitled to, among other things, a release

---

[19] "Account Holder Avoidance Action Settlement" is defined in the Plan as "the settlement of Avoidance Actions between the Debtors and certain Account Holders, the terms of which are set forth in Article IV.B.3 herein." Plan Art. I.A.4.

[20] "Account Holder" is defined in the Plan as "a Person or Entity that maintained a Celsius Account with the Debtors as of the Petition Date."  Plan Art. I.A.1.  "Excluded Party" is defined in the Plan as "each of the following: (a) Alexander Mashinsky; (b) Shlomi Daniel Leon; (c) Roni Cohen Pavon; (d) the other UCC Claims Stipulation Defendants; (e) any current or former director, officer, employee, independent contractor, professional, equity holder, or other Entity associated with the Debtors that is not specifically identified as a Released Party in this Plan or the Schedule of Released and Exculpated Parties, except current and former managing partners, officers, directors, and employees of the Initial Consenting Series B Preferred Holders, WestCap Management LLC, and Caisse de dépôt et placement du Québec, CDPQ Placements privés Québec Inc., CDPQ Placements privés Inc., and CDPQ U.S. Inc.; (f) any party on the Schedule of Excluded Parties; and (g) with respect to each of the foregoing, each Related Party of such Person or Entity that is not specifically identified in this Plan or the Schedule of Released and Exculpated Parties as a Released Party. Notwithstanding anything to the contrary in this Plan, no Excluded Party shall constitute a Released Party or an Exculpated Party in any capacity hereunder." *Id.* Art. I.A.110.

of all "Avoidance Actions" (as defined in the Plan and discussed below) against such Account

Holders.  *Id.*

59.    To effectuate this offer, the Debtors established a simplified formula to calculate

the cash value of the assets at issue solely for settlement purposes.  This formula was defined in

the Plan as "Withdrawal Preference Exposure" ("**WPE**"):

> (i) the aggregate value of all assets an Account Holder withdrew from the Debtors' platform in the 90 days prior to the Petition Date (*i.e.*, on or after April 14, 2022), valued as of the time of such withdrawals _less_ (ii) the aggregate value of any deposits such Account Holder made after such Account Holder's first withdrawal in such period, valued as of the time of such deposits.

*Id.* Art. I.A.270.  The definition of WPE further provided that "[f]or the avoidance of doubt, the

Debtors' calculation of Withdrawal Preference Exposure shall not be binding on any defendant in

an Avoidance Action."  *Id.*

60.    Defendants have seized on the Plan's definition of WPE to argue that it somehow

strips the Litigation Administrator's right to (i) seek the current value of the transferred assets in

accordance with section 550(a) and (ii) properly calculate subsequent new value as provided for

under the Bankruptcy Code by crediting as "new value" solely those transfers to Celsius that

occurred after the first preferential transfer.  Defendants' arguments lack merit.

**A.    Section 550 of the Bankruptcy Code Preserves Appreciation from Estate Assets for the Estates and Prevents Defendants from Receiving a Windfall.**

61.    Section 550 provides that a debtor can recover "the property transferred, or, if the

court so orders, the value of such property."  11 U.S.C. § 550(a).  Courts consistently recognize

that in avoidance actions, the estate is entitled to recover the greater of (i) the value of the property

at the time of transfer or (ii) the current value of the property, if it has appreciated.  *See, e.g.*,

*Govaert v. B.R.E. Holding Co. (In re Blitstein)*, 105 B.R. 133, 137 (Bankr. S.D. Fla. 1989) (finding

that, at a minimum, the estate is entitled to recover "the greater of the [(i)] value at the time of the

transfer; or [(ii)] the value at the time of recovery less the value of improvements made"); *Sanders v. Hang (In re Hang)*, Adv. Proc. No. 06-02274-C, No. 05-30655, 2007 WL 2344958, at *5 (Bankr. E.D. Cal. Aug. 16, 2007) ("The trustee is entitled to recover the 'greater of the value of the transferred property at the transfer date or the value at the time of the recovery.'" (quoting COLLIER ON BANKRUPTCY, 15th ed., ¶ 550.02)); *Cooper v. Ashley Commc'ns, Inc.* (*In re Morris Commc'ns NC Inc.*), 75 B.R. 619, 629 (Bankr. W.D.N.C. 1987) (ordering return of transferred stock, which had appreciated since the transfer), *rev'd on other grounds by Cooper v. Ashley Commc'ns, Inc. (In re Morris Commc'ns)*, 914 F.2d 458 (4th Cir. 1990).

62.    This principle makes sense. Otherwise, the estate will be deprived of value that its stakeholders would have otherwise received. *Feltman v. Warmus (In re Am. Way Serv. Corp.)*, 229 B.R. 496, 530-31 (Bankr. S.D. Fla. 1999) ("The purpose of section 550 is 'to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred.'" (quoting *Hirsch v. Gersten (In re Centennial Textiles, Inc.)*, 220 B.R. 165, 176 (Bankr. S.D.N.Y. 1998)). If this were not the case, recipients of preferential transfers could sell the property, return the transfer-date value and pocket the appreciation—an unjust and inequitable result. Thus, where property has appreciated, courts enter judgments based on "the value of the property at the time of judgment." *Id.* at 531.

63.    This approach, moreover, directly addresses a longstanding concern of Congress that "a transferee has an opportunity to benefit by delay, and there are possibilities for abuse where the transferred property is appreciating substantially in value." Hearings on H.R. 31 and H.R. 32 before the Subcomm. on Civil and Constitutional Rights of the Comm. on the Judiciary, House of Representatives, 94th Cong., 2d Sess., ser. no. 27, pt. 3, at 1844 (1976). Indeed, the language of section 550(a) reflects "a congressional intent to return the property transferred unless to do so would be inequitable." *In re Morris Commc'ns NC Inc.*, 75 B.R. at 629.

64.     Here, Defendants are attempting to benefit from the Plan definition of WPE, which values the transferred property at an earlier, lower price point.  To be sure, if the value of cryptocurrency had *declined* since the dates of transfer, Defendants would not be making this argument.[21]  It is only because cryptocurrency has *appreciated* that Defendants seek to tie their liability to the lower, transfer-date prices.  That is the opposite of what Congress intended when it codified section 550.  *See In re Centennial Textiles*, 220 B.R. at 176 ("Section 550(a) is intended to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred.").

65.     Moreover, allowing Defendants to use the transfer date prices would give them a windfall.  For example, Defendants who received preferential transfers of BTC would return only about one-fourth of the value of BTC (as of May 1, 2025), keeping the remaining three-fourths, or all of the appreciation that the coins have enjoyed since the transfer date, for themselves.[22]  Such a result violates both the letter and spirit of section 550.  *See Gunsalus v. Cty. of Ontario*, 37 F.4th 859 (2d Cir. 2022) (finding that a sale "would give [one creditor] a windfall at the expense of the estate, the other creditors, and the debtor – which is precisely what the Code[] . . .  [is] intended to prevent"); *MOAC Mall Holdings LLC v. Transform Holdco LLC (In re Sears Holdings Corp.)*, 661 B.R. 298, 322 (S.D.N.Y. 2024) (finding that "the purpose of chapter 11 is to preserve and maximize the value of the debtor's estate for the benefit of all creditors — not to provide windfalls

---

[21] Courts have also recognized that in circumstances where the value of property has *depreciated* rather than appreciated, the trustee is entitled to the value the debtor would have had at the time of the transfer. *See Pritchard v. Brown (In re Brown)*, 118 B.R. 57, 60 (Bankr. N.D. Tex. 1990) (determining trustee was entitled to value of oil and gas lease at time of transfer, rather than the lease itself or its value at petition date or trial, as it had substantially declined in value).

[22] By way of illustration, in June 2022, the average price of one BTC was $24,197.  *See Today's Cryptocurrency Prices by Market Cap*, CoinMarketCap, https://coinmarketcap.com/ (last visited May 2, 2025).  The closing price of one BTC as of May 1, 2025 was $96,492.34, which represents an approximately 299% increase in value. *See id.*

to any"); *Riske v. Seitz Irr. Trust (In re Seitz)*, 400 B.R. 707, 722 (Bankr. E.D. Mo. 2008) ("To limit the Trustee to a recovery that is capped at the transfer date value would punish the estate and its creditors by depriving them of the appreciation in value—and allow the bad faith transferees to capture it—on a piece of property that, pursuant to the avoidance judgment, was property of the estate as of the Petition Date."); *In re Nettel Corp.*, No. 00-01771-SMT, 2017 WL 5664840, at *10 (Bankr. D.D.C. Oct. 2, 2017) ("The Bankruptcy Code goes to great lengths to close windfalls and ensure equitable distribution to creditors within a priority scheme established by Congress."); *In re Hipple*, 225 B.R. 808, 815 (Bankr. N.D. Ga. 1996) (determining that "creditors should not receive a windfall merely because a debtor files bankruptcy" (citing, in part, *Patterson v. Shumate*, 504 U.S. 753, 764 (1992))).

