**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>CELSIUS CUSTOMER PREFERENCE ACTIONS, | **FOR PUBLICATION**<br><br>Case No. 24-04024 (MG)<br><br>Chapter 11 |

**MEMORANDUM OPINION AND ORDER ON PHASE ONE ISSUES**


*A P P E A R A N C E S:*

WHITE & CASE LLP
*Attorneys to Moshin Y. Meghji, Litigation Administrator,*
*as Representative for the Post-Effective Date Debtors*
1221 Avenue of the Americas
New York, New York 10020
By:     Samuel P. Hershey, Esq.
         David M. Turetsky, Esq.
         Lucas Curtis, Esq.
         Nikita Ash, Esq.


                    – and –


WHITE & CASE LLP
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
By:     Keith H. Wofford, Esq.
         Devin Rivero, Esq.


                    – and –


WHITE & CASE LLP
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
By:     Gregory F. Pesce, Esq.
         Laura Baccash, Esq.


                    – and –

WHITE & CASE LLP
555 South Flower Street, Suite 2700
Los Angeles, California 90071
By:   Ronald Gorsich, Esq.
        Aaron Colodny, Esq.

– and –

ASK LLP
60 East 42nd Street 46th Floor
New York, New York 10165
By:   Marianna Udem, Esq.

– and –

ASK LLP
2600 Eagan Woods Drive, Suite 400
St. Paul, Minnesota 55121
By:   Brigette McGrath, Esq.
        Kara E. Casteel, Esq.

TROUTMAN PEPPER LOCKE LLP
*Attorneys for the Troutman Defendants*
875 Third Ave
New York, New York 10022
By:   Deborah Kovsky-Apap, Esq.
        Robert S. Hertzberg, Esq.

LOWENSTEIN SANDLER LLP
*Attorneys for the Lowenstein Defendants*
1251 Avenue of the Americas
New York, New York 10020
By:   Daniel B. Besikof, Esq.
        Brittany M. Clark, Esq.

WILMER CUTLER PICKERING HALE AND DORR LLP
*Attorneys for the Olney-Fraser Lawyers on behalf of the DOF Group of Defendants*
7 World Trade Center
250 Greenwich Street
New York, New York 10007
By:   Philip D. Anker, Esq.

AIDALA, BERTUNA & KAMINS, P.C.
*Attorneys for Defendant Joshua Bingham*
546 Fifth Avenue, Sixth Floor
New York, New York 10036
By:    Imran H. Ansari, Esq.

BECKER, GLYNN, MUFFLY, CHASSIN & HOSINSKI LLP
*Attorneys for Defendant Vincenzo Agui*
299 Park Avenue
New York, New York 10171
By:    Alec P. Ostrow, Esq.

BRESSLER, AMERY & ROSS P.C.
*Attorneys for The Bressler Defendants*
17 State Steet 34th Floor
New York, New York 10004
By:    Christopher M. Vaughan, Esq.

FREEMAN | MASON
*Attorneys for Khanh Le Pham*
8484 Wilshire Blvd., Suite 515
Beverly Hills, CA 90211
By:    Shannon O.C. Nelson, Esq.

JONES & ASSOCIATES
*Attorneys for Chieh Chung, Tomas Greif, Sakari Tapio Perttunen,*
*Edward Won Jae Lee, Jonathan Michael Dawson, Jason Kirby*
*Didier VanMaercke, Christopher Leclerc,*
*Edwin Jared Veldheer, Coinlend Gmbh*
1325 Avenue of the Americas 28th Floor
New York, New York 10019
By:    Roland Gary Jones, Esq.

K&L GATES
*Attorneys for Defendant Andrew M. Tymms*
599 Lexington Avenue
New York, New York 10022
By:    Robert T. Honeywell, Esq.

MILLBANK LLP
*Attorneys for Defendant Alexander J.S. Hartley*
55 Hudson Yards
New York, New York 10001
By:    Jaimie Fedell, Esq.

PROSKAUER ROSE LLP
*Attorneys for Coinhouse LLC*
Eleven Times Square
New York, NY 10036-8299
By:    Brian Rosen, Esq.

**As to Issue 1 only:**

JACKSON WALKER LLP
*Attorneys for Mike Boudet*
1401 McKinney Street, Suite 1900
Houston, TX 77010
By:    Zachary McKay, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is the Phase One Briefing and proposed order of Mohsin Y. Meghji (the "Litigation Administrator Opening Brief" (ECF Doc. # 59), the "Litigation Administrator Reply Brief" (ECF Doc. # 68), collectively, the "Litigation Administrator Briefing") as litigation administrator (the "Litigation Administrator" or the "Plaintiff") of Celsius Network LLC ("LLC") and its affiliates (collectively, the "Debtors") and the Phase One Briefing and proposed order of the Defendants[1] (the "Defendants' Joint Opening Brief" (ECF Doc. # 58), the "Defendants' Brief in Response to Phase One Issues" (ECF Doc. # 67), collectively the "Defendants' Briefing").

The Plaintiff seeks entry of an order finding (i) that the Litigation Administrator is not limited by the Chapter 11 Plan's definition of Withdrawal Preference Exposure ("WPE") for purposes of calculating the amount of the Defendants' potential liability in the Avoidance Actions pursuant to sections 547 and 550 of the Bankruptcy Code (the "Code"), (ii) that the Defendants are subject to personal jurisdiction, and (iii) that the above-captioned Debtors' preferential transfers were domestic transfers for the purposes of the preference avoidance provisions of the Code, or in the alternative, that sections 547 and 550 of the Code apply extraterritorially.

For the reasons below, the Court finds for the Plaintiff on all three issues. The definition of WPE does not waive the Litigation Administrator's statutory right to pursue avoidance actions to the fullest extent of their liability under sections 547 and 550 of the Code. Furthermore, the Court finds, on a general basis, that the Defendants are subject to personal jurisdiction. Most defendants reside in the United States and undertook their

---

[1]     As defined in the *Revised Motion for an Order Establishing Streamlined Procedures Governing Avoidance Actions Pursuant to Sections 502, 547, and 550 of the Bankruptcy Code* (ECF Doc. # 3).

transactions with Celsius from the United States.  Some defendants, however, reside outside the United States and undertook their transactions with Celsius online from outside the United States.  It is this group only that raises the issue of personal jurisdiction.  The Court further finds that as to all customers the transfers are domestic and involve a domestic application of sections 547 and 550 of the Code.  Because the transfers are domestic in nature, the Court does not reach the issue of extraterritoriality.