>   **B.      Section 547(c)(4) Similarly Prevents Defendants from Receiving a Windfall from Transactions That Occurred before the Preferential Transfers.**

66.     Section 547(c)(4) of the Bankruptcy Code provides: "the trustee may not avoid under this section a transfer . . . to or for the benefit of a creditor, to the extent that, ***after such transfer***, such creditor gave new value to or for the benefit of the debtor . . . ."  11 U.S.C. § 547(c)(4) (emphasis added).  By the plain language of the statute, only deposits made *after* a preferential transfer may be credited as new value and earlier deposits are excluded.  New value is properly calculated by using each advance to offset prior preferences, with preferences carried forward until exhaustion.  *In re Meredith Manor, Inc.*, 902 F.2d 257, 259 (4th Cir. 1990); *Krohn v. ADM Milling Co. (In re Dependable Food Prod.)*, 193 B.R. 662, 667 (Bankr. E.D.N.Y. 1996) (adopting reasoning from *Meredith Manor*); *Young v. Cont'l Worsteds, Inc. (In re Wingspread*

*Corp.)*, 120 B.R. 8 (Bankr. S.D.N.Y. 1990). This method prevents impermissible "netting" of withdrawals against past deposits—a result unsupported by the Bankruptcy Code.[23]

67. Congress created the new value exception in section 547(c)(4) to incentivize creditors to extend new credit to troubled debtors. *See Gonzales v. DPI Food Prods. (In re Furrs Supermarkets, Inc.)*, 296 B.R. 33, 45 (Bankr. D.N.M. 2003) ("The purpose of the section 547(c)(4) defense is to encourage creditors to deal with troubled businesses"); *see also* 5 COLLIER ON BANKRUPTCY ¶ 547.04(4)(a) ("The exception of section 547(c)(4) is intended to encourage creditors to work with troubled companies"). This legislative intent, however, depends on counting as "new value" only those deposits that are made after the preferential transfer occurs. Otherwise, a creditor could transfer assets to a company then, sensing trouble, withdraw all the assets the day before the company files for bankruptcy, and have a complete "new value" defense against any preference action. That is not what Congress intended in creating the exception.

### C. The Plan's WPE Calculation for the Account Holder Avoidance Action Settlement Was a Limited-Time Offer That Expired and Does Not Govern Subsequent Settlements, Particularly with Defendants Who Rejected It.

68. The definition of WPE in the Plan does not supersede the provisions of the Bankruptcy Code described above.

69. *First*, the Plan's WPE calculation was for the sole purpose of effectuating the Account Holder Avoidance Action Settlement, a limited-time settlement offer that was part of the Plan but required acceptance and payment by Defendants over a year ago to be binding. Defendants rejected that offer, and it has now lapsed.

---

[23] *See In re Thomas W. Garland, Inc.*, 19 B.R. 920, 922, 926 (Bankr. E.D. Mo. 1982) (the judicially created "net result rule" was applied to address perceived issues under the Bankruptcy Act of 1898, and such doctrine is no longer applicable under the Bankruptcy Code, which directs that new value may be applied only subsequent to a transfer).

70.    **Second**, Defendants cannot cherry-pick the provisions of the Account Holder Avoidance Action Settlement that they like and disregard the provisions that they do not like.  For example, none of the Defendants has agreed to "provide[] the Litigation Administrator(s)" with "Cash equal to 27.5% of such Account Holder's" WPE.  In fact, Defendants have rejected settlement offers at substantially lower percentages.  Nor is it clear that all Defendants would qualify for the Account Holder Avoidance Action Settlement, since they may not have "vote[d] in favor of the Plan" or may have "opt[ed] out of the releases under the Plan."

71.    **Third**, the definition of WPE in the Plan provided that "[f]or the avoidance of doubt, the Debtors' calculation of Withdrawal Preference Exposure shall not be binding on any defendant in an Avoidance Action."  Plan Art. I.A.270.  This language further demonstrates that the Account Holder Avoidance Action Settlement was cabined to this settlement offer and had no bearing on future litigation.

72.    **Fourth**, Defendants' argument, if accepted, would lead to absurd results.  For example, a Defendant who removed 10 BTC from the Estates during the Preference Period could have rejected the settlement offer and watched the value of the coins move.  If the value of the BTC goes down, he can assert that he is not bound by the WPE calculation, but if the value goes up, the Debtors are locked into a valuation determined as of the transaction date pursuant to the WPE calculation.  This opportunity to arbitrage at the expense of the Estates was clearly not intended by the Plan or Confirmation Order, and turns on its head long-standing case law that the Estates, not Defendants, enjoy the appreciation from preferentially transferred assets.  *See Tulis v. Gordos N. Rest. Corp. (In re Gordos Rest. Corp.)*, 643 B.R. 1, 36 (Bankr. S.D.N.Y. 2022) (explaining that post-transfer appreciation in value might lead a court to "require payment of value as of the date of the recovery" or "recovery of the property"); *Joseph v. Madray (In re Brun)*, 360 B.R. 669, 675 (Bankr. C.D. Cal. 2007) (explaining that when the transferred property appreciates,

"[p]laintiff may recover the property transferred, e.g. the 'asset', or the current fair market value of the asset, less the cost or value of improvements, assuming such recovery is for the benefit of the estate"); *In re Seitz*, 400 B.R. at 722 ("[T]here is both case law and a strong equitable argument for allowing the trustee to recover either [the] greater of the value of the transferred property at the transfer date or the value at the time of the recovery.").   In a different scenario where cryptocurrency depreciated after the Effective Date, it is hard to imagine that the Defendants would argue that the settlement offer WPE calculation is binding on anyone.   Such opportunism is inconsistent with the principles of the Bankruptcy Code.

**D.      The Plan Preserved and Did Not Waive the Litigation Administrator's Right to Calculate Preference Liability in Accordance with the Bankruptcy Code.**

73.      New York law, which governs the Plan, provides that rights may be waived only if "knowingly, voluntarily and intentionally abandoned."  *In re HS 45 John LLC*, 585 B.R. 64, 75 (Bankr. S.D.N.Y. 2018); *see also Wiener v. AXA Equitable Life Ins. Co*., 113 F.4th 201, 215 (2d Cir. 2024) ("[W]aiver [of contractual rights] 'should not be lightly presumed' and must be established through 'a clear manifestation of intent.'" (citing *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt.*, *L.P.*, 850 N.E.2d 653, 658 (N.Y. 2006))).   Waiver is "essentially a matter of intent which must be proved."  *Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 585 (2d Cir. 2006) (citation omitted). "[M]ere silence, oversight or thoughtlessness in failing to object is insufficient to support an inference of waiver."  *Luitpold Pharms., Inc. v. Ed. Geistlich Söhne A.G. Für Chemische Industrie*, 784 F.3d 78, 95 (2d Cir. 2015) (alteration in original) (citation omitted).

74.      Here, the Plan expressly preserves the Litigation Administrator's rights to pursue all "Recovery Causes of Action," including any and all "Causes of Action" not expressly released pursuant to the terms of the Plan, and all available damages and remedies in connection with such

actions.[24]  *See* Plan Art. IV.S.  The Plan provides that "each Post-Effective Date Debtor shall retain, and any Litigation Administrator (with respect to Recovery Causes of Action) . . . may enforce, all rights to commence and pursue, as appropriate, any and all Causes of Action[.]"  *Id.*  The Plan further provides that "[t]he rights of the Litigation Administrator(s) . . . to commence, prosecute, or settle such Causes of Action *shall be preserved* notwithstanding the occurrence of the Effective Date" with the exception of specific released claims.  *Id.* (emphasis added).  "Recovery Causes of Action" include "Avoidance Actions," such as the Litigation Administrator is pursuing here.  Plan Arts. I.A.205, I.A.17.  An "Avoidance Action" under the Plan is defined as "*any and all actual or potential* avoidance, recovery, subordination, or other similar Claims, Causes of Action, or remedies that *may be brought by or on behalf of the Debtors or their Estates*[.]"  *Id.* Art. I.A.17 (emphases added).   In turn, Causes of Action means "any claim, counterclaim, cross-claim, interest, *damages*, *remedy*, *cause of action*, *demand*, *right* . . . *of any kind or character whatsoever* . . . [including] claims or defenses pursuant to section 362 or chapter 5 of the Bankruptcy Code."  *Id.* Art. I.A.31 (emphasis added).  Moreover, each of the carve-outs from the Debtor release, third party release, and exculpation specifically preserves "any Avoidance Action *not released pursuant to the Account Holder Avoidance Action Settlement*."  *Id.* Arts. VIII.C, VIII.D (emphasis added); *see also id.* Art. VIII.E.  Thus, to the extent Defendants direct the Court to the language of the Plan, that language explicitly and repeatedly preserves these avoidance claims and the full amount of damages and remedies to which the Litigation Administrator is entitled under the Bankruptcy Code.