## I.  BACKGROUND

### A.  Relevant Case History

Prior to filing for Chapter 11, Celsius shifted its primary operations and business relationships and obligations to customers away from Celsius Network Limited ("CNL"), a U.K. entity, to LLC, a Delaware entity.  Celsius "migrated" all customer balances and obligations arising from transactions on the Celsius platform from CNL to LLC.  (Pl. Br. ¶ 8.)  On July 22, 2021, the Terms of Use were updated to "Version 6."  (*Id.* ¶ 9.)  Among other changes, the Terms of Use added LLC as a contractual counterparty for all customers.  (*Id.*)  Additionally, the governing law of the Terms of Use for customer accounts was changed from English law to New York law, and any disputes "arising out of, or related to, [a customer's] Celsius Account or relationship with Celsius must be brought exclusively in the competent courts located in New York, NY[.]"  (*Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, Providing Terms of Use Dating Back to February 18, 2018*, Case No. 22-10964, ECF Doc. # 393 (the "Terms of Use Declaration").)  Version 6 also required any arbitration or related proceeding to be designated to take place in New York or the state and federal courts thereof and was to be governed by the American Arbitration Association.  (*Id.* ¶ 33)

When this change was made, Celsius's customers were required to agree to abide by the updated Terms of Use by clicking a check-box to "acknowledge that under the new [Terms of Use], the services will be provided to me by Celsius Network LLC, and that Celsius Network Limited shall transfer to Celsius Network LLC my data, account balance, and its rights and obligations to me," which included a "[c]hange of legal entity [to LLC], a Delaware company" and "[c]hange of governing laws [to] (NY)[.]" (*Declaration of Oren Blonstein, Head of Innovation and Chief Compliance Officer of the Debtors, in Support of the Debtors' Motion Regarding Ownership of Earn Assets and the Sale of Stablecoin*, Case No. 22-10964, ECF Doc. # 1327, Exs. A-7, A-9 ("Blonstein II Declaration").)

On July 13, 2022, the Debtors filed voluntary petitions for relief under Chapter 11 of the Code. Following the entry of the *Findings of Fact, Conclusions of Law, and Order Signed on November 9, 2023 Confirming the Modified Joint Chapter 11 Plan of Celsius Network LLC and its Debtor Affiliates* (Case No. 22-10964, ECF Doc. # 3972), the Litigation Administrator was appointed to prosecute, settle, or otherwise resolve any claims remaining in the estates of the Post-Effective Date Debtors.

This Court previously found that Version 6 of the Terms of Use was enforceable against all customers. (*See Memorandum Opinion and Order Regarding Ownership of Earn Account Assets*, Case No. 22-10964, ECF Doc. # 1822 at 34-38 (the "Earn Decision").) The Court found that the Terms of Use created a valid and enforceable contract. (*Id.* at 24.) Subsequent updates to the Terms of Use were also determined to be valid enforceable contract modifications. (*Id.* at 38.)

7

On March 20, 2024, the Litigation Administrator issued a notice setting forth a settlement offer (the "Settlement Offer") to individuals identified as having received transfers of more than $100,000 of cryptocurrency from the platform during the Preference Period.  (*See Notice of Deadline to Accept Settlement Offer in Connection with Celsius Customer Preference Actions*, Case No. 24-04024, ECF Doc. # 4.) Individuals with less than $100,000 of preference liability at transaction date pricing who voted in favor of Plan confirmation had been released under the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates (Conformed for MiningCo Transaction)* (Case No. 22-10964, ECF Doc. # 4289 at 24) (the "Plan"). The Settlement Offer gave current and former account holders who directed and received transfers over $100,000 the opportunity to resolve their preference exposure immediately through payment to the Litigation Administrator equal to 13.75% of the transaction date pricing for the transferred assets.  (*Id.*)  While the Litigation Administrator initiated Avoidance Actions (defined below) in July 2024 against individuals and entities who had not accepted the Settlement Offer, the Settlement Offer remained available at the Court's direction through October 29, 2024.  (*Amended Notice of Deadline to Accept Settlement Offer in Connection with Celsius Customer Preference Actions*, Case No. 24-04024, ECF Doc. # 27.)

Additionally, the Plan contained an "Account Holder Avoidance Action Settlement."  This offer was available to any "Account Holder"[2] who was not an "Excluded Party" and "(i) ha[d] Withdrawal Preference Exposure greater than $100,000, (ii) vote[d] in favor of the Plan, (iii) [did] not opt out of the releases under the Plan, and (iv) provide[d] the Debtors or the Litigation Administrator(s), as applicable, with Cash

---

[2]        Terms not otherwise defined will have their ordinary meaning as defined by the Plan.

equal to 27.5% of such Account Holder's Withdrawal Preference Exposure no later than 14 days prior to the anticipated Effective Date of the Plan." (Plan Art. IV.B.3.) This offer expired 14 days before the Effective Date and required parties accepting the offer to, *inter alia*, (i) vote in favor of the Plan, (ii) not opt out of the releases, and (iii) pay, in cash, 27.5% of their WPE. Account Holders who accepted this offer were entitled to, among other things, a release of all "Avoidance Actions" against such Account Holders.

Following the Settlement Offer, the Litigation Administrator filed thousands of avoidance actions against non-settling parties (the "Avoidance Actions"). On July 22, 2024, the Litigation Administrator filed a motion seeking an order establishing streamlined procedures to govern the Avoidance Actions. (*Motion for an Order Establishing Streamlined Procedures Governing Avoidance Actions Pursuant to Sections 502, 547, and 550 of the Bankruptcy* Code, Case No. 22-10964, ECF Doc. # 7534.)

The Litigation Administrator initiated thousands of preference actions seeking to recover funds from creditors who withdrew their funds in the 90-day period immediately prior to the Debtors' bankruptcy filing (the "Preference Period"). (Pl. Br. ¶ 17.) Briefing in these cases was consolidated: on November 7, 2024, the Court entered the *Order Granting the Revised Motion for an Order Establishing Streamlined Procedures Governing Avoidance Actions Pursuant to Sections 502, 547, and 550 of the Bankruptcy Code* (Case No. 24-04024, ECF Doc. # 36) (the "Procedures Order"), which established the issues, schedule, and procedures for the Phase One Briefing.

**B.  Phase One Issues**

The Phase One Issues consist of three primary disputes defined by the Procedures

Order:

1. Whether the presumption against extraterritoriality is applicable to the
   Avoidance Actions, and if so, whether 11 U.S.C. § 547 applies
   extraterritorially.

2. Whether the Court may exercise specific personal jurisdiction over
   Defendants in connection with the Avoidance Actions.

3. Whether the definition of "Withdrawal Preference Exposure" under the Plan
   governs, or 11 U.S.C. §§ 547(c) and 550, govern for purposes of calculating
   the amount of the Defendants' potential liability in the Avoidance Actions.

**C.  Briefing**

1. <u>Litigation Administrator's Opening Brief</u>

The Litigation Administrator first argues that the presumption against

extraterritoriality does not bar the Avoidance Actions because the transfers are domestic

and, in the alternative, if the transfers are not domestic, sections 547 and 550 of the

Bankruptcy Code apply extraterritorially.  (Pl. Br. ¶ 22.)  The Litigation Administrator

argues the transfers are domestic because they were initiated from domestic accounts and

section 547 of the Code focuses on the location of the initial transfer to determine where

a preferential transfer is domestic in nature.  (*Id.* ¶¶ 28-30.)  The Litigation Administrator

points to additional factors to bolster his claim that the transfers were domestic including:

(1) the accounts are governed by New York law; (2) dispute notices are to be sent to LLC

in New Jersey; (3) any arbitration is governed by the American Arbitration Association;

(4) any arbitration will take place in New York or in the continental United States; and

(5) any litigation must be brought in New York.  (*Id.* ¶ 31.)

If the Court finds that the transfers were not domestic, the Litigation Administrator contends that section 547 and 550 of the Code apply extraterritorially. (*Id.* ¶ 33.) The Litigation Administrator contends the Trustee may avoid preferential transfers of property whether foreign or domestic and section 541 of the Code provides that a trustee may avoid "all transfers," indicating the Code was intended to be extraterritorial in scope. (*Id.* ¶¶ 36-37.) The Litigation Administrator lastly points to the purpose of the Code and claims that the extraterritorial application of sections 547 and 550 would "reconcile Congress's intent for the [] Code" by preventing property from being illegitimately transferred. (*Id.* ¶ 39.)