75.    Defendants have not identified any language in the Plan or any other document releasing or waiving the Litigation Administrator's right to calculate preference liability consistent

---

[24] "Recovery Causes of Action" and "Causes of Action" are defined in the Plan and are discussed below. Plan Arts. I.A.31, I.A.205.

with the Bankruptcy Code—much less language that evidences a waiver of such right that is "knowing, voluntary or intentional." None exists. To the contrary, the Plan expressly and robustly preserves the ability of the Litigation Administrator to bring avoidance and recovery actions, and seek the full scope of remedies and damages available in those actions, in accordance with the law.

## CONCLUSION

76.    For the reasons above, the Court should hold that: (i) the presumption against extraterritoriality is not applicable to the Avoidance Actions, where the "focus" is on the United States, and, in any case, sections 547 and 550 apply extraterritorially; (ii) the Court has specific personal jurisdiction over all Defendants in connection with the Avoidance Actions; and (iii) sections 547(c) and 550(a) govern for purposes of calculating the amount of Defendants' potential liability in the Avoidance Actions, and the definition of "Withdrawal Preference Exposure" under the limited-time, defunct Plan settlement offer that Defendants rejected does not alter Celsius's statutory rights. The Litigation Administrator respectfully requests that the Court enter an order substantially in the form of the proposed order attached hereto as **Exhibit A**.

*[Remainder of this page intentionally left blank]*

Dated: May 2, 2025
        New York, New York

By: */s/ Samuel P. Hershey*

**WHITE & CASE LLP**
Samuel P. Hershey
David M. Turetsky
Lucas Curtis
Nikita Ash
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: sam.hershey@whitecase.com
        david.turetsky@whitecase.com
        lucas.curtis@whitecase.com
        nikita.ash@whitecase.com

– and –

**WHITE & CASE LLP**
Gregory F. Pesce (admitted *pro hac vice*)
Laura Baccash (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
Email: gregory.pesce@whitecase.com
        laura.baccash@whitecase.com

– and –

**WHITE & CASE LLP**
Keith H. Wofford
Devin Rivero (admitted *pro hac vice*)
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
Email: kwofford@whitecase.com
        devin.rivero@whitecase.com

**WHITE & CASE LLP**
Ronald Gorsich (admitted *pro hac vice*)
Aaron Colodny (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Telephone: (213) 620-7700
Facsimile: (213) 620-7800
Email: rgorsich@whitecase.com
        aaron.colodny@whitecase.com

– and –

**ASK LLP**
Marianna Udem, Esq.
60 East 42nd Street
46th Floor
New York, New York 10165
Telephone: (212) 267-7342
Facsimile: (212) 918-3427
Email:  mudem@askllp.com
– and –

**ASK LLP**
Brigette McGrath, Esq.
Kara E. Casteel, Esq. (admitted *pro hac vice*)
2600 Eagan Woods Drive, Suite 400
St. Paul, Minnesota 55121
Telephone: (651) 406-9665
Facsimile: (651) 406-9676
Email: bmcgrath@askllp.com
        kcasteel@askllp.com

*Co-Counsel to Mohsin Y. Meghji, Litigation Administrator, as Representative for the Post-Effective Date Debtors*

# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | § | |
| | § | |
| CELSIUS CUSTOMER PREFERENCE | § | Adv. Proc. No. 24-04024 (MG) |
| ACTIONS.[1] | § | |
| | § | |
| | § | |

**[PROPOSED] ORDER REGARDING THE CELSIUS CUSTOMER PREFERENCE**
**ACTIONS PHASE ONE ISSUES**

Upon the receipt of the Litigation Administrator's opening brief,[2] the Defendants' joint

opening brief, each of the foregoing parties' response briefs, and any supplemental filing granted

by the Court, with respect to the Phase One Issues (the "**Briefing**") in accordance with the

Procedures Order; and the Court having jurisdiction to consider and determine the Phase One

Issues as a core proceeding in accordance with 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the

Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and venue

being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having the

power to enter a final order consistent with Article III of the United States Constitution; and the

Court having held a hearing with respect to the Phase One Issues (the "**Hearing**");[3] and upon the

record of the Hearing, the record of all of the proceedings before the Court, and the consideration

of the Briefing; and the Court having reached its findings of fact and conclusions of law as set

---

[1] The Post-Effective Date Debtors in these chapter 11 cases (the "**Chapter 11 Cases**"), along with the last four digits of each Post-Effective Date Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Post-Effective Date Debtor Celsius Network LLC's principal place of business and the Post-Effective Date Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Litigation Administrator's opening brief.

[3] The record of the Hearing is incorporated as if fully set forth herein.

forth in its separate opinion (the "**Opinion**"); and having determined that there is just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefore, it is

**HEREBY ORDERED THAT:**

1.      The presumption against extraterritoriality is not applicable to the Avoidance Actions.

2.      The Court has specific personal jurisdiction over all Defendants in connection with the Avoidance Actions.

3.      Sections 547(c) and 550(a) of the Bankruptcy Code govern for purposes of calculating the amount of Defendants' potential liability in the Avoidance Actions.

4.      All objections, responses, and other Briefing that have not been withdrawn, waived, or otherwise resolved, if any, are hereby denied or overruled on the merits with prejudice.  All withdrawn objections are deemed withdrawn with prejudice.

5.      Nothing in the Opinion or this Order modifies or alters the terms of the Procedures Order.

6.      This Order shall be effective immediately upon its entry.  Defendants that have been served the complaint and summons are bound by this Order.  For the avoidance of doubt, if any Defendants in the Avoidance Actions have not been served the complaint and summons as of the date the Order is entered, these Defendants will be bound by the Order once service is effected.

7.      This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement hereof.

Dated: _____
       New York, New York

_____
JUDGE MARTIN GLENN
Chief United States Bankruptcy Judge

2

# EXHIBIT B

**WHITE & CASE LLP**
Samuel P. Hershey
Lucas Curtis
Nikita Ash
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: sam.hershey@whitecase.com
     lucas.curtis@whitecase.com
     nikita.ash@whitecase.com

– and –

**WHITE & CASE LLP**
Keith H. Wofford
Devin Rivero (admitted *pro hac vice*)
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
Email: kwofford@whitecase.com
     devin.rivero@whitecase.com

– and –

**WHITE & CASE LLP**
Gregory F. Pesce (admitted *pro hac vice*)
Laura Baccash (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
Email: gregory.pesce@whitecase.com
     laura.baccash@whitecase.com

– and –

**ASK LLP**
Marianna Udem
60 East 42nd Street
46th Floor
New York, New York 10165
Telephone: (212) 267-7342
Facsimile: (212) 918-3427
Email: mudem@askllp.com

– and –

**ASK LLP**
Brigette McGrath
Kara E. Casteel (admitted *pro hac vice*)
2600 Eagan Woods Drive, Suite 400
St. Paul, Minnesota 55121
Telephone: (651) 406-9665
Facsimile: (651) 406-9676
Email: bmcgrath@askllp.com
     kcasteel@askllp.com

*Co-Counsel to Mohsin Y. Meghji, Litigation Administrator, as Representative for the Post-Effective Date Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | § § | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*, | § § § | Case No. 22-10964 (MG) |
| Reorganized Debtors.[1] | § § | (Jointly Administered) |