Next, the Litigation Administrator argues that the Court has personal jurisdiction over all Defendants, including Defendants residing outside the United States. (*Id.* ¶ 40.) The Litigation Administrator claims the Defendants purposefully availed themselves of the United States by agreeing to the Terms of Use, which provided that New York law governed the agreement, and the Terms of Use contained a forum selection clause mandating that suits be brought in New York courts. (*Id.* ¶¶ 43-44.) Furthermore, the transfers are directly related to the Defendants' contacts with the United States because the dispute arises directly from the Terms of Use. (*Id.* ¶ 47.) Lastly, the Litigation Administrator argues that the exercise of jurisdiction is reasonable under the circumstances. (*Id.* ¶¶ 49-54.)

The Litigation Administrator's final argument is that the Plan's definition of Withdrawal Preference Exposure does not limit the amount the Litigation Administrator may recover under sections 547 and 550 of the Code. (*Id.* ¶ 60.) The Litigation Administrator believes section 550 of the Code preserves appreciation for the Debtors'

estates.  (*Id.* ¶ 61.)  The Litigation Administrator then turns to section 547(c)(4) of the

Code and claims the Defendants are prevented from receiving a windfall from

transactions that occurred before the preferential transfers, namely the "netting" of

withdrawals against past deposits.  (*Id.* ¶ 67.)  Lastly, the Litigation Administrator argues

that the Plan does not waive his ability to pursue avoidance actions in accordance with

the Code.  (*Id.* ¶¶ 73-74.)  The Plan specifically states that the Post-Effective Date

Debtors shall retain all rights to pursue Causes of Action, and the release provisions of

the Plan contain a carve-out for claims not released pursuant to the Account Holder

Avoidance Action Settlement.  (*Id.* ¶ 74.)

  2.  <u>Defendant's Opening Brief</u>

   The Defendants in their Opening Brief argue that their potential preference

liability is governed by the terms of the Debtors' confirmed Chapter 11 Plan.  (Def. Br. at

1.)  Defendants note WPE does not contain verbiage that expressly limits it to the

Account Holder Avoidance Action Settlement.  (*Id.* at 14-15.)  Defendants further claim

the Plan uses WPE in reference to customers' post-Effective Date liability.  (*Id.*)

Moreover, the Defendants contend that WPE was an agreement to limit customers'

potential liability and is binding on the Litigation Administrator.  (*Id.* at 17.)  Defendants

argue that courts have enforced Plan terms that are expressly contrary to the Code.  (*Id.*)

The Defendants claim the Litigation Administrator clearly and unambiguously waived his

rights under sections 547 and 550 of the Code by utilizing WPE in the context of post-

emergence litigation.  Therefore, the Defendants ask this Court to find that WPE was not

limited to the Account Holder Avoidance Action Settlement and that the Litigation

Administrator waived his rights under sections 547 and 550 of the Code.

Next, the Defendants cite to purported representations made by the Debtors in various communications and disclosures that allegedly limited a customers' liability to their WPE. (*Id.* at 22-23.) The Defendants claim they relied upon these representations and the Litigation Administrator is estopped from imposing on the Defendants greater liability than disclosed by the Debtors. (*Id.* at 24.)

The Defendants then argue that the presumption against extraterritoriality bars the preference claims. The Defendants note that there is a "strong presumption against extraterritoriality" and that section 547 does not contain a clearly expressed intent to apply extraterritorially. (*Id.*) Defendants then contend that the transfers are not domestic transfers because there is a factual dispute as to the location of the transfers. (*Id.* at 28 (citing Final Report of Shoba Pillay, Examiner, Case No. 22-10964, ECF Doc. # 1956 ("Examiner's Report"), at 363.)) Therefore, the Court may not conclude the transfers are domestic at this stage. (*Id.* at 27-28.)

The Defendants' final argument is that personal jurisdiction cannot be decided at this stage without a factual record. (*Id.* at 29-30.) The Examiner's Report raises doubt as to whether the cryptocurrencies were owned by, and the transfers were effectuated by, LLC. (*Id.* at 31.) Defendants note different versions of the Terms of Use had different governing law provisions and argue that whether the Terms of Use were reasonably communicated to the Defendants should be an individualized inquiry. (*Id.* at 32-33.) Defendants claim Celsius's misleading or false statements provide a potential fraudulent inducement defense. (*Id.* at 33-34.) Lastly, the Defendants claim the burden on the Defendants, depending on the individual, would be significant to litigate in the United States. (*Id.* at 35.)

3. Litigation Administrator's Response Brief

The Litigation Administrator's Response Brief largely tracks his initial argument. It begins by arguing the Plan preserved, and did not waive, the Debtors' rights under sections 547 and 550 of the Bankruptcy Code in post-emergence litigation.  (Pl. Resp. Br. ¶ 7.)  The Litigation Administrator again argues the Plan did not waive its rights under sections 547 and 550 of the Code; rather, it specifically preserved them.  (*Id.* ¶¶ 7-10.) Moreover, the Litigation Administrator again argues that the WPE is clearly tied to the Account Holder Avoidance Action Settlement and cites a litany of references to support its contention.  (*Id.* ¶¶ 14-18.)  The Litigation Administrator then turns to Second Circuit case law and argues that the Defendants bear the burden of showing the Debtors intended to fix the Defendants' liability at transfer-date prices.  (*Id.* ¶ 22.)  The Litigation Administrator then responds to the Defendants' reliance on the "protective language" in the Plan.  (*Id.* ¶ 24.)  The protective language states, "[f]or the avoidance of doubt, the Debtors' calculation of Withdrawal Preference Exposure shall not be binding on any defendant in an Avoidance Action."  (*Id.*)  Contrary to the Defendants' assertions, none of the calculations made in connection with the Settlement would be binding in post-emergence litigation.  (*Id.*)  Furthermore, the external evidence cited by the Defendants is irrelevant.  All of the extrinsic evidence post-dates confirmation of the Plan, thus cannot help the Court discern the Parties' thoughts and intentions at the time of Plan's formation. (*Id.* ¶ 27.)

The Litigation Administrator then turns to the Defendants' equitable estoppel argument, arguing (i) the Debtors did not misrepresent their liability in connection with post-emergence litigation liability, (ii) the Defendants did not rely on representations of

the Debtors when assessing future risk and deciding how to vote on the plan, and (iii) if Defendants did rely on the Debtors' purported statements, they suffered no detrimental change in position as a result. (*Id.* ¶¶ 30-34.)

Next, the Litigation Administrator responds to the Defendant's argument that the presumption against extraterritoriality bars the Avoidance Actions. (*Id.* ¶ 39.) The Litigation Administrator repeats the argument that the transfers are domestic (*id.* ¶¶ 42-43), and responds to the Defendants' reliance on the Examiner's Report, referring to it as hearsay (*id.* ¶ 45). The Litigation Administrator then responds to the Defendants' argument that section 547 does not apply extraterritorially by noting that an express statement of extraterritoriality is not essential for a provision to be extraterritorial in scope and the Defendants' reliance on *In re Colonial Realty Co.*, 980 F.2d 125 (2d Cir. 1992) is misplaced. (*Id.* ¶ 50.) *Colonial Realty* pertained to a non-analogous fact pattern regarding whether the Federal Deposit Insurance Corporation violated the automatic stay by asserting fraudulent conveyance claims when acting as the receiver for five banks. (*Id.* ¶ 52.) Lastly, policy considerations would not be served by limiting the extraterritorial application of section 547. (*Id.* ¶¶ 54-57.)