---

[1] The Debtors in these chapter 11 cases (the "**Chapter 11 Cases**"), along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's

| | | |
|---|---|---|
| MOHSIN Y. MEGHJI, LITIGATION ADMINISTRATOR, AS REPRESENTATIVE FOR THE POST-EFFECTIVE DATE DEBTORS, | §<br>§<br>§<br>§<br>§ | Adv. Proc. No.  **Refer to Summons** |
| Plaintiff, | §<br>§<br>§ | |
| v. | §<br>§ | |
| AHARON YOJANAN KING, | §<br>§<br>§ | |
| Defendant. | § | |

## <u>COMPLAINT</u>

Mohsin Y. Meghji, as Litigation Administrator for Celsius Network LLC and its affiliated debtors ("**Plaintiff**" or the "**Litigation Administrator**"), through his undersigned counsel, hereby submits this complaint (the "**Complaint**") to avoid and recover transfers made by the above-captioned debtors (collectively, the "**Debtors**," and together with their non-Debtor affiliates "**Celsius**" or the "**Company**") to or for the benefit of the above-captioned defendant (the "**Defendant**"), and alleges the following facts and claims based upon information and belief based on reasonable due diligence regarding the facts and circumstances of the Debtors' bankruptcy cases, Plaintiff's ongoing investigation, and the documents and information currently available to Plaintiff as to all other matters:

## <u>PRELIMINARY STATEMENT</u>

1.      Before it filed for chapter 11 protection on July 13, 2022, the Debtors worked hard to make its customers believe that it was a legitimate enterprise.  It was not.  Despite the Company's public messaging, on the inside, Celsius was a fraudulent mess, the extent of which has come to light through investigative fallout in the Debtors' bankruptcy.  Far from being "safer

---

principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

than a bank," Celsius repeatedly failed to responsibly hold or invest the assets that its account holders transferred to its platform. Losing billions of dollars because of risky investments and grave mismanagement, Celsius managed to keep up appearances until the cryptocurrency crashes of 2022, insisting on its legitimacy as a business to the very end. As a result of Celsius's staggering and widespread fraud, many of the Company's customers lost their life savings and faced financial ruin. Customers who trusted the lies propagated by management and did not withdraw the assets they had transferred to Celsius found those assets trapped on Celsius's platform, and themselves embroiled in an 18-month bankruptcy.

2.      The Defendant in this action is one of the lucky few who were spared—either partly or entirely—the devastation and hardship caused by Celsius's collapse. Indeed, less than 2% of Celsius's customers withdrew more than $100,000 of assets in the 90 days before the Debtors' bankruptcy filing. Notably, of the customers whose preference exposure was not released under the Debtors' confirmed plan of reorganization, the vast majority removed more than 90% of their account balances before the June 12, 2022 pause on withdrawals.[2]

3.      The Bankruptcy Code provides a mechanism to correct this inequity. The Litigation Administrator, with his obligation to *all* creditors of the Estates, seeks to put as many Celsius customers as possible on equal footing. To do so, the Litigation Administrator brings this preference avoidance and recovery action against the Defendant as the initial transferee of the assets transferred away from the Debtors in the 90 days before the date of Celsius filing for Bankruptcy (the "**Petition Date**"). Through these targeted efforts, the Litigation Administrator will level the disproportionate impact of the Debtors' bankruptcy and increase the amount of resources available for distribution to creditors.

---

[2] Under the confirmed plan of reorganization, Celsius customers with less than $100,000 of withdrawal preference exposure were released from that exposure.

4.      To that end, and through this Complaint, Plaintiff seeks to avoid and recover the preferential transfers that Defendant received as an initial transferee during the 90 days immediately preceding the Debtors' commencement of the Chapter 11 Cases.

## NATURE OF THE ACTION

5.      Plaintiff brings this adversary proceeding (the "**Adversary Proceeding**") pursuant to sections 502, 547 and 550 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "**Bankruptcy Code**"), seeking to avoid and recover from Defendant, or from any other person or entity for whose benefit the transfers were made, transfers of property of the Debtors during the 90-day period (the "**Preference Period**") before the commencement of the Chapter 11 Cases.

6.      Plaintiff seeks entry of a judgment against Defendant: (i) avoiding, pursuant to section 547(b) of the Bankruptcy Code, preferential transfers to and/or for the benefit of Defendant; (ii) directing, pursuant to section 550(a) of the Bankruptcy Code, Defendant to pay to Plaintiff an amount to be determined at trial that is not less than the value of the Avoidable Transfers (defined below), plus interest and costs; and (iii) pending such payment, disallowing, pursuant to section 502 of the Bankruptcy Code, any claim of Defendant against the Debtors.

7.      Through its ongoing investigation, Plaintiff has determined, based on currently available information, that the transfers set forth on **Exhibit A** (the "**Avoidable Transfers**") with a value totaling no less than approximately $2,120,535.63[3] were made by the Debtors to or for the benefit of Defendant and are avoidable under section 547 of the Bankruptcy Code and recoverable under section 550 of the Bankruptcy Code.

---

[3] To provide a sense of the dollar value for the preference actions and potential new value calculations (with the exception of CEL token, where the Plan (defined below) value was used to calculate value), the Litigation Administrator has provided the market value of the various assets as of June 14, 2024, in USD. In doing so, Plaintiff does not waive, and expressly reserves, any and all arguments with respect to the proper valuation date of the Avoidable Transfers and/or the form of recovery on any judgments.

8.    During the course of this Adversary Proceeding, Plaintiff may learn (through discovery or otherwise) of additional transfers made to Defendant during the Preference Period that are avoidable and recoverable under sections 547 and 550 of the Bankruptcy Code.  Plaintiff intends to avoid and recover all such transfers made to or for the benefit of Defendant or any other transferee during the Preference Period.  Plaintiff reserves the right to amend this Complaint to include, without limitation: (i) further information regarding the Avoidable Transfers; (ii) additional transfers made during the Preference Period; (iii) additional plaintiffs; (iv) modifications of and/or revisions to Defendant's name and other information; (v) additional defendants; and (vi) additional causes of action, if applicable (collectively, the "**Amendments**"), that may become known at any time during this Adversary Proceeding, through formal discovery or otherwise, and intend for any such Amendments to relate back to this Complaint.

9.    To the extent that any Defendant has filed a proof of claim in the Chapter 11 Cases, is listed on the Debtors' schedules, or has otherwise requested payment from the Debtors' Estates (collectively, the "**Claims**"), this Complaint is not intended to be, nor should it be construed as, a waiver of Plaintiff's right to object to such Claims for any reason including, but not limited to, section 502 of the Bankruptcy Code, and such rights are expressly reserved.

## **THE PARTIES**

10.    The Litigation Administrator brings this action pursuant to the *Findings of Fact, Conclusions of Law, and Order Signed on November 9, 2023 Confirming the Modified Joint Chapter 11 Plan of Celsius Network LLC and its Debtor Affiliates* (the "**Confirmation Order**") [Docket No. 3972],[4] the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network*

---

[4] "Docket No." refers to the docket of *In re Celsius Network LLC, et al.*, Case No. 22-10964 (MG) (Bankr. S.D.N.Y., filed July 13, 2022).  Documents filed on this docket can be accessed free of charge at https://cases.stretto.com/celsius/ (the "**Claims Agent Website**").

*LLC and its Debtor Affiliates (Conformed for MiningCo Transaction)* [Docket No. 4289] (the

"**Plan**"), the *Litigation Administrator Agreement* attached as Exhibit B to the *Eleventh Notice of*

*Filing of Plan Supplement* [Docket No. 4297] (the "**Litigation Administrator Agreement**"), and

section 1123 of the Bankruptcy Code.  Pursuant to the Plan, Confirmation Order, and the Litigation

Administrator Agreement, Plaintiff has the capacity, in his own right and name, to investigate,

prosecute, compromise, and settle Recovery Causes of Action,[5] including this Avoidance Action,

on behalf of the Debtors and their estates (the "**Estates**").  The Debtors are: Celsius Network LLC;

Celsius KeyFi LLC; Celsius Lending LLC; Celsius Mining LLC; Celsius Network Inc.; Celsius

Network Limited; Celsius Networks Lending LLC; Celsius US Holding LLC; GK8 Ltd; GK8 UK

Limited; and GK8 USA LLC.

11.     Upon information and belief, Defendant was, at all relevant times, a Celsius

customer utilizing the Celsius platform for the storage, transfer, purchase, and/or withdrawal of

assets.