The Litigation Administrator concludes by arguing that the Court has personal jurisdiction over the Defendants. (*Id.* ¶ 58.) Again, the Litigation Administrator argues the requirements of personal jurisdiction are met because the Defendants purposefully availed themselves of the United States by agreeing to the forum selection clause in the Terms of Use.

4.   Defendants' Response Brief

The Defendants' Response Brief generally recites the arguments made in the opening brief.  The Defendants respond by arguing that the Plaintiff's insistence that the Plan definition of WPE has expired is meritless and that WPE was not used solely for settlement purposes.  (Def. Resp. Br. at 1-3.)  The protective language included in the Plan's definition of WPE manifests a binding intent to fix a defendant's potential liability for preference actions.  (*Id.* at 4.)  Additionally, the protective language stating that the Defendants are not bound indicates that the Plaintiffs are bound.  (*Id.* at 5.)  Defendants further note that if Plaintiffs' logic as to the protective language is correct, and it reaffirms that the calculation is non-binding in post-emergence litigation, it would defy logic as to why the Defendants would have sought to include it.  (*Id.* at 7.)  The Defendants then discuss the additional representations they claim demonstrate the Debtors intended to limit Defendants' preference liability to their WPE and claims it would be inequitable to customers to all the Litigation Administrator to sue for another amount.  (*Id.* at 8-9.)  Many of the Defendants are not lawyers and are not familiar with bankruptcy or legal documents.  (*Id.* at 9.)  Lastly, if there is a dispute regarding the Parties' intent, a factual record must be developed and that cannot be decided in Phase One.  (*Id.* at 10.)

Turning to extraterritoriality, the Defendants reargue their contention that the U.S. preference laws do not apply to transfers outside the U.S.  (*Id.* at 14.)  Defendants again dispute the location of the transfers and note the only authority the Litigation Administrator cited was a declaration by Mr. Oren Blonstein.  (*Id.* at 15.)  They further dispute whether each defendant accepted the Terms of Use in a way that was legally

binding.  (*Id.* at 16.)  Defendants then discuss the case law holding the presumption

against extraterritoriality bars the extraterritorial application of section 547 of the Code.

(*Id.* at 18-19.)

Lastly, Defendants continue to argue that personal jurisdiction is a fact-intensive

issue that the Court cannot decide en masse as to all Defendants without affording them

the right to take discovery and present evidence.  (*Id.* at 19-20.)  Further, a forum

selection clause does not automatically confer personal jurisdiction; rather, the Second

Circuit requires a four-part test to determine if the clause confers personal jurisdiction.

(*Id.* at 20.)  Defendants conclude by arguing the adversary proceedings do not relate to

the Defendants' contacts with the United States and the exercise of jurisdiction would not

be appropriate in this circumstance.  (*Id.* at 20-22.)

## II.  <u>LEGAL STANDARD</u>

### A.  **Withdrawal Preference Exposure**

Section 550(a) of the Bankruptcy Code provides that "the trustee may recover, for

the benefit of the estate, the property transferred, or, if the court so orders, the value of

such property[.]"  11 U.S.C. § 550(a).  Section 547 permits a trustee to avoid any transfer

of an interest of the debtor that was (i) to the benefit of a creditor, (ii) on account of an

antecedent debt, (iii) made while the debtor was insolvent (iv) on or within 90 days

before the Petition Date, and (v) that enables the creditor to receive more than it would

under a hypothetical chapter 7 case, if the transfer hadn't been made, and the creditor

received payment of such debt.  11 U.S.C. § 547.

Defendants argue that the Plan waived the Plan Administrator's right to seek

recovery to full extent permitted by the statute and caselaw.  The Plan Administrator

disputes that argument. "New York courts allow waivers of statutory rights only when:

1.) such a waiver constituted an 'intentional relinquishment of a known right,' and 2.) the

waiver would not contravene public policy." *Massey v. On-Site Manager, Inc.*, No. 11

Civ. 2612 (BMC), 2011 WL 4356380, at *3 (E.D.N.Y. Sept. 16, 2011). Such a waiver

must be "clear, unmistakable and without ambiguity." *County of Erie v. State*, 14 A.D.3d

14, 785 N.Y.S.2d 130, 134 (3d Dep't 2004) (internal quotation marks omitted) (quoting

*Civil Serv. Emps. Ass'n, Inc. v. Newman*, 88 A.D.2d 685, 450 N.Y.S.2d 901, 903 (3d

Dep't 1982), *aff'd mem.*, 61 N.Y.2d 1001, 475 N.Y.S.2d 379, 463 N.E.2d 1231 (1984)).

At issue is whether the Plan's definition of WPE prevents the Plaintiff from

recovering amounts other than the WPE from the Defendants. WPE is defined in the

Plan as follows:

> "Withdrawal Preference Exposure" means (i) the aggregate
> value of all assets an Account Holder withdrew from the
> Debtors' platform in the 90 days prior to the Petition Date
> (i.e., on or after April 14, 2022), valued as of the time of
> such withdrawals less (ii) the aggregate value of any
> deposits such Account Holder made after such Account
> Holder's first withdrawal in such period, valued as of the
> time of such deposits. The details of how Withdrawal
> Preference Exposure is calculated are included in
> Article.III.PP of the Disclosure Statement. For the
> avoidance of doubt, the Debtors' calculation of Withdrawal
> Preference Exposure shall not be binding on any defendant
> in an Avoidance Action.

Plan at 24.

"Confirmed chapter 11 plans are construed as contracts under the governing

state's law . . . ." *In re DPH Holdings Corp.*, 553 B.R. 20, 25 (Bankr. S.D.N.Y. 2016).

Under New York law, the primary objective of contract interpretation is to give effect to

the parties' intent as evidenced by the language of their agreement. (*Id.*) Therefore, "[i]n

a dispute over the meaning of a contract, the threshold question is whether the contract is

ambiguous. . . .   When an agreement is unambiguous on its face, it must be enforced

according to the plain meaning of its terms."  (*Id.* (quoting *Lockheed Martin Corp. v.

Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011)).)  Plain language does not become

ambiguous simply because a party encourages a different interpretation in litigation.  *L.

Debenture Tr. Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir.

2010).

### B.  Personal Jurisdiction

A bankruptcy court's valid exercise of jurisdiction over a foreign defendant

depends first on whether that defendant has "the requisite minimum contacts with the

United States at large."  *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC*, 460

B.R. 106, 117 (Bankr. S.D.N.Y. 2011), *aff'd*, 474 B.R. 76 (S.D.N.Y. 2012) (quoting

*Picard v. Chais (In re Bernard L. Madoff Investment Securities LLC)*, 440 B.R. 274, 278

(Bankr. S.D.N.Y.2010) (internal quotation marks omitted).  To exercise specific personal

jurisdiction over a non-resident defendant, three requirements must be satisfied: (i) a

defendant must have "purposefully availed itself of the privilege of conducting activities

within the forum State or have purposefully directed its conduct into the forum State," or

the United States when the issue arises in adversary proceedings in bankruptcy courts; (ii)

the plaintiff's claim raises out of or relates to the defendant's forum conduct; and (iii) the

exercise of jurisdiction must be "reasonable under the circumstances."  *U.S. Bank Nat'l

Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019) (internal citations omitted).