12.     Upon further information and belief, Defendant resides at an address within the

United States of America, which address is known to Plaintiff but is not publicly disclosed

pursuant to the *Memorandum Opinion and Order on the Debtors' Sealing Motion* (the "**Order to**

**Seal**"), Docket No. 910.

### JURISDICTION AND VENUE

13.     The United States Bankruptcy Court for the Southern District of New York (the

"**Bankruptcy Court**" or the "**Court**") has jurisdiction over the Adversary Proceeding pursuant to

28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference, No. M-431, of the

United States District Court for the Southern District of New York, dated January 31, 2012.

---

[5] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the
Plan, Confirmation Order, and/or Litigation Administrator Agreement, as applicable.

14.     The Adversary Proceeding is commenced pursuant to sections 502, 547 and 550 of the Bankruptcy Code, and Rules 3007, 6009, and 7001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

15.     The Adversary Proceeding is a core proceeding pursuant to 28 U.S.C. § 157.  This Court has jurisdiction to hear and to determine this proceeding and to enter a final order and judgment.  In the event that this Court or any other court finds any part of the Adversary Proceeding to be "non-core," this Court has non-core concurrent jurisdiction over this proceeding under 28 U.S.C. § 1334 because the relief sought herein relates to the Chapter 11 Cases and will have a material impact on the administration of the Estates.

16.     Plaintiff consents to entry of final orders and judgments by this Court in this Adversary Proceeding pursuant to Bankruptcy Rule 7008.  Plaintiff also consents to entry of final orders or judgments by this Court if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

17.     This Court has jurisdiction over Defendant in as much as Defendant has maintained minimum contacts with the United States in connection with the claims asserted in this Complaint.  This Court also has jurisdiction over Defendant pursuant to Bankruptcy Rules 7004(d) and (f) and New York Civil Practice Law & Rules § 302 (McKinney 2008) because Defendant purposefully availed itself of the laws of the United States and the State of New York by, among other things, doing or transacting business in the United States and in the State of New York which gives rise and/or relates to the claims at issue in this Adversary Proceeding.  Further, this Court also has jurisdiction over Defendant by virtue of Defendant having entered into agreements with the Debtors and/or Plaintiff that for various contracts and matters designated New York law as the governing law and New York as the forum state for dispute resolution with respect to the transactions at issue in this Adversary Proceeding.  To the extent Defendant has also filed a proof

of claim in these Chapter 11 Cases and is therefore subject to the Court's jurisdiction, Defendant's

claim, if any, is hereby incorporated by reference.

18.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409 because this Adversary

Proceeding arises under and is related to the Debtors' Chapter 11 Cases pending in this Court.

## FACTUAL BACKGROUND

### A.     The Celsius Business Model and its Programs

19.     Celsius was founded in 2017. The business idea was described in a whitepaper,

which Celsius used to solicit capital through the public initial coin offering of its CEL token.

Celsius planned to offer two primary products. Of relevance for the purposes of this Complaint,

customers could transfer their cryptocurrency assets to Celsius in exchange for weekly interest.

Celsius said it would lend those cryptocurrency assets to hedge funds, family offices, and crypto

funds to generate yield.  Celsius account holders could elect to receive weekly rewards payments

(or interest) in the transferred cryptocurrency (*i.e.*, in-kind) or in CEL token, which had higher

return interest rates. In short, customers would transfer digital assets to the Celsius platform.

Celsius would lend the coins to third parties to earn yield.

20.     "Earn" was an investment program offered to Celsius account holders who held

their assets on Celsius's cryptocurrency platform (the "**Earn Program**").  Under the Earn

Program, participants ("**Earn Users**") could place digital assets in accounts with Celsius ("**Earn

Accounts**") in return for rewards.  The relationship between Earn Users and Celsius was governed

by Celsius's "**Terms of Use**," which versions relevant to this action were attached to the

*Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, Providing Terms*

8

*of Use Dating Back to February 18, 2018*, Docket No. 393 as Exhibits A-6 through A-8,[6] and are incorporated herein by reference.

21.    The Terms of Use provided that when account holders transferred assets to Celsius, they transferred ownership of those assets to the Debtors. The Terms of Use provided that customers who transferred assets to the Company as part of the Earn Program "grant Celsius all rights and title to such Digital Assets, for Celsius to use in its sole discretion while using the Earn Service."[7]  The Company was thus, among other things, granted the right "to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership," and "to use or invest such Digital Assets in [its] full discretion."[8]  In other words, as recognized by this Court,[9] the Terms of Use unambiguously transferred title and ownership of cryptocurrency assets transferred to Earn Accounts from users to the Company.

22.    Originally, customers who agreed to the Terms of Use entered into a contractual arrangement with Celsius Network Ltd ("**CNL**"), a United Kingdom entity.  However, in July 2021, the Terms of Use were updated such that the counterparty for ***all*** customers became Celsius Network LLC ("**LLC**"), a Delaware entity.[10]  Moreover, the governing law of the Terms of Use

---

[6] The Terms of Use as of July 2021 are found at Exhibit A-6, with technical corrections made in August 2021 as Exhibit A-7.  The Terms of Use in effect as of April 14, 2022, can be found at Exhibit A-8.  These documents can be accessed free of charge on the Claims Agent Website.

[7] Terms of Use Version 8 § 4(D).

[8] *Id.* § 13.

[9] During the Chapter 11 Cases, this Court addressed whether transfers to Earn Accounts constituted assets of the Estates.  On January 4, 2023, following a multi-day hearing and extensive briefing from the parties in interest, this Court issued a ruling (the "**Earn Ruling**") determining that when assets were transferred to Earn Accounts, "the cryptocurrency assets became Celsius's property."  *In re Celsius Network LLC*, 647 B.R. 631, 637 (Bankr. S.D.N.Y. 2023).  The Earn Ruling is available on the Claims Agent Website at Docket No. 1822.

[10] Terms of Use Version 6 § 1. Typographical errors were corrected in Version 7 released in August 2021.

was changed to New York law, and any disputes "arising out of, or related to, your Celsius Account or relationship with Celsius must be brought exclusively in the competent courts located in New York, NY and the US District Court located in the Borough of Manhattan."[11]  All customers were required to accept these updates to the Terms of Use through a "push" notification to continue to access Celsius's platform.  This was done, in part, to reflect the change in legal entity with which customers would conduct business moving from CNL in the United Kingdom to LLC in the United States.  Previously, CNL received all transfers from retail and institutional customers for the Earn Program.  After these changes were made, LLC remained the counterparty on the Terms of Use and a holder of assets.  Further, all "user-facing" activities, including all withdrawal requests related to the Earn Program, were housed in the workspace hosted by LLC for customer accounts.  Accordingly, as of the Petition Date and during the 90 days before the Petition Date, all Celsius customers who participated in the Earn Program were knowingly and willingly contracting with a U.S. entity in connection with the assets that they transferred to and withdrew from Celsius's platform.

23.     The Terms of Use provided that customers could withdraw assets corresponding to the balances in their Earn Accounts or Custody Accounts (defined below) at will or transfer them between accounts at Celsius as needed.[12]  However, that was not how Celsius actually operated. In March 2022, Celsius acknowledged internally that it was not producing enough revenue to cover liabilities or additional operating expenses. Celsius was insolvent by nearly $800 million by its own account.  Accordingly, Celsius was unable to fulfill the promises set forth in the Terms of Use and return assets to customers when requested.  Rather, the assets that customers withdrew depleted a pool of assets that was insufficient for Celsius to honor customers' withdrawal requests.

---

[11] *Id.* § 33.

[12] *See* Terms of Use Version 8 § 11.

24. Celsius's model was therefore always a fraud, with the Company promising it could, and would, pay its customers back when it knew it could not.

**B.** **Celsius Faces Heavy Losses and Public Regulatory Scrutiny, Leading to the Pause**

25. Beginning in 2021 through July 13, 2022 (the Petition Date), Celsius faced increasing regulatory pressure from the United Kingdom and United States' governments. Among other things, on September 17, 2021, the New Jersey Bureau of Securities ordered Celsius to cease and desist from offering Earn Accounts to certain investors in the United States (the "**New Jersey Order**").[13] Around the same time, several other state regulatory agencies, including those in Vermont, California, and New York, took action against Celsius.

26. In mid-2021, Celsius was forced by regulators in the U.K. to "migrate" its retail business from CNL (a U.K. entity) to LLC (a Delaware entity). More specifically, Celsius "migrated" all customer balances and obligations arising from transactions on the Celsius platform from CNL to LLC. In response to adverse regulatory action in the U.K., Celsius announced on June 23, 2021, that it was migrating its main business activity and headquarters from the United Kingdom to the United States and where applicable, to several other jurisdictions.