If the Defendants are found to have such minimum contacts, then the Court must

undertake a "reasonableness" inquiry to determine whether the Court's exercise of

jurisdiction will offend "traditional notions of fair play and substantial justice." *Asahi Metal Indus. Co., Ltd. v. Super. Ct. Cal.*, 480 U.S. 102, 113 (1987) (internal quotation marks omitted). The Defendants may be subject to personal jurisdiction if they have "purposefully directed [their] activities at residents of the forum" and the litigation "arise[s] out of or relate[s] to those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985). "The defendant's activity need not have taken place within the forum . . . and a single transaction with the forum will suffice." *Sec. Inv. Prot. Corp.*, 460 B.R. at 117 (citing *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)). Where specific jurisdiction is sought, the inquiry "focuses on the affiliation between the forum state and the underlying controversy." *In re Motors Liquidation Co.*, 565 B.R. 275, 286 (Bankr. S.D.N.Y. 2017) (quoting *Arcapita Bank B.S.C.*, 549 B.R. at 63).

Cases involving forum selection causes require a four-part analysis. *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 383 (2d Cir. 2007). First, whether the clause was reasonably communicated to the party resisting enforcement. (*Id.*) Second, whether courts classify a forum selection clause as mandatory or permissive, i.e., to decide whether the parties are required to bring any dispute to the designated forum or simply permitted to do so. (*Id.*) Third, whether the claims and parties involved in the suit are subject to the forum selection clause. (*Id.*) A forum selection clause is presumptively enforceable if it was communicated to the resisting party, and has mandatory force and covers the claims and parties involved in the dispute. (*Id.*) Fourth, whether the resisting party has rebutted the presumption of enforceability by making a sufficiently strong showing that "enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching." *Phillips*, 494 F.3d at 383-84 (internal

quotation marks omitted) (quoting *M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 15 (1972)).

### C.  The Extraterritorial Application of Sections 547 and 550 of the Code

It is a well-settled principle that "Congress has the ability to enforce its laws beyond the territorial boundaries of the United States."  *In re Lyondell Chem. Co.*, 543 B.R. 127, 148 (Bankr. S.D.N.Y. 2016) (quoting *E.E.O.C. v. Arabian Am. Oil Co.*, 499 U.S. 244, 248, 111 S. Ct. 1227, 1230, 113 L. Ed. 2d 274 (1991)) (internal quotation marks omitted); cf. *Foley Bros. v. Filardo*, 336 U.S. 281, 284 (1949); *In re French*, 440 F.3d 145, 149 (4th Cir. 2006).  The presumption against extraterritoriality, a "basic premise of our legal system," provides that "[a]bsent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." *RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325, 335 (2016) (citing *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010)).  Courts engage in a two-step inquiry when analyzing extraterritoriality issues.

First, a Court must ask "whether the presumption against extraterritoriality has been rebutted."  (*Id.* at 337.)  "[If] a statute gives no clear indication of an extraterritorial application, it has none."  *Morrison*, 561 U.S. at 255.  If a statute is not found to be extraterritorial at step one, the Court "moves to step two, where it examines the statute's 'focus' to determine whether the case involves a domestic application of the statute." *RJR Nabisco*, 579 U.S. at 326.  "[A]n action may proceed if either the statute indicates its extraterritorial reach or the case involves a domestic application of the statute" and the Court must look to the statute's focus.  *In re Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Sec. LLC*, 917 F.3d 85, 95 (2d Cir. 2019); *RJR Nabisco*, 579 U.S. at 337.

21

The two-step process may be examined in either order. *In re Arcapita Bank B.S.C.(c)*, 575 B.R. 229, 242 (Bankr. S.D.N.Y. 2017), *aff'd sub nom. In re Arcapita Bank B.S.C.(C)*, 640 B.R. 604 (S.D.N.Y. 2022), and *aff'd sub nom. In re Arcapita Bank B.S.C.(C)*, 640 B.R. 604 (S.D.N.Y. 2022). Moreover, if the relevant conduct occurred in the United States, then the case involves a "permissible domestic application even if other conduct occurred abroad." (*Id.*) However, if the relevant conduct occurred in a foreign jurisdiction, then the case involves an impermissible extraterritorial application regardless of whether other conduct occurred in U.S. territory. (*Id.*)

### III. DISCUSSION

#### A. The Withdraw Preference Exposure Does Not Control the Calculation of Preference Liability

The Defendants rely on the following passage to claim that the Debtors used the term WPE was not solely for the purposes of the Avoidance Action Settlement:

> Pursuant to section 547 of the Bankruptcy Code, the Debtors can pursue Avoidance Actions against Account Holders for certain withdrawals Account Holders made from the Debtors' platform within 90 days of the Petition Date, which are referred to as "preferences." **An Avoidance Action would be pursued by filing a lawsuit against the Account Holder requesting the return of the withdrawals identified as preferences. As defined under the Plan, an Account Holder's Withdrawal Preference Exposure is** (i) the aggregate value of all assets an Account Holder withdrew from the Debtors' platform in the 90 days prior to the Petition Date (i.e., between April 14, 2022, and July 13, 2022), **valued as of the time of such withdrawals**, minus (ii) the aggregate value of any deposits such Account Holder made after such Account Holder's first withdrawal in this period, **valued as of the time of such deposits**.

(Disclosure Statement at 76.) Defendants argue this definition indicates that customers' preference liability would be their WPE if they did not accept the Account Holder

Avoidance Settlement.  (Def. Br. at 4.)  Defendants further contend that the Debtors did

not indicate that non-settling customers would be potentially liable for an amount other

than the WPE and the Debtors use of WPE in other provisions of the Plan and Disclosure

Statement indicate that WPE was not cabined to the Settlement Offer.  (*Id.* at 3-4.)

However, the term WPE is clearly used in connection with the Account Holder

Avoidance Action Settlement (defined in the Plan).  Examples of how the Plan uses WPE

are as follows:

- any Account Holder who is not an Excluded Party who (i) has Withdrawal
  Preference Exposure less than or equal to $100,000, (ii) votes in favor of
  the Plan, and (iii) does not opt out of the releases under the Plan.  (Plan
  Art. IV.V.3.)

- Avoidance Actions against Account Holders with De Minimis Claims
  shall be released if (i) their Withdrawal Preference Exposure is less than or
  equal to $100,000 or (ii) their Withdrawal Preference Exposure is over
  $100,000 and they make the requisite payments, and (c) as a result of the
  Account Holder Avoidance Action Release, any Custody Settlement
  Participant with Withdrawal Preference Exposure less than or equal to
  $100,000. . . .  (*Id.*)

- Prior to the Effective Date, the Debtors and the Committee (and after the
  Effective Date, the applicable Litigation Administrator in consultation
  with the Plan Administrator) may enter into agreements with any Account
  Holders that agreed to settle their Withdrawal Preference Exposure as set
  forth herein, and make agreements regarding setting off the amount to be
  repaid against the recovery to be received under this Plan.  (*Id.*)

As Plaintiff notes, Defendants' reference to customers' liability in the Avoidance

Actions is clearly located within a provision of the Plan pertaining to, and titled, the

Account Holder Avoidance Action Settlement.  (Disclosure Statement at 76.)  In the

Disclosure Statement, references to WPE, *inter alia*, include: under a header titled "What

is the Account Holder Avoidance Action Settlement?," a subheader titled "what kinds of

transactions count as "withdrawals" and "deposits" for purposes of calculating the

Withdrawal Preference Exposure?"; an explanation regarding an Account Holder's
hypothetical recovery under the Account Holder Avoidance Action Settlement stating
"Account Holder with a $120,000 Withdrawal Preference Exposure, however, would
only receive the Account Holder Avoidance Action Release if such Account Holder (a)
voted all Claims to accept the Plan, (b) released all claims against the Released Parties,
and (c) made a payment in Cash, Bitcoin, or ETH . . . 27.5% ($33,000) of their total
Withdrawal Preference Exposure;" and a graphic explaining how twelve different types
of transactions impact a defendant's WPE.  (*Id.* at 76-82.)