27. As much as Celsius tried to keep these issues secret, on April 15, 2022, the New Jersey Order became effective, forcing Celsius to publicly admit to the regulatory issues that had been plaguing it for over a year. In a dramatic and public move, Celsius was forced to close its Earn Program to unaccredited investors. In an attempt to keep customers on the platform, Celsius launched its "Custody" product for customers in certain U.S. states (the "**Custody Program**"). The Custody Program provided accounts ("**Custody Accounts**") that were unlike the Earn

---

[13] State of New Jersey Bureau of Securities, *Summary Cease and Desist Order in the Matter of Celsius Network, LLC* (Sept. 17, 2021), https://www.nj.gov/oag/newsreleases21/Celsius-Order-9.17.21.pdf.

Accounts in that the Terms of Use provided that customers retained title to the assets but could not generate rewards.[14] Funds that were already held in Celsius's Earn Accounts were allowed to remain in those Earn Accounts regardless of accreditation status; however, on and after April 15, 2022, only international-based users and U.S. accredited users could transfer funds to Earn Accounts. The Custody Program was created—and the attendant regulatory problems revealed— 89 days before the Petition Date. Any transfers of assets from Earn Accounts to Custody Accounts, and the accompanying transfer of title from Celsius to customers ("**Earn to Custody Title Transfers**"), therefore also occurred during the Preference Period. Following the New Jersey Order, the Company began to experience significant outflows of assets from its platform. The amount of digital assets transferred off the Celsius platform increased by 67%,[15] and the corresponding transaction volume increased by 137%, from the period of April 15, 2022 to May 15, 2022, as compared to the period of March 15, 2022 to April 15, 2022.

28.    While Celsius was already insolvent at least as of March 2022, the situation at the Company was about to become even more untenable. On May 7, 2022, what started as a spike in migration of assets off Celsius's platform turned into an explosion. The cryptocurrency token, TerraUSD ("**UST**"), suffered a significant loss of value that sent shockwaves through the entire cryptocurrency market. The UST token was a stablecoin whose value was pegged to USD through an algorithm and use of another cryptocurrency called "Luna." The UST coin value "de-pegged" and plummeted (the **"Terra Luna Collapse"**).[16] Celsius had approximately $940 million

---

[14] Celsius, *Custody FAQ*, https://support.celsius.network/hc/en-us/articles/4838161060381-Custody-FAQ (last visited June 3, 2024).

[15] The amount of digital assets transferred off the Celsius platform during these periods was calculated using the approximate value of the transferred assets in USD as of the date of the transfer and not as of June 14, 2024.

[16] The Terra Luna Collapse and other events discussed herein are described in further detail in the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3332] (the "**Disclosure Statement**"). *See, e.g.*, Disclosure Statement at 587.

deployed on the Terra blockchain. It was able to escape the crash with an approximately $30 million loss. Celsius also had lent $41 million to Three Arrows Capital, which entered liquidation as a result of the Terra Luna Collapse.

29.     In the face of the Terra Luna Collapse, rumors swirled around Celsius and its stability. Customers withdrew billions of dollars' worth of cryptocurrency assets from the Celsius platform the week after the Terra Luna Collapse. Seventy-five percent of all withdrawals during the Preference Period occurred after the Terra Luna Collapse.

30.     Internally, Celsius faced a liquidity crisis. It had billions of dollars invested in illiquid investments but insufficient assets to address customer withdrawal requests. Celsius also had more than one billion in loans that were collateralized by cryptocurrency that was dramatically decreasing in value and required additional collateral to survive margin calls. By May 16, 2022, Celsius's liquidity had dropped by 40% due to customer withdrawals and steep price declines in BTC and ETH.

31.     Over the course of May and June 2022, crypto prices widely and continuously plummeted, and the instability in the crypto markets led to a run on the bank. In May, BTC was down 15.7% month-over-month.[17] June was even worse, as BTC was down 37.9%.[18] Many customers began rapidly withdrawing all or some of their assets, demanding crypto assets that Celsius lacked liquidity to provide. Many other players in the crypto markets were also collapsing under the same pressures, with crypto hedge fund Three Arrows Capital, Ltd. and crypto brokerage

---

[17] Statmuse, *what is the average price of bitcoin in May 2022*, https://www.statmuse.com/money/ask/what-is-the-average-price-of-bitcoin-in-may-2022 (last visited June 3, 2024).

[18] Statmuse, *what is the average price of bitcoin in June 2022*, https://www.statmuse.com/money/ask/what-is-the-average-price-of-bitcoin-in-june-2022 (last visited June 3, 2024).

company Voyager Digital Holdings, Inc. filing for chapter 11 bankruptcy shortly before the Debtors, on July 1, 2022, and July 5, 2022, respectively.[19]

32.    On June 12, 2022, in response to customer withdrawal demands and increasing volatility in the cryptocurrency markets, Celsius paused all withdrawals from its platform to prevent further erosion of value (the "**Pause**").  Hundreds of thousands of customers who still had assets on Celsius's platform were left without recourse, unable to withdraw or sell their coins. A matter of minutes, in some cases, made the difference between being a customer who was able to escape with assets and a customer who would have assets frozen indefinitely while the value continued to plummet.

**C.    The Chapter 11 Cases**

33.    On the Petition Date, the Debtors, other than GK8 Ltd, GK8 UK Limited, and GK8 USA LLC (collectively, the "**GK8 Debtors**"), filed voluntary petitions for relief in this Court under chapter 11 of the Bankruptcy Code.  On December 7, 2022, the GK8 Debtors filed voluntary petitions in this Court under chapter 11 of the Bankruptcy Code.  All of these Chapter 11 Cases were consolidated for procedural purposes only and are jointly administered pursuant to Bankruptcy Rule 1015(b).[20]

34.    On July 27, 2022, the United States Trustee for the Southern District of New York appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code.[21]  On September 29, 2022, the Court entered an order directing the appointment of an

---

[19] *See In re Three Arrows Capital, Ltd.*, Case No. 22-10920 (MG) (Bankr. S.D.N.Y, filed July 1, 2022); *In re Voyager Digital Holdings, Inc., et al.*, Case No. 22-10943 (MEW) (Bankr. S.D.N.Y, filed July 5, 2022).

[20] *See Order Directing (I) Joint Administration of the Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 53]; *Order Directing (I) Joint Administration of the Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 1648].

[21] *See Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 241].

examiner.[22]  Following the examiner's issuance of a final report of her examination, on April 4,

2023, the Court entered an order discharging the examiner.[23]

35.     On March 21, 2023, the Court entered the *Order (I) Approving (A) the Settlement
by and among the Debtors, the Committee, and the Custody Ad Hoc Group and (B) the Election
Form and (II) Granting Related Relief* [Docket No. 2291] approving the Settlement Agreement
attached as Exhibit 1 [Docket No. 2291-1] (the "**Custody Settlement**").   Under the Custody
Settlement, the parties to the Custody Settlement released each other from any and all claims and
causes of action related to the Allowed Custody Claims of Settling Custody Account Holders (as
defined in the Custody Settlement), including avoidance actions.[24]  Notwithstanding anything to
the contrary set forth in the Custody Settlement, parties to the Custody Settlement did not release
any rights or causes of action with respect to any assets other than Custody Assets (as defined in
the Custody Settlement) or claims other than Allowed Custody Claims (as defined in the Custody
Settlement).[25]  To the extent the Defendant is a party to the Custody Settlement, this Complaint
asserts causes of action and claims that were not released under the Custody Settlement.

36.     On April 20, 2023, the Court entered the *Order (I) Approving the Settlement by
and among the Debtors, the Committee, and the Withhold Ad Hoc Group and (II) Granting Related
Relief* [Docket No. 2509] approving the Settlement Agreement attached as Exhibit 1 (the
"**Withhold Settlement**").   Under the Withhold Settlement, the Estates released any avoidance
claims against the Settling Withhold Account Holders (as defined in the Withhold Settlement).[26]

---

[22] *See Order Approving the Appointment of Chapter 11 Examiner* [Docket No. 923].

[23] *See Order Discharging Examiner* [Docket No. 2364].

[24] *See* Custody Settlement ¶ 6.

[25] *Id.* Examples of non-released rights or causes of action with respect to assets other than Custody Assets
(as defined in the Custody Settlement) include assets held in an Earn Account by an account holder and
certain assets transferred off Celsius's platform by an account holder.  *See id.*

[26] *See* Withhold Settlement ¶ 7.