A Chapter 11 Plan must be read in its entirety.  *In re DPH Holdings Corp.*, 553
B.R. at 25-26.  WPE was used almost exclusively in the Plan in connection with the
Account Holder Avoidance Action Settlement.  Within the Plan, the only references to
WPE are the definition of the term, the release for claims with less than $100,000 in
preference liability for customers who did not elect to participate in the Custody
Settlement, the Account Holder Avoidance Action Settlement, and customers with
unresolved WPE will not receive a distribution pursuant to the disbursement provisions
of the Plan until their WPE is resolved.  (Plan at Arts. III.B.6A, IV.B.3, IV.K., VI.A,
VI.G.)  With respect to the Defendants' argument regarding the usage of WPE in the
context of the Dispute and Contingent Claims Reserve, this reference is merely used to
indicate that the Plan Administrator will not make a distribution to creditors until their
claim becomes an Allowed Claim.  (Plan Art. VII.G.)  If a dispute were to arise regarding
Defendants' preference exposure, then the Plan Administrator is not required to make a
distribution until the Parties have settled their dispute.  This provision does not create

additional rights for the Defendants or indicate that WPE was used in a context other than the Account Holder Avoidance Action Settlement.

When considering how WPE is utilized in the Disclosure Statement, Defendants' argument is also unavailing.  WPE is used prolifically in connection with the Account Holder Avoidance Action Settlement.  (*See* Disclosure Statement at 67-82, 117.)  Of the fifty-five times WPE is used in the Disclosure Statement, it is used fifty-three times in connection with the Account Holder Avoidance Action Release and twice regarding the treatment of claims, one of those times in reference to how claims are treated for Custody Settlement Participants.  The Defendants have not demonstrated that the usage of WPE in the Disclosure Statement manifested an intent to waive the Debtors' ability to pursue Avoidance Actions in post-emergence litigation.

Moreover, the Disclosure Statement provides that to the extent an Avoidance Action is brought pursuant to section 547 of the Code, it "would be pursued by filing a lawsuit against the Account Holder requesting the return of the ***withdrawals identified as preferences***."  (Disclosure Statement at 76 (emphasis added).)  This phrasing, which notably does not utilize the defined term WPE, indicates the Debtors explicitly did not intend to limit the Avoidance Actions to the definition of WPE, rather the Avoidance Actions would be brought for what the Litigation Administrator would be entitled to pursue under the Bankruptcy Code.

Additionally, the Debtors did not waive the right to bring an Avoidance Action. Within the Plan's exculpation provisions, the Debtors preserved any "Avoidance Action not released pursuant to the Account Holder Avoidance Action Settlement."  (Plan Arts. VII.C, VII.D.)  Avoidance Action is defined broadly under the Plan, which states an

Avoidance Action is "any and all actual or potential avoidance, recovery, subordination, or other similar Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code. . . ."  (Plan at Art. I.A.17.)  The Plan provides a robust carveout for the Account Holder Avoidance Action Settlement, which enables the Litigation Administrator to bring Avoidance Actions against the Defendants to the extent permitted under sections 547 and 550 of the Code.

Lastly, Defendants have failed to demonstrate the Debtors intentionally waived their rights under sections 547 and 550 of the Code.  Defendants have not demonstrated that the WPE was reasonably understood to apply to post-emergence litigation, much less that the term demonstrated an intent to waive the Debtors' rights under these sections. Again, under New York law, a waiver must constitute (i) an intentional relinquishment of a known right, and (ii) the waiver would not contravene public policy.  *Massey*, No. 11 Civ. 2612 (BMC), 2011 WL 4356380, at *3.  The Defendants did not identify a usage of the term WPE in either the Plan or the Disclosure Statement that demonstrated an intentional relinquishment of the Debtors' rights under sections 547 and 550 of the Code.

When taken as a whole, it becomes clear that the references to WPE were intended to be used within the context of the Account Holder Avoidance Action Settlement.  WPE was not used to limit the Litigation Administrator's recovery under sections 547 and 550 of the Code generally.  Rather, it was used to provide a calculation for customers to decide if they desired to participate in the Account Holder Avoidance Action Settlement.

Defendants effectively ask the Court to provide them with the benefit of a settlement agreement they rejected, and this Court will not do so. For the reasons set forth below, the Plan's definition of WPE does not waive the Litigation Administrator's ability to recover under sections 547 and 550 of the Code.

### B. The Defendants are Subject to Personal Jurisdiction

#### 1. Minimum Contacts

The foreign defendants fall into two primary groups, those who contracted with LLC before July 2021 and those who contracted following July 2021. (Pl. Br. ¶ 42.) The Litigation Administrator contends that all foreign defendants are bound by Version 6 of the Terms of Use or a later version, which contained a New York choice of law provision and a forum selection clause requiring litigation in New York courts, as well as shifted Celsius's primary business operations, relationships, and obligations away from CNL, a U.K. entity, to LLC, a U.S. company. (*Id.* ¶¶ 8-9; *see* Terms of Use Declaration, Ex.A-6 ¶¶ 27, 33.) Defendants either contracted after Version 6 of the Terms of Use was adopted on July 22, 2021, or were required to accept Version 6 as a precondition to utilizing Celsius's platform.[3] (*Id.* ¶ 32.) Version 6 of the Terms of Use also added LLC as a contractual counterparty for all customers.

This Court has previously held that the Terms of Use were enforceable against all customers. (*See* Earn Decision at 34-38.) This Court also found that the Terms of Use

---

[3]    Version 7 of the Terms of Use was adopted on August 3, 2021 and, like Version 6, stated that all customer accounts were owned by LLC. Version 8 of the Terms of Use was adopted on April 14, 2022 and, like the prior two versions, stated that all accounts were owned by LLC. Versions 6 through 8 each provided that any disputes were governed by New York law. As a result, all customer transactions after July 22, 2021, were with LLC and disputes were governed by New York law. While some account holders may assert that the switch in the contract counter-party from CNL to LLC involved "fraud," making it impossible for the account holders to withdraw their crypto from the platform unless they agreed to the change in the Celsius counter-party, this ignores the account holders trading activity, buying and selling crypto on the platform after July 2021.

unambiguously transferred ownership of assets to LLC.  (*Id.* at 38-42.)  Defendants'

decision to contract with LLC manifests an intent purposefully direct their activities at

the forum.  Defendants have contracted to open accounts in a U.S. based entity and

signed a contract subject to the laws of the State of New York.  The fraudulent transfers

were made by a U.S. entity to the Defendants' accounts.