Notwithstanding anything to the contrary set forth in the Withhold Settlement, parties to the Withhold Settlement did not release any rights or causes of action with respect to any assets other than Withhold Assets (as defined in the Withhold Settlement) or claims other than Withhold Claims (as defined in the Withhold Settlement).[27]   To the extent the Defendant is a party to the Withhold Settlement, this Complaint asserts causes of action and claims that were not released under the Withhold Settlement.

37.    On November 9, 2023, the Court entered the Confirmation Order, pursuant to which the Court approved and confirmed the Plan (as amended, supplemented, or modified from time to time) for all of the Debtors.  The Confirmation Order provides that Cryptocurrency held by Debtors as of the Petition Date as collateral with respect to Account Holders' loan obligations under the Borrow Program constitutes property of the Estates under section 541 of the Bankruptcy Code.[28]

38.    Pursuant to the Confirmation Order and Plan, Debtors Celsius Network Limited, Celsius Network LLC, Celsius Lending LLC, and Celsius Networks Lending LLC (the "**Consolidated Debtors**") were substantively consolidated for purposes of the Plan, including for purposes of voting, confirmation, and Plan distributions.  Among other aspects of the substantive consolidation, (i) all assets and all liabilities of the Consolidated Debtors shall be treated as though they were merged; (ii) all joint obligations of two or more Consolidated Debtors and multiple Claims against such Consolidated Debtors on account of such joint obligations shall be treated and allowed as a single Claim against the Consolidated Debtors; and (iii) each Claim filed or scheduled

---

[27] *Id.* Examples of non-released rights or causes of action with respect to assets other than Withhold Assets (as defined in the Withhold Settlement) include assets held in an Earn Account by an account holder and certain assets transferred off Celsius's platform by an account holder.  *See id.*

[28] *See* Confirmation Order ¶¶ 33-36, 269.

in the Chapter 11 Case of any Consolidated Debtor shall be deemed filed against the Consolidated

Debtors and a single obligation of the estates of the Consolidated Debtors.[29]

39.     As described in articles III.A.1 and III.B.9 of the Plan and article III.E of the

Disclosure Statement, General Unsecured Claims constitute an impaired class of creditors that has

not been, and is not expected to be, paid in full.

40.     On January 31, 2024, the Plan became effective.[30]   As part of the Plan, the

Litigation Administrator was appointed to prosecute, settle, or otherwise resolve any claims

belonging to the Estates and to serve as the Estates' representative in certain litigation, including

causes of action under chapter 5 of the Bankruptcy Code.[31]   The Litigation Administrator is

charged to maximize distributions to the stakeholders, including victims of Celsius's collapse.

### D.     The Avoidable Transfers

41.     The market turmoil that Celsius faced during the Preference Period led to

unprecedented withdrawals from its platform, amounting to a classic "run on the bank."   Celsius's

records show that Defendant contributed to this "run on the bank" by making significant

withdrawals during this time, *i.e.*, the Avoidable Transfers.   Unlike other customers, Defendant

was able to withdraw net assets valued greater than $100,000 USD, even when accounting for any

new value, before Celsius paused withdrawals and locked all assets on its platform, advantaging

Defendant over other creditors.

42.     During the Preference Period, Celsius Network LLC and/or one or more of the

Debtors transferred to Defendant, by virtue of Defendant: receiving an Earn to Custody Title

---

[29] *See* Plan, Art. IV.A.

[30] *See Notice of Occurrence of Effective Date of Debtors' Modified Chapter 11 Plan of Reorganization and Commencement of Distributions* [Docket No. 4298].

[31] *See* Plan, Art. IV.L.

Transfer; and/or withdrawing funds held in their Earn Account/s; and/or receiving any transfer of property of the Debtors constituting an Avoidable Transfer,[32] Avoidable Transfer(s) in an aggregate gross amount valued at no less than approximately $2,120,535.63.[33]   Details of each such Avoidable Transfer are set forth on **Exhibit A**.  These details include:

- A transaction description, which contains: i) the type of asset (*e.g.*, BTC, ETH, USDC), ii) a description of whether the transfer was internal (*i.e.*, from one account on the Celsius platform to another account) or a withdrawal (*i.e.*, off the Celsius platform), and iii) the type of account the asset was transferred to and from (*e.g.*, from Yield to Custody);[34]

- The transaction date; and

- The transaction amount, which is the approximate value of the transferred asset in USD as of June 14, 2024.

### E.    The Litigation Administrator's Demand and Due Diligence

43.    On or about April 9, 2024, Plaintiff, via email and through his professionals, sent a demand letter (the "**April Letter**") to Defendant, seeking a return of the Avoidable Transfer(s).

---

[32] All types of withdrawals or transactions which Plaintiff alleges qualify as Avoidable Transfers are described in the Disclosure Statement. As noted in section III.PP of the Disclosure Statement, transfers which are listed as increasing an Account Holder's Withdrawal Preference Exposure are ones involving transfers of the Debtors' property under the Terms of Use and any other governing documents and would be considered Avoidable Transfers under this Complaint.

[33] As noted *supra*, the Litigation Administrator has provided the market value of the various assets as of June 14, 2024 in USD.  In doing so, Plaintiff does not waive, and expressly reserves, any and all arguments with respect to the proper valuation date of the Avoidable Transfers and/or the form of recovery on any judgments.

[34] The Litigation Administrator received the underlying data used in **Exhibit A** from the Debtors. The accounts within the data are coded with the following names: (1) "Yield"; (2) "Custody"; (3) "Off-Platform"; and (4) "Celsius." "Yield" means Earn Accounts as defined in this Complaint. "Custody" means Custody Accounts as defined in this Complaint.  "Off-Platform" means a digital asset account, wallet, or other mechanism for receiving digital assets that is not on the Celsius platform. "Celsius" means a digital asset account, wallet, or other mechanism enabling the transfer of digital assets under the control of Celsius with respect to the transfer of collateral.

The April Letter also provided the Defendant an option to settle at a discount to the net withdrawal preference exposure prior to Plaintiff initiating this preference action.[35]  Prior to sending the April Letter, Plaintiff reviewed the Debtors' records and identified certain transfers or other qualifying transactions[36] that could potentially provide new value under section 547(c) of the Bankruptcy Code, decreasing the net amount owed by Defendant to Plaintiff.  On or about May 15, 2024, Plaintiff, via email and through his professionals, sent a second demand letter (the "**May Letter**") to Defendant, again seeking a return of the Avoidable Transfer(s).  In the May Letter, the Litigation Administrator informed the Defendant that he had conducted due diligence with respect to potential defenses to liability under 11 U.S.C. § 547(c).

44.     As part of this due diligence evaluation, Plaintiff reviewed the Debtors' books and records and identified that Defendant potentially has $  0.00 in transfers or other transactions that would qualify as new value under section 547(c)(4) of the Bankruptcy Code.  However, the subsequent new value defense is an affirmative defense, for which Defendant bears the burden of proof under section 547(g) of the Bankruptcy Code.  Factors such as the appropriate valuation date of such new value may affect the ultimate net of new value amount, if any.  Accordingly, Defendant bears the burden of proof to establish it is entitled to this new value.

45.     Plaintiff also reviewed the ordinary course of business defense, and asserts it is not applicable to the Avoidable Transfers.  As described above, Celsius did not operate in the manner that the Terms of Use set forth, and the vast majority of the withdrawals during the Preference Period were essentially a run on the bank, occurring after Celsius's regulatory problems became notorious and the Terra Luna Collapse.  Additionally, transfers of assets from Earn Accounts to

---

[35] The settlement offer was calculated using the approximate value of the transferred assets in USD as of the date of the transfer and not as of June 14, 2024.

[36] *See* Disclosure Statement, section III.PP for a list of transactions that would qualify for new value credit under section 547(c) of the Bankruptcy Code.

Custody Accounts, if any, were the result of the creation of the new Custody Program in response to regulatory scrutiny. To the extent that Defendant asserts that any Avoidable Transfers were withdrawals that were ordinary as compared to prior withdrawals of Defendant, Plaintiff puts Defendant to its burden of proof to establish it is entitled to this defense.