### 2.  Purposeful Availment

To establish minimum contacts necessary to support a finding of specific personal

jurisdiction, a defendant must have "purposefully availed itself of the privilege of doing

business in the forum and could foresee being haled into court there."  *Charles Schwab*

*Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 82 (2d Cir. 2018) (quoting *Licci v. Lebanese*

*Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013)).  "Although a defendant's

contacts with the forum state may be 'intertwined with [its] transactions or interactions

with the plaintiff or other parties . . . [,] a defendant's relationship with a . . . third party,

standing alone, is an insufficient basis for jurisdiction.'"  *Fairfield Sentry Ltd. v. Schwiez*

*(In re Fairfield Sentry Ltd.)*, 669 B.R. 124, 139 (Bankr. S.D.N.Y. 2025) (alterations in

original) (quoting *U.S. Bank*, 916 F.3d at 150).  It is further insufficient to "rely on a

defendant's random, fortuitous, or attenuated contacts or on the unilateral activity of a

plaintiff with the forum to establish specific jurisdiction."  (*Id.*)

Rather, the contacts "must be the defendant's own choice" and "show that the

defendant deliberately reached out beyond its home—by, for example, exploi[ting] a

market in the forum State or entering a contractual relationship centered there."  *Ford*

*Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021) (citations and

internal quotation marks omitted) (alterations in original).  A party resisting a forum

selection clause "must make a 'strong showing' in order to overcome the presumption of enforceability." *New Moon Shipping Co., Ltd. v. MAN B&W Diesel AG*, 121 F.3d 24, 29 (2d Cir. 1997).

In the case at hand, the Defendants have purposefully availed themselves by consenting to the Terms of Use in Versions 6, 7 and 8 that designated New York as the forum for resolving all disputes arising from the Defendants' affiliation with Celsius and designating New York law as the governing law. (Terms of Use Declaration, Ex.A-6 ¶ 33, Ex. A-7 ¶ 33, Ex. A-8 ¶ 33.) A choice-of-law provision is a factor that gives rise to a deliberate affiliation with the forum state that makes the possibility of litigation foreseeable in the forum. *Burger King*, 471 U.S. at 482. Additionally, a contract with a New York choice of law provision is "a significant factor in a personal jurisdiction analysis because the parties . . . invoke the benefits and protections of New York law." *Sec. Inv. Prot. Corp.*, 460 B.R. at 117. These principles also apply to clickwrap agreements. *Zaltz v. JDATE*, 952 F. Supp. 2d 439, 451–55 (E.D.N.Y. 2013) (finding plaintiff assented to defendant's terms of service when she clicked a box agreeing to the defendant's terms of service). Therefore, the Defendants' acceptance of the Terms of Use constituted purposeful availment for the purposes of personal jurisdiction.

### 3. Defendants' Forum Conduct

In addition to having contact with the forum, the underlying cause of action must "arise[s] out of or relate[s]" to that contact. *Arcapita*, 549 B.R. at 63 (quoting *Burger King*, 471 U.S. at 472). "Courts typically require that the plaintiff show some sort of causal relationship between a defendant's U.S. contacts and the episode in suit, and the plaintiff's claim must in some way arise from the defendants purposeful contacts with the

forum." *Schwab*, 883 F.3d at 84 (quoting *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 341, 343 (2d Cir. 2016)) (internal quotation marks omitted). Moreover, the Supreme Court has clarified that a suit that "relate[s] to [a] defendant's contacts with the forum" may also suffice. *See Ford Motor*, 592 U.S. at 362 (indicating that the specific jurisdiction inquiry has not been framed "as always requiring proof of causation"; "our most common formulation of the rule demands that the suit 'arises out of *or relates to* the defendants' contacts with the forum' (internal citation omitted)); *see also Fairfield Sentry*, 592 B.R. at 149 (citing to *Ford Motor*).

The Terms of Use starting with Version 6 memorialize the parties' intent to exploit the U.S. market, thus there appears to be "an affiliation between the forum and the underlying controversy." *Ford Motor*, 592 U.S. at 359–60. The Terms of Use contain a New York choice of law provision, a forum selection clause mandating all disputes be brought within a court of competent jurisdiction New York, and the Terms of Use established LLC as a contractual counterparty. (*See* Terms of Use Declaration, Ex.A-6.) Moreover, the transfers were initiated from LLC's workspaces and the frictional wallets used to effectuate the transfers were domestic. (*See Declaration of Oren Blonstein Head of Innovation and Chief Compliance Officer of Celsius Network Limited, with Respect to Certain Phase I Issues Pursuant to the Joint Stipulation and Agreed Scheduling Order by and among the Debtors, the Committee, and the Ad Hoc Groups with Respect to the Custody and Withhold Issues* ¶ 20, Case No. 22-10964, ECF Doc. # 1192 (the "Blonstein I Declaration").) The Plaintiff has met his burden to show that the Defendants reached into the forum and purposefully availed themselves of its laws.

4. <u>Exercise of Jurisdiction Would be Reasonable</u>

Once there has been a sufficient showing of minimum contacts, it must then be

determined "whether the assertion of personal jurisdiction comports with 'traditional

notions of fair play and substantial justice'—that is, whether it is reasonable under the

circumstances of the particular case." *Fairfield Sentry*, 669 B.R. at 150 (quoting *Bank

Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002).

The "reasonableness" factors include: (1) the burden that the exercise of jurisdiction will

impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3)

the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate

judicial system's interest in obtaining the most efficient resolution of the controversy; and

(5) the shared interest of the states in furthering substantive social policies. *In re Bernard

L. Madoff Inv. Sec. LLC*, 525 B.R. 871, 883 (Bankr. S.D.N.Y. 2015); *Asahi Metal Indus.

Co.*, 480 U.S. at 113.

The Court concludes that the Plaintiff has made a threshold showing of minimum

contacts.  Therefore, the Defendants bear the burden to make a "compelling case that the

presence of some other considerations would render jurisdiction unreasonable," which

Defendants have not done. *Bank Brussels Lambert*, 305 F.3d at 129 (quoting *Metro. Life

Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 5668 (2d Cir. 1996)).  The Defendants

argue that a further individualized showing is required because some Defendants live

around the world, are individuals, and/or do not speak English.  (Def. Resp. Br. at 22.)

However, being a foreign citizen does not make litigation in the United States *per se*

unreasonable.  *In re Celsius Network LLC*, No. 22-10964 (MG), 2025 WL 1232578, at *5

(Bankr. S.D.N.Y. Apr. 28, 2025) (citing *Fairfield Sentry*, 657 B.R. at 381).  The

Litigation Administrator has a clear interest in obtaining convenient and effective relief,

and this Court possesses a strong interest because the bulk of the Celsius litigation has

occurred in this Court. *Celsius Network LLC*, 2025 WL 1232578, at *5. This Court has

accommodated litigants from all over the world in this case, and it would not create an

undue burden to litigate this matter in the United States. (*Id.*) Lastly, Defendants have

not raised any special social policies applicable to this case, therefore, the Defendants

have failed to demonstrate that litigation in the United States would be unreasonable.

### 5. Forum-Selection Clause

Parties may consent to personal jurisdiction forum selection clauses in contractual

agreements. *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 103 (2d Cir. 2006) (citing

*Nat'l Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 315–16 (1964) ("And it is settled . . .

that parties to a contract may agree in advance to submit to the jurisdiction of a given

court. . . .")). Here, Version 6 of the Terms of Use (and Versions 7 and 8) included a

governing law provision and forum selection clause that state in relevant part:

> [t]he relationship between you and Celsius is governed
> exclusively by the laws of the state of New York. . . . Any
> dispute arising out of, or related to, your Celsius Account
> or relationship with Celsius must be brought exclusively in
> the competent courts located in New York, NY and the US
> District Court located in the Borough of Manhattan. . . .

(Terms of Use Declaration, Ex.A-6 ¶ 33, Ex. A-7 ¶ 33, Ex. A-8 ¶ 33.) Although forum

selection clauses are regularly enforced, several conditions must be met. *D.H. Blair &

Co.* 462 F.3d at 103 (internal citation omitted). Forum selection clauses must be

analyzed according to a four-part analysis to be enforced. *Phillips*, 494 F.3d at 383.

Turning to the four-part analysis, the first factor is satisfied because the Terms of

Use were reasonably communicated to the Defendants. This Court previously found that

32

customers were advised via email that their engagement from Version 6 on would be with

LLC rather than CNL, that the relationship would be governed by New York law, and

that the email instructed customers to "carefully read and make sure" they understood the

contractual changes. *In re Celsius Network LLC*, 649 B.R. 87, 94 (Bankr. S.D.N.Y.

2023). A forum selection clause present in the fine print of a contract is sufficient to be

reasonably communicated. *See Effron v. Sun Line Cruises, Inc.*, 67 F.3d 7, 9 (2d Cir.

1995). The Debtors' communication with creditors surpasses the "reasonably

communicated" standard.

Second, the forum selection clause was mandatory. Forum selection clauses may

be either permissive or mandatory. A permissive forum clause confers jurisdiction on a

designated forum but does not deny a plaintiff its choice of forum. *Phillips*, 494 F.3d at

386. Mandatory forum selection clauses evince an intent to decide on a forum where all

disputes will be litigated in advance. (*Id.*; *Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1363

(2d Cir. 1993).) A mandatory forum selection clause must exclude jurisdiction

elsewhere. *John Boutari & Son, Wines & Spirits, S.A. v. Attiki Importers & Distributors

Inc.*, 22 F.3d 51, 53 (2d Cir. 1994). Mandatory forum selection clauses are presumptively

valid. (*Id.*)

A forum selection clause is mandatory when it "contain[s] clear language

showing that jurisdiction is appropriate only in the designated forum." *TECH USA, Inc.

v. Evans*, 592 F. Supp. 2d 852, 856 (D. Md. 2009). The forum selection clause present in

the Terms of Use states that any dispute "***must be brought exclusively*** in . . . New York,

NY and the US District Court . . . in the Borough of Manhattan." (Terms of Use

Declaration, Ex.A-6 ¶ 33 (emphasis added).) The forum selection clause provides an

exclusive remedy—litigation in New York courts.  Since the forum selection clause does

not provide a choice of forum, it is a mandatory forum selection clause.  The forum

selection clause contained in Version 6 and subsequent versions of the Terms of Use is

unambiguously a mandatory forum selection clause and is presumptively valid.

In relation to the third prong, the claims and parties involved are subject to the

forum selection clause.  Again, each Defendant is a counterparty to an agreement with

LLC.  The Defendants' U.S.-based accounts were the instruments through which the

preferential transfers occurred.  Therefore, the claims involving the Defendants' transfers

on and off Celsius's platform are subject to the forum selection clause and the third prong

is satisfied.

The fourth and final prong is whether the Defendants have demonstrated a strong

showing to rebut the presumption of enforceability.  Defendants devote much of their

argument to the contention that the Court must come to an individualized determination

with respect to each defendant and cannot rule on the Defendants "en masse."  (Def. Br.

at 19-22.)  The Court is not persuaded by this argument.  The Defendants do not dispute

that the Terms of Use that were active during the Preference Period contained a forum

selection clause.  To transfer assets off of Celsius's platform during the Preference

Period, Defendants must have accepted Version 8 of the Terms of Use, which also

contained a choice-of-law provision requiring application of  New York law and a forum

selection clause requiring litigation in New York courts.  The Defendants have not made

a showing that the forum selection clause is not enforceable, and the fourth prong is

satisfied.

**C.  Creditors' Rights with Respect to Personal Jurisdiction**

As this Court noted in the Earn Decision, the Court takes seriously potential

violations of state law and non-bankruptcy federal law, as well as the litany of allegations

including, but not limited to, fraudulent inducement into the contract, fraudulent

conveyance, breach of contract, and that the contract was unconscionable.  These

allegations may (or may not) have merit, and the creditors' rights with respect to such

claims are explicitly reserved.  Nonetheless, this Court finds that the Litigation

Administrator has made a *prima facie* showing that personal jurisdiction exists as to all

Defendants.  Any Defendant wishing to do so may raise good faith, non-conclusory

allegations rebutting personal jurisdiction in litigating the adversary proceedings.

For the reasons stated, the Court finds that the Defendants are subject to personal

jurisdiction.

**D.  The Presumption Against Extraterritoriality Does Not Bar the Avoidance
Actions Because the Transfers Were Domestic.**

"[T]he Code's avoidance provisions protect creditors by preserving the

bankruptcy estate against illegitimate depletions."  *In re French*, 440 F.3d at 154.

Furthermore, the avoidance and recovery provisions work together to avoid transfers that

"deplete the estate and recover the payments for the benefit of creditors."  *Sec. Inv. Prot.

Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 480 B.R. 501, 524 (Bankr. S.D.N.Y. 2012);

*see* 11 U.S.C. §§ 544-550.  Both sections 547(b) and 548(a)(1)(B) enable a trustee to

avoid certain "transfer[s] of an interest of the debtor in property."  11 U.S.C. § 547(b); 11

U.S.C. § 548(a)(1)(B).

In this case, the preferential transfers were made from LLC, a Delaware

Corporation, via LLC-designated frictional wallets and workspaces to the Defendants'

Earn Accounts.  (Blonstein I Declaration ¶ 20.)  The Second Circuit in *In re Picard* held that the location of a debtor's fraudulent transfer of property is the relevant focus of the Court's inquiry, not the location of the transferee's receipt of the property.  917 F.3d at 100 (finding that a Debtor's fraudulent transfer from a U.S. bank account constitutes a domestic transfer for purposes of § 550(a)).  LLC is a domestic entity.  (Pl. Br. ¶ 30.) The accounts used by LLC to transfer funds into the Defendants' accounts were domestic accounts maintained by LLC.  (Blonstein I Declaration ¶ 20.)

Applying *Picard*, if the property is transferred from a U.S. bank account to a creditor, then that transfer is a domestic activity and that activity is subject to the avoidance statutes of the Bankruptcy Code.  *Id*.  The conduct relevant to the statute's focus, the transfers from LLC, occurred in the United States, therefore this case involves a permissive domestic application of the Code.  *Arcapita* 575 B.R. at 242.  Although the Second Circuit's analysis in *Picard* pertained to the application of section 548(a)(1)(A), this Court finds that the analysis to applies equally to section 547.  Therefore, this Court finds that the transfers were domestic and the presumption against extraterritoriality does not bar the application of §§ 547 and 550 of the Code.


*[remainder of page left blank]*

## IV. CONCLUSION

For the reasons stated above, the Court finds that the Litigation Administrator is
not limited by Withdrawal Preference Exposure, the Defendants are subject to personal
jurisdiction, and the Avoidance Actions involve a domestic application of sections 547
and 550 of the Code.

**IT IS SO ORDERED.**

DATED:        July 29, 2025

_Martin Glenn_
MARTIN GLENN
Chief United States Bankruptcy Judge