46.     In accordance with section 547(b) of the Bankruptcy Code, Plaintiff has analyzed available information and asserts that the Avoidable Transfers are avoidable and recoverable pursuant to sections 547 and 550(a) of the Bankruptcy Code as set forth in **Exhibit A**.  Plaintiff reasonably believes all of the Avoidable Transfers are avoidable, subject to Defendant's known or reasonably knowable affirmative defenses under section 547(c) of the Bankruptcy Code, and Defendant's successful establishment of these defense(s) pursuant to section 547(g) of the Bankruptcy Code.  Based in part on the Earn Ruling, which held that assets in Earn Accounts were the property of the Debtors, Defendant's transfers from Earn Account(s) either (a) off the Celsius platform or (b) to Custody Account(s), if any, during the Preference Period qualify as avoidable transfers for which Defendant was the initial transferee.

47.     Plaintiff seeks to avoid all of the transfers of an interest of the Debtors in any property made by the Debtors to Defendant during the Preference Period.

### CAUSES OF ACTION

### COUNT ONE

**(Avoidance of Avoidable Transfers — 11 U.S.C § 547(b) — Defendant)**

48.     Plaintiff repeats, reiterates and realleges each of the foregoing allegations of this Complaint as if fully set forth herein.

49.     During the Preference Period, the Debtors made the Avoidable Transfers to, and/or for the benefit of, Defendant in the asset type, approximate value, and transfer types set forth on **Exhibit A**, which is incorporated by reference herein.

50.    Defendant was a creditor of the Debtors within the meaning of section 547(b)(1) of the Bankruptcy Code at the time of each Avoidable Transfer by virtue of the Terms of Use, under which the Debtors were obligated to transfer the Avoidable Transfer(s) to Defendant.

51.    According to the books and records of the Debtors, the Avoidable Transfers were made to, and/or for the benefit of, Defendant because each Avoidable Transfer either reduced or fully satisfied a debt or debts then owed by the Debtors to Defendant.

52.    The Avoidable Transfers were made for, or on account of, antecedent debts owed by the Debtors to Defendant with respect to which each such Avoidable Transfer relates. Defendant had withdrawal rights to the assets reflected in the balances in its accounts, having transferred the assets to the Debtors under the Terms of Use.  Under the Terms of Use, the Debtors were obligated to transfer assets corresponding to the balances in Defendant's account upon request.

53.    The Avoidable Transfers were made while the Debtors were insolvent.  As discussed, *supra*, upon information and belief each Avoidable Transfer during the Preference Period was made while Debtors were insolvent within the meaning of sections 101(32) and 547(b)(3) of the Bankruptcy Code.  Notwithstanding the foregoing, Plaintiff is also entitled to the presumption of insolvency for each Avoidable Transfer made during the Preference Period pursuant to section 547(f) of the Bankruptcy Code.

54.    The Avoidable Transfers enabled Defendant to receive more than it would have received if (a) the Debtors' Chapter 11 Cases were a case under chapter 7 of the Bankruptcy Code, (b) the Avoidable Transfers had not been made, and (c) Defendant received payment of such debt(s) to the extent provided by the provisions of the Bankruptcy Code.

55.     Under the Plan and current projected distributions pursuant to the Plan, general unsecured creditors of the Debtors will receive less than full value on account of their allowed claims against the Estates.

56.     By reason of the foregoing, each Avoidable Transfer should be avoided and set aside as a preferential transfer pursuant to section 547(b) of the Bankruptcy Code.

## COUNT TWO

### (Recovery of Avoidable Transfers — 11 U.S.C § 550 — Defendant)

57.     Plaintiff repeats, reiterates and realleges each of the foregoing allegations of this Complaint as if fully set forth herein.

58.     Plaintiff is entitled to avoid the Avoidable Transfers pursuant to section 547(b) of the Bankruptcy Code.

59.     Defendant was the initial transferee of the Avoidable Transfers, the immediate or mediate transferees of such initial transferee, or the person(s) for whose benefit the Avoidable Transfers were made.

60.     As of the date hereof, the Defendant has not repaid all or a part of the value of the Avoidable Transfers or returned the Avoidable Transfers.

61.     Pursuant to section 550(a) of the Bankruptcy Code, Plaintiff is entitled to recover from Defendant, for the benefit of the Estates, the property transferred in the Avoidable Transfers, or the value of such transferred property, plus interest thereon to the date of payment and the costs of this action.

## COUNT THREE

### (Disallowance of Defendant's Claims — 11 U.S.C. § 502(d) — Defendant)

62.     Plaintiff repeats, reiterates and realleges each of the foregoing allegations of this Complaint as if fully set forth herein.

63.    As alleged above, Defendant is the initial, immediate and/or mediate transferees of transfers avoidable under section 547 of the Bankruptcy Code and the persons from whom property is recoverable under section 550 of the Bankruptcy Code.

64.    As of the date hereof, the Defendant has not repaid all or a part of the value of the Avoidable Transfers or returned the Avoidable Transfers.

65.    By reason of the foregoing facts and pursuant to section 502(d) of the Bankruptcy Code, any Claims of Defendant that have been or may in the future be asserted in the Chapter 11 Cases should be disallowed unless and until Defendant relinquishes to Plaintiff the property transferred or pays to Plaintiff the value of such transferred property, for which and to the extent that the Court has determined Defendant is liable pursuant to section 550 of the Bankruptcy Code.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment against the Defendant as follows:

(a)    Pursuant to section 547(b) of the Bankruptcy Code, avoiding each of the Avoidable Transfers;

(b)    Pursuant to section 550(a) of the Bankruptcy Code, directing Defendant to relinquish to Plaintiff the property transferred in the Avoidable Transfers, or pay to Plaintiff an amount to be determined at trial that is not less than the full amount of the Avoidable Transfers;

(c)    Disallowing any Claim of Defendant pursuant to section 502(d) of the Bankruptcy Code;

(d)    Awarding pre-judgment interest at the maximum legal rate running from the date of Plaintiff's first demand to Defendant to return all Avoidable Transfers to the date of judgment with respect to this Complaint (the "**Judgment**") herein;

(e)    Awarding post-judgment interest at the maximum legal rate running from the date of the Judgment until the date the Judgment is paid in full;

(f)    Awarding Plaintiff costs of suit incurred herein, including, without limitation, attorneys' fees, costs, and other expenses incurred in this action, to the fullest extent allowed by applicable law;

23

(g)      Requiring Defendant to pay forthwith the amount of the Judgment; and

(h)      Ordering such other and further relief as the Court may deem just and proper.

*[Remainder of page intentionally left blank.]*

Dated: July 1, 2024
      New York, New York

By: /s/ *Samuel P. Hershey*

**WHITE & CASE LLP**
Samuel P. Hershey
Joshua D. Weedman
Lucas Curtis
Nikita Ash
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email:  sam.hershey@whitecase.com
      jweedman@whitecase.com.
      lucas.curtis@whitecase.com
      nikita.ash@whitecase.com

– and –

**WHITE & CASE LLP**
Gregory F. Pesce (admitted *pro hac vice*)
Laura Baccash (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
Email:  gregory.pesce@whitecase.com
      laura.baccash@whitecase.com

– and –

**WHITE & CASE LLP**
Keith H. Wofford
Devin Rivero (admitted *pro hac vice*)
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
Email:  kwofford@whitecase.com
      devin.rivero@whitecase.com

– and –

**ASK LLP**
Marianna Udem, Esq.
60 East 42nd Street
46th Floor
New York, New York 10165
Telephone: (212) 267-7342
Facsimile: (212) 918-3427
Email:  mudem@askllp.com

– and –

**ASK LLP**
Brigette McGrath, Esq.
Kara E. Casteel, Esq. (admitted *pro hac vice*)
2600 Eagan Woods Drive, Suite 400
St. Paul, Minnesota 55121
Telephone: (651) 406-9665
Facsimile: (651) 406-9676
Email:   bmcgrath@askllp.com
             kcasteel@askllp.com

*Co-Counsel to Mohsin Y. Meghji,*
*Litigation Administrator, as*
*Representative for the Post-Effective*
*Date Debtors*

| Defendant: | **AHARON YOJANAN KING** |
|---|---|
| Bankruptcy Case: | **Celsius Network LLC, et al.** |
| Preference Period: | **Apr 14, 2022 - Jul 13, 2022** |

## Transfers During Preference Period

| Debtor Entity | Transaction Description | Transaction Amount | Transaction Date |
|---|---|---|---|
| Celsius Network LLC, et al. | Internal Account Transfer: Yield to Custody (31.76332666 BTC) | $2,120,535.63 | 5/21/2022 |

**Totals:** **1 transfer(s),** **$2,120,535.63